

FILED IN CLERK'S OFFICE
RECEIVED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUL 1 5 2002

LUTHER D. _____, Clerk
By: _____ Deputy Clerk

**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| BOBBY WALKER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **Civil Action File No.:** |
| v. ) | 1:00-CV-0367 (CC) |
| ) | |
| WORLD CHAMPIONSHIP ) | |
| WRESTLING, INC., TURNER ) | **JURY TRIAL DEMANDED** |
| SPORTS, INC. AND TURNER ) | |
| BROADCASTING SYSTEM, INC. ) | |
| ) | |
| Defendants. ) | |

## THIRD AMENDED COMPLAINT

Plaintiff Bobby Walker files this Third Amended Complaint against World Championship Wrestling, Inc. ("WCW"), Turner Sports, Inc. ("Turner Sports"), and Turner Broadcasting System, Inc. ("TBS") (collectively, "Defendants"). The gravamen of Plaintiff's action remains the same as his previously filed First Amended Complaint: Defendants violated Plaintiff's civil rights by discriminating against Plaintiff on the basis of his race. Plaintiff's Third Amended Complaint includes race discrimination claims founded on both 42 U.S.C. § 1981 and 42 U.S.C. § 2000e *et seq.* as well as a surviving state claim of intentional infliction of emotional distress. In support of this Third Amended Complaint, Plaintiff shows the following:

79

## JURISDICTION

1.

This Court has jurisdiction over Plaintiff's federal claims under 42 U.S.C. § 1981, 42 U.S.C. § 2000e *et seq.*, and 28 U.S.C. §§ 1331 and 1343.

2.

This Court has supplemental jurisdiction over Plaintiff's related state claims under 28 U.S.C. § 1367.

3.

Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

4.

Plaintiff Bobby Walker is an African-American male citizen of the United States and a resident of Fayetteville, Georgia. Plaintiff submits to the jurisdiction and venue of this Court.

5.

When Plaintiff first filed his Complaint, Defendant WCW was a Georgia corporation that could be served through its registered agent in Georgia, National Registered Agents, Inc., at its registered office at 3761 Venture Drive, Duluth, Georgia 30096.  At the time Plaintiff first filed his Complaint, WCW was

a viable entity subject to the jurisdiction and venue of this Court.

6.

Defendant Turner Sports is a Georgia corporation and may be served through its registered agent in Georgia, National Registered Agents, Inc., at its registered office at 3761 Venture Drive, Duluth, Georgia 30096.  Defendant Turner Sports is subject to the jurisdiction and venue of this Court.

7.

Defendant TBS is a Georgia corporation and may be served through its registered agent in Georgia, C T Corporation System, 1201 Peachtree Street, N.E., Atlanta, Georgia 30361.

8.

At the time Plaintiff first filed his Complaint, all three Defendants were enterprises engaged in interstate commerce. Turner Sports and TBS continue to be enterprises engaged in interstate commerce.

9.

On or about February 11, 2000, Plaintiff filed a Charge of Discrimination against WCW with the U.S. Equal Employment Opportunity Commission ("EEOC").  On or about March 26, 2001, Plaintiff filed an Amended Charge of Discrimination to include Turner Sports, Inc. as a Respondent.  Plaintiff has received a

Right to Sue on his Title VII race and retaliation claims, as to both the WCW and Turner Sports, although the EEOC retains investigatory jurisdiction of the matter. Plaintiff has fulfilled all conditions precedent to raising his Title VII claims.

### FACTS

### Background

10.

Bobby Walker is an African-American citizen who had a contractual and/or employment relationship with WCW to perform as a professional wrestler.

11.

At all times pertinent to this action, and until March 27, 2001, WCW was a wrestling league with its roots in various Southern wrestling associations. WCW was an overwhelmingly Caucasian organization. Out of the over one hundred wrestlers it had in its employment, on the average only five or six were African-American. Out of its approximately seventy non-wrestling staff, only two or three were African-American. WCW had no African-Americans in creative, executive or high-level decision-making positions.

12.

WCW paid its minority wrestlers substantially less than similarly situated white wrestlers. Indeed, the highest paid African-American wrestlers were, as a group, paid approximately one-fifth of what Caucasian wrestlers were paid.

13.

Professional wrestling is a "staged event," i.e., the outcomes are predetermined. WCW required wrestlers to follow various scripts and story lines in their matches. WCW exercised responsibility for determining the outcome of matches, developing story lines and devising characters for the wrestlers to portray.

14.

WCW exploited racial and national origin animus in its story lines and characters: WCW directed certain wrestlers to wear stereotypical ethnic clothing and to act according to negative stereotypes associated with the wrestler's particular ethnicity; WCW developed story lines to encourage and provoke "negative" fan reaction toward minority wrestlers and the associated racial or ethnic group. In short, minority characters created by WCW personified racial and ethnic slurs.

15.

The negative stereotyping was not limited to the story
lines at WCW.  The individuals at WCW responsible for booking
matches and writing the story line for wrestling shows and
events commonly referred to African-Americans as "niggers" in
the presence of minority and non-minority personnel, and used
other derogatory racial slurs within the work environment.

16.

In another typical demonstration of WCW's hostile attitude
toward minorities, WCW directed a white wrestler (Marcus "Buff"
Bagwell) to appear on national television in a match against an
African-American in "black face" and to act in a racially
derogatory manner towards African-Americans.  Although WCW
subsequently acknowledged that this "act" was inappropriate, it
proceeded to replay the scene on national television on several
occasions to promote wrestling events.

**The Relationship Between Defendants WCW, Turner Sports and TBS**

17.

Defendants Turner Sports and TBS dominated and controlled
the business activities of WCW.  Defendant Turner Sports' and
TBS's executives managed and operated the business of WCW and
paid wrestlers' salaries.

18.

WCW, as a division of Turner Sports, acted as Defendant Turner Sports and TBS's agent in connection with operation of the business. As such, Defendants Turner Sports and TBS are vicariously liable for the conduct of WCW.

19.

Defendant Turner Sports, TBS and WCW acted as joint venturers in the business operations of WCW, combining their money and efforts to operate the WCW wrestling enterprise.

20.

Defendant WCW acts as the alter ego of Defendants Turner Sports and TBS. Defendants Turner Sports and TBS have commingled their assets with those of WCW, have controlled the business of WCW to advance and further their own business purposes, and have abused the corporate form such that the corporate veil should be pierced.

21.

Defendants Turner Sports, TBS and WCW commingled their assets. All financial transactions within the Turner enterprise were handled through "paper transfers." When any of the affiliated entities within the Turner organization engaged in financial transactions with WCW, it would not forward any actual payment to WCW. Rather, the Turner entity would allocate funds

to WCW's financials.  In this manner, TBS completely controlled the financial affairs of WCW.

22.

TBS controlled WCW programming, operations and management to obtain higher subscription fees from cable operating providers.  In other words, TBS included WCW programming as a part of a Turner entertainment package that it offered to cable operators.  If the cable operators agreed to include the package as part of its basic cable offerings, it paid a subscription fee to TBS.  TBS knew that WCW programming was valuable to cable operators due to its popularity.  By packaging it with other TBS offerings, it enhanced the possibility that a cable operator would purchase the package, and therefore, the other TBS offerings.

23.

For much of its existence, WCW operated as a financial loss.  During this time, TBS funded the losses of WCW by loaning WCW money to allow it to continue to operate.  Upon information and belief, the inter-company loan TBS carried on its books for loans to WCW was approximately $100 million when WCW terminated its operations.

24.

While WCW operated at a loss, WCW's financial status was such that a third-party bank probably would have denied WCW loans or credit.  A bank in an arms-length transaction would not have extended further credit to WCW.

25.

WCW stayed in business despite its persistent pattern of financial losses only because TBS decided it was financially beneficial to TBS to keep WCW operational, so that it could continue to sell WCW programming to advertisers and cable operators.

26.

In his capacity as a Vice-President at WCW, Mr. Eric Bischoff reported directly to Dr. Harvey Schiller, the President of Turner Sports.

27.

Before Eric Bischoff was terminated from employment with WCW, all human resources employees at WCW were on the Turner Sports payroll.  During this time, any WCW human-resource complaint would be forwarded to Turner Sports' Human Resource Department.

28.

In or around early 2000, Eric Bischoff was terminated by WCW, and he was replaced by Bradley Siegel, the President of Turner Entertainment Group, Inc. ("TEG").

29.

When Bradley Siegel replaced Mr. Bischoff, any WCW human-resource complaint was forwarded to TEG's Human Resource Department.

### Bobby Walker's Relationship with Defendants

30.

Plaintiff Walker began his relationship with WCW in 1994. During his relationship with WCW, Plaintiff earned a reputation as a hard and focused worker, thereby gaining the wrestling moniker Bobby "Hardwork" Walker.

31.

In or about 1997, Plaintiff Walker filed suit against Defendant WCW, alleging that WCW discriminated against him on the basis of his race (the "Previous Litigation").

32.

The parties to the Previous Litigation agreed to settle it prior to trial. As part of the settlement agreement (the "Settlement Agreement," Defendant WCW agreed to contract for the provision of wrestling services with Plaintiff Walker.

33.

Pursuant to the Settlement Agreement, Plaintiff Walker signed a two-year contract with WCW (the "Contract"), ending January 1, 2001.  A true and accurate copy of the contract, nominally an "independent contractor" contract was attached to Plaintiff's previously filed Complaint as Exhibit "A."  Although Plaintiff Walker was categorized as an independent contractor under the Contract, he was, as a matter of law, an employee of Defendants.

34.

Plaintiff Walker and WCW also entered into a Merchandising Agreement dated January 1, 1999.  A true and correct copy is attached to Plaintiff's previously filed Complaint as Exhibit "B."

35.

Plaintiff Walker complied with each and every provision of his Contract and Merchandising Agreement and fulfilled all conditions precedent thereunder.  Defendants never criticized Plaintiff's performance of his duties under the terms of the Contract.

## Advancement in WCW

36.

To advance within WCW, a wrestler had to be "promoted" by WCW and receive exposure to the public.  This promotion was also known as "pushing" a wrestler.  A wrestler received this exposure by being booked for nationally televised wrestling matches of several weekly and monthly television programs produced and aired by WCW and TBS.  Those programs in descending order of popularity were: (1) monthly pay-per-view events; (2) weekly Monday night "Nitro;" (3) weekly Thursday night "Thunder;" and (4) weekly Saturday Night or Saturday Morning WCW.

37.

WCW had complete control over how much (if any) exposure each wrestler received.  WCW was solely responsible for booking the matches, determining whether a wrestler would appear on a televised program, and scripting the outcome of each predetermined match.

38.

During his wrestling tenure with WCW, Plaintiff received paychecks issued by Defendant Turner Sports and showing WCW as an affiliated entity.  Exhibit "A" to Plaintiff's Second Amended Complaint is a true and accurate copy of one such paycheck stub.

39.

In order to develop fan support, Defendants encouraged
wrestlers to develop their own individual wrestling styles and
persona, particular to that wrestler only, which would inspire
fan reaction.  This persona and routine were known as
"gimmicks."

40.

Plaintiff Walker developed his own style and gimmick.
Plaintiff, respected as an especially dedicated and committed
wrestler, developed the moniker of Bobby "Hardwork" Walker, and
attempted to convey to the fans the message that if you work
hard, you can achieve your dreams.  Plaintiff attempted to send
constructive messages to fans, acted "clean cut," and was a
positive role model.

**Defendants Did Not Promote African-American Wrestlers**

41.

As a rule, Defendants did not promote or "push" African-
American wrestlers.  On the average, out of the nearly 100
wrestlers WCW had under contract at any given time, no more than
5 or 6 were African-American.

42.

When WCW did "push" African-American wrestlers, it did so
in a blatantly derogatory and racist manner.  For example, the

only two African-American wrestlers that received any
significant exposure were a "tag team" called the "Harlem Heat."
WCW directed African-American wrestlers to act as pimps,
savages, "Uncle Toms," or otherwise to act in conformity with
negative stereotypes.

43.

WCW would only provide exposure to African-American
wrestlers if they portray themselves in a traditionally negative
fashion.  WCW refused to "push" to Plaintiff because he refused
to change his "Hardwork" persona to fit one of management's
traditional negative African-American stereotypes and refused to
let himself be portrayed as lazy, stupid or criminal.

44.

Because Plaintiff is African-American and because he
refused to accept a stereotypical role, Defendants refused to
provide Plaintiff with an opportunity to advance within WCW.

45.

When Defendants sought to promote a wrestler, the wrestler
would be granted appearances on national television several
times a month.  Defendants would provide the wrestler with
continuing story plots and scripts for fans to follow for weeks
and even months at a time.

46.

During 1999, Defendants allowed Plaintiff to appear on television less than five times.  On only one of those occasions were the matches against opponents with name-recognition. Plaintiff was not given an ongoing story line or plot and the matches appeared on WCW's least popular television program.

47.

During the relevant period of time that Defendants refused to promote Plaintiff, Defendants promoted numerous Caucasian wrestlers who were less qualified than Plaintiff.  Indeed, Plaintiff was the only wrestler who could "walk the ropes," a feat that requires such physical skill and control that whenever Plaintiff performed it the crowds roared.  Plaintiff was told that he was not being promoted or given exposure because of (1) a lawsuit he previously filed against WCW alleging racial discrimination and (2) because he was African-American.

48.

Defendants' intentional and discriminatory refusal to promote Plaintiff was tantamount to ending his career as a professional wrestler.  Without this exposure and without being booked for television matches, Plaintiff was incapable of advancing.  WCW's illegal conduct precluded Plaintiff from earning Merchandising Royalties under the Merchandising

Agreement, or pay-per-view revenues.  Defendants did not renew
Plaintiff's contract in January of 2001.

49.

Paragraph 9(b) of the Contract prohibited Plaintiff from
working as a wrestler in the United States, Canada or Japan for
a period of 120 days after the termination or expiration of his
Contract.  Because of this non-competition provision and because
Plaintiff has little material to show other wrestling
organizations and virtually no fan following, Plaintiff's career
as a wrestler is effectively over.

50.

Because Defendants refused to permit Plaintiff an
opportunity to advance within WCW, because WCW continually
discriminated against Plaintiff and other African-American
wrestlers, and because WCW's conduct effectively ended
Plaintiff's career as a wrestler, Plaintiff was forced to file
the instant lawsuit.

## COUNT I

### Intentional Discrimination on the Basis of Race in Violation of 42 U.S.C. § 1981 and/or 42 U.S.C. § 2000e *et seq.*

51.

Plaintiff hereby incorporates and realleges each and every
allegation contained in Paragraphs 1 through 50 as if fully
stated herein.

- 16 -

52.

By engaging in the unlawful conduct described herein,
Defendants acted intentionally, willfully and with malice or
reckless indifference to Plaintiff's federally protected civil
rights.   Plaintiff filed a timely Charge and Amended Charge of
Discrimination against Defendants and brings this action within
ninety (90) days of the receipt of his Notice of Right to Sue.

53.

Defendants refused and failed to engage in good faith
efforts to comply with federal law.

54.

In violation of 42 U.S.C. § 1981 and/or 42 U.S.C. § 2000e
*et seq.*, Defendants refused to provide Plaintiff with
opportunities for advancement commensurate with the
opportunities Defendants provided to similarly situated white
wrestlers.

55.

In violation of 42 U.S.C. § 1981 and/or 42 U.S.C. § 2000e
*et seq.*, Defendants fostered and encouraged a hostile work
environment wherein Plaintiff and other minorities suffered
severe and pervasive hostility in the form of racial slurs,
jokes and other sanctioned debasement.

56.

As a direct and proximate result of Defendants' intentional racial discrimination in the performance, proposed modification, termination and the enjoyment of all benefits, privileges, terms and conditions of Plaintiff's contractual relationship and/or employment relationship with Defendants, Plaintiff suffered and continues to suffer serious injury, including, but not limited to, economic losses, humiliation, embarrassment, emotional distress and deprivation of his federally protected civil rights.

57.

Consequently, Plaintiff is entitled to actual, compensatory and punitive damages from Defendants.

## COUNT II

### Federal Law Claim for Retaliation

58.

Plaintiff hereby incorporates and realleges each and every allegation contained in Paragraphs 1 through 57 as if fully stated herein.

59.

During his tenure with Defendants, he and other minority wrestlers raised concerns about racially discriminatory practices.

60.

Plaintiff filed suit against Defendant WCW in 1997, alleging that it discriminated against him on the basis of his race.

61.

As a direct and proximate result of having raised concerns about Defendants' discriminatory conduct, including filing suit against Defendant WCW, Defendants retaliated by refusing to promote or otherwise continue Plaintiff's tenure, resulting in Plaintiff's continuous and serious injury, including but not limited to economic losses, humiliation, embarrassment, emotional distress and deprivation of his statutorily protected civil rights.

62.

Consequently, Plaintiff is entitled to actual, compensatory and punitive damages from Defendants.

## COUNT III

### Intentional Infliction of Emotional Distress

63.

Plaintiff hereby incorporates and realleges each and every allegation contained in Paragraphs 1 through 62 as if fully stated herein.

64.

Defendants' conduct described herein occurred within the context of a special relationship between the parties wherein Defendant exercised control over Plaintiff; Defendants' conduct was intentional or reckless, extreme and outrageous, and such conduct directly and proximately caused Plaintiff humiliation, embarrassment, worry and emotional distress.

65.

Accordingly, Plaintiff is entitled to actual, compensatory and punitive damages from Defendants.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bobby Walker prays that:

A.   Defendant TBS be served with a copy of the Third Amended Complaint in this action;

B.   Plaintiff shall have a trial by jury;

C.   Plaintiff shall recover reasonable attorneys' fees and costs of this action pursuant to 42 U.S.C. §§ 1988, 1981, and 2000e-5(k); and

D.   Plaintiff shall recover such further relief as this Court deems just and proper.

Respectfully submitted this *15th* day of July, 2002.

Cary Ichter
Georgia Bar No. 382515
Kelly Jean Beard
Georgia Bar No. 044380
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

**MEADOWS, ICHTER & BOWERS, P.C.**
Eight Piedmont Center, Suite 300
3525 Piedmont Road
Atlanta, GA  30305
(404) 261-6020                  Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

This is to certify that I have this date served opposing counsel to this action with the foregoing **THIRD AMENDED COMPLAINT** by causing a copy of same to be hand delivered, addressed as follows:

> John J. Dalton, Esq.
> James Lamberth, Esq.
> Evan Pontz, Esq.
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia 30308-22165

This 15 day of July, 2002.

Michelle M. Rothenberg-Williams
Georgia Bar No. 615680