S

N O T I C E
- - - - - -


To:  Kelly Jean Beard, Esq.
     Meadows Ichter & Bowers
     Eight Piedmont Center, Suite 300
     3525 Piedmont Road, N.E.
     Atlanta, GA  30305



December 18, 2002



UNITED STATES DISTRICT COURT
for the
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Bobby Walker,

                    plaintiff                    CIVIL ACTION

              v.                                 NO. 1:0-cv-367-CC

World Championship Wrestling, Inc., et al,

                    defendant


NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
--------------------------------------------

    On 12/17/02, World Championship Wrestling, Inc., et al,

filed a motion for  summary judgment in this Court, case document

number 98.

    Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

                                        Luther D. Thomas, Clerk
                                        United States District Court
                                        Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To:  Merrick D. Bernstein, Esq.
     Meadows Ichter & Bowers
     Eight Piedmont Center, Suite 300
     3525 Piedmont Road, N.E.
     Atlanta, GA  30305



December 18, 2002



                UNITED STATES DISTRICT COURT
                        for the
                NORTHERN DISTRICT OF GEORGIA
                     ATLANTA DIVISION


Bobby Walker,

                    plaintiff              CIVIL ACTION

            v.                             NO. 1:0-cv-367-CC

World Championship Wrestling, Inc., et al,

                    defendant


        NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
        -------------------------------------------


        On 12/17/02, World Championship Wrestling, Inc., et al,

filed a motion for  summary judgment in this Court, case document

number 98.

        Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To:  Michelle Rothenberg, Esq.
     Meadows Ichter & Bowers
     Eight Piedmont Center, Suite 300
     3525 Piedmont Road, N.E.
     Atlanta, GA  30305



December 18, 2002



UNITED STATES DISTRICT COURT
for the
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Bobby Walker,

                plaintiff                    CIVIL ACTION

          v.                                 NO. 1:0-cv-367-CC

World Championship Wrestling, Inc., et al,

                defendant


NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
---------------------------------------------


     On 12/17/02, World Championship Wrestling, Inc., et al,
filed a motion for  summary judgment in this Court, case document
number 98.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-
sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials,  including any affidavits, depositions, answers to interrogatories, admissions on file  and any other relevant materials to be  considered  in  opposition to the  motion for  summary judgment, is required.   Federal  Rules of Civil Procedure,  Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court,  the Court will take said motion for  summary judgment  under advisement immediately upon the close of  the aforesaid  20 day period.   Id. at 519.   See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986);  Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry  of a summary judgment  by the trial court  is a final judgment on the claim or claims decided.   Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984).  Whenever the non-moving party bears the burden of proof at trial on a  dispositive issue and the party  moving for summary judgment has demonstrated the absence of any genuine issue of fact,  the nonmoving party must go  beyond the pleadings and must designate, by af-fidavit or other materials,  "... specific facts showing that there is a genuine issue for trial."  Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett,  477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To:  John J. Dalton, Esq.
     Troutman Sanders
     Bank of America Plaza
     Suite 5200
     600 Peachtree Street, N.E.
     Atlanta, GA  30308-2216



December 18, 2002



                UNITED STATES DISTRICT COURT
                        for the
                NORTHERN DISTRICT OF GEORGIA
                     ATLANTA DIVISION


Bobby Walker,

                    plaintiff              CIVIL ACTION

          v.                               NO. 1:0-cv-367-CC

World Championship Wrestling, Inc., et al,

                    defendant


          NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
          --------------------------------------------

     On 12/17/02, World Championship Wrestling, Inc., et al,

filed a motion for  summary judgment in this Court, case document

number 98.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

                                            Luther D. Thomas, Clerk
                                            United States District Court
                                            Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -

To:   James Andrew Lamberth, Esq.
      Troutman Sanders
      Bank of America Plaza
      Suite 5200
      600 Peachtree Street, N.E.
      Atlanta, GA  30308-2216


December 18, 2002


                    UNITED STATES DISTRICT COURT
                              for the
                    NORTHERN DISTRICT OF GEORGIA
                          ATLANTA DIVISION

Bobby Walker,

                    plaintiff              CIVIL ACTION

          v.                               NO. 1:0-cv-367-CC

World Championship Wrestling, Inc., et al,

                    defendant


          NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
          ---------------------------------------------

     On 12/17/02, World Championship Wrestling, Inc., et al,
filed a motion for  summary judgment in this Court, case document
number 98.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-
sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk<br>
United States District Court<br>
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -

To:  Evan H. Pontz, Esq.
     Troutman Sanders
     Bank of America Plaza
     Suite 5200
     600 Peachtree Street, N.E.
     Atlanta, GA  30308-2216


December 18, 2002


                    UNITED STATES DISTRICT COURT
                             for the
                    NORTHERN DISTRICT OF GEORGIA
                          ATLANTA DIVISION


Bobby Walker,

                   plaintiff                    CIVIL ACTION

              v.                                NO. 1:0-cv-367-CC

World Championship Wrestling, Inc., et al,

                   defendant


          NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
          ----------------------------------------------


       On 12/17/02, World Championship Wrestling, Inc., et al,
filed a motion for  summary judgment in this Court, case document
number 98.
       Pursuant to this Court's order dated April 14, 1987, opposing coun-
sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials,  including any affidavits, depositions, answers to interrogatories,  admissions on  file  and any other relevant materials  to be  considered  in  opposition to the  motion for  summary judgment, is required.   Federal  Rules of Civil Procedure,  Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court,  the Court will take said motion for  summary judgment  under advisement  immediately upon the close of  the aforesaid  20 day period.   Id. at 519.   See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986);  Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry  of a summary judgment  by the trial court  is a final judgment on the claim or claims decided.    Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984).  Whenever the non-moving party bears the burden of proof at trial on a  dispositive issue and the party  moving for summary judgment has demonstrated the absence of any genuine issue of fact,  the nonmoving party must go  beyond the pleadings and must designate, by af-fidavit or other materials,   "... specific facts showing that there is a genuine issue for trial."  Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett,  477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -

To:  Eric Allen Richardson, Esq.
     Troutman Sanders
     Bank of America Plaza
     Suite 5200
     600 Peachtree Street, N.E.
     Atlanta, GA  30308-2216


December 18, 2002


                UNITED STATES DISTRICT COURT
                        for the
                NORTHERN DISTRICT OF GEORGIA
                      ATLANTA DIVISION

Bobby Walker,

                plaintiff                    CIVIL ACTION

            v.                               NO. 1:0-cv-367-CC

World Championship Wrestling, Inc., et al,

                defendant


        NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
        --------------------------------------------


        On 12/17/02, World Championship Wrestling, Inc., et al,
filed a motion for  summary judgment in this Court, case document
number 98.

        Pursuant to this Court's order dated April 14, 1987, opposing coun-
sel is hereby notified that within 20 days from the date said motion was

served,  filing of all materials,   including  any affidavits,  depositions, answers  to interrogatories,   admissions  on  file  and any other relevant materials  to be  considered  in  opposition to the  motion for  summary judgment,  is required.   Federal  Rules  of Civil  Procedure,   Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

  Unless  otherwise  stated by the trial court,  the Court  will  take said motion for  summary judgment  under advisement  immediately upon the close of  the aforesaid  20 day period.   Id. at 519.   See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986);  Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

  The entry  of a summary judgment  by the trial court  is a final judgment on the claim or claims decided.   Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984).   Whenever the non-moving party bears the burden of proof at trial on a  dispositive issue and the party  moving for summary judgment has demonstrated the absence of any genuine issue of fact,  the nonmoving party must go  beyond the pleadings and must designate, by af- fidavit or other materials,   "... specific facts showing that there is a genuine issue for trial."  Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett,  477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To:  Bridget Bobick, Esq.
     Troutman Sanders
     Bank of America Plaza
     Suite 5200
     600 Peachtree Street, N.E.
     Atlanta, GA  30308-2216


December 18, 2002


UNITED STATES DISTRICT COURT
for the
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Bobby Walker,

                    plaintiff                    CIVIL ACTION

          v.                                     NO. 1:0-cv-367-CC

World Championship Wrestling, Inc., et al,

                    defendant


NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
--------------------------------------------

     On 12/17/02, World Championship Wrestling, Inc., et al,
filed a motion for  summary judgment in this Court, case document
number 98.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-
sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials,  including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required.  Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period.  Id. at 519.  See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986);  Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided.  Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984).  Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett,  477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

> Luther D. Thomas, Clerk
> United States District Court
> Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To:  Cary Ichter, Esq.
     Meadows Ichter & Bowers
     Eight Piedmont Center, Suite 300
     3525 Piedmont Road, N.E.
     Atlanta, GA  30305


December 18, 2002


                    UNITED STATES DISTRICT COURT
                             for the
                    NORTHERN DISTRICT OF GEORGIA
                          ATLANTA DIVISION

Bobby Walker,

                    plaintiff                CIVIL ACTION

          v.                                 NO. 1:0-cv-367-CC

World Championship Wrestling, Inc., et al,

                    defendant


          NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
          ---------------------------------------------

     On 12/17/02, World Championship Wrestling, Inc., et al,

filed a motion for  summary judgment in this Court, case document

number 98.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

# ORIGINAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

DEC 1 7 2002

LUTHER D. THOMAS, Clerk
By_____ Deputy Clerk

BOBBY WALKER,                          )
                                        )
           Plaintiff,             )
                                          )   CIVIL ACTION FILE
v.,                                    )
                                        )   NO. 1:00-CV-0367-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC. and TURNER     )
BROADCASTING SYSTEM, INC.,         )
                                          )
           Defendants.            )

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Local Rules of this Court, Defendants Universal Wrestling Corporation (f/k/a World Championship Wrestling, Inc. and hereinafter referred to as "WCW"), Turner Sports, Inc. (hereinafter referred to as "TSI") and Turner Broadcasting System, Inc. (hereinafter "TBS") (collectively, "Defendants") hereby move this Court for an order granting summary judgment in their favor because, as a matter of law, no genuine issue of material fact exists to be tried in this case.

Defendants base this Motion on the following documents and record evidence filed contemporaneously herewith:

1.    Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment;

2.    Deposition testimony of Bobby L. Walker, Jr.;

3.    Deposition testimony of Eric A. Bischoff;

4.    Deposition testimony of Martin Lunde;

5.    Deposition testimony of Jimmy R. Hart;

6.    Deposition testimony of Paul W. "Terry" Taylor, III;

7.    Deposition testimony of Paul Orndorff;

8.    Affidavit of Diana L. Myers;

9.    Affidavit of Joseph Hamilton;

10.   Affidavit of James A. Morrison (p/k/a "JJ Dillon");

11.   Affidavit of Paul Orndorff;

12.   Defendants' Statement of Undisputed Material Facts.

This 17th day of December, 2002.

TROUTMAN SANDERS LLP

*Evan H. Pontz*

JOHN J. DALTON
Georgia Bar No. 203700
JAMES A. LAMBERTH
Georgia Bar No. 431851
ERIC A. RICHARDSON
Georgia Bar No. 233873
EVAN H. PONTZ
Georgia Bar No. 583577

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

Attorneys for Defendants
Universal Wrestling Corporation
(f/k/a World Championship
Wrestling, Inc.) and Turner
Sports, Inc.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BOBBY WALKER,                          )
                                       )
              Plaintiff,               )
                                       )        CIVIL ACTION FILE
v.                                     )
                                       )        NO. 1:00-CV-0367-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., and TURNER        )
BROADCASTING SYSTEM, INC.,             )
                                       )
              Defendants.              )

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of

this **_DEFENDANTS' MOTION FOR SUMMARY JUDGMENT_** upon the interested

parties by hand delivery to:

> Cary Ichter
> Kelly Jean Beard
> Charles Gernazian
> Michelle M. Rothenberg-Williams
> MEADOWS, ICHTER AND BOWERS, P.C.
> Eight Piedmont Center, Suite 300
> 3525 Piedmont Road
> Atlanta, GA  30305

This 17th day of December, 2002.

Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404)885-3000

# ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

DEC 1 7 2002

LUTHER D. THOMAS, Clerk
By
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BOBBY WALKER, )
)
          Plaintiff, )
)    CIVIL ACTION FILE
v. )
)    NO. 1:01-CV-0367-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., and )
TURNER BROADCASTING SYSTEM, INC., )
)
          Defendants. )

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Universal Wrestling Corporation (f/k/a World Championship Wrestling, Inc. and hereinafter referred to as "WCW"), Turner Sports, Inc. ("TSI") and Turner Broadcasting System, Inc. ("TBS") (collectively "Defendants") submit this Memorandum in Support of their Motion for Summary Judgment on all claims brought by Plaintiff Bobby Walker ("Walker").

## INTRODUCTION

Walker's Third Amended Complaint contains claims of race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and under the Civil Rights Act of 1866, 42 U.S.C. § 1981, and also alleges a Georgia state law claim of intentional infliction of emotional distress. With respect to Walker's race discrimination claims, he alleges that WCW (i) discriminated against him due to his race (African-American)

with regard to wrestling opportunities, (ii) retaliated against him
for complaining about alleged racial discrimination, and (iii)
subjected him to a racially hostile environment.  Walker also
alleges that by engaging in such discriminatory conduct, WCW
intentionally caused him emotional distress.  Based upon principles
of agency and vicarious liability, Walker seeks not only to hold
WCW liable for these alleged acts, but seeks to hold TSI and TBS
liable as well.

        As shown below, Walker's claims are completely baseless.  In
fact, Walker has not presented even a scintilla of evidence showing
that he was treated differently due to his race.  To the contrary,
the evidence establishes that Walker was given numerous and
significant wrestling opportunities and treated like other
similarly-situated white wrestlers with WCW.  In addition, the
record shows that Walker was not subjected to any retaliation or
adverse action for complaining about discrimination, and that he
was not subjected to a racially hostile environment.  Because WCW's
decisions or actions taken with regard to Walker were based on
legitimate, non-discriminatory business reasons that had nothing to
do with Walker's race, summary judgment should be entered in WCW's
favor on all of Walker's claims.  Moreover, because Walker's claims
against TSI and TBS derive from Walker's claims against WCW, and
are based upon principles of agency and vicarious liability,

summary judgment should also be granted in favor of TSI and TBS on Walker's claims.

## STATEMENT OF FACTS

**WCW's Business**

WCW created, produced, and marketed professional wrestling events during the 1990s and through March 2001. (Affidavit of Diana Myers (hereinafter "Myers Aff.") ¶ 3 (a copy of this affidavit is attached hereto as Exhibit A)). WCW's events were seen by live audiences and/or aired on various television networks and pay-per-view cable and satellite systems. (Id.) The wrestlers and other on-screen wrestling talent who appeared in WCW's wrestling events generally provided their services to WCW as independent contractors, either through formal written contracts or without written agreements. (Id. at ¶ 4). WCW's wrestling events, both live and taped, were created by a creative team of writers and producers at WCW, with the goal of entertaining wrestling fans and general audiences nationwide.[1] (Id. at ¶ 3).

After having much commercial and financial success in the mid-to-late 1990s, WCW's business suffered a sharp downturn in 1999.

---

[1] Traditionally, individuals known as "bookers" were responsible for "booking" matches at arenas or live events. As the business changed and professional wrestling became more of a television property, "bookers" also began creating wrestling events for television. More recently, while individuals known as "bookers" continued to be involved in creating wrestling events, WCW brought in additional writers and staff as part of the creative team. (Deposition of Eric A. Bischoff ("Bischoff Dep.") at 46-49).

(Myers Aff. ¶ 6).  In 1999, WCW lost significant sums of money and,
thus, only added new talent that it perceived was likely to
generate substantial revenue.  (Id.)  WCW also began reducing the
compensation of existing talent, and began producing fewer and
fewer wrestling events.  (Id.)  Moreover, because of the downturn
and reduced number of productions, in 1999 and over the next two
years, WCW had less and less need for wrestling services, including
on-screen talent, trainers, and creative staff.  (Id. at ¶ 7).  WCW
even terminated some of its televised events, including a taped
show commonly referred to as its "Saturday Night" show, in early
2000.  (Id. at ¶ 6).  Despite these efforts, WCW's business
downturn continued, and in March 2001, WCW sold certain of its
assets and ceased its operations.  (Id. at ¶ 8).  After the sale of
assets was completed, WCW changed its name to Universal Wrestling
Corporation.  (Id.)

**Walker's Background And Relationship With WCW**

Walker first became affiliated with WCW in July 1993, when he
began training, pursuant to a written contract, at WCW's Power
Plant facility.  (Deposition of Bobby L. Walker, Jr. (hereinafter
"Walker Dep.") at 23).[2]  Walker's training contract ran through
October 17, 1993 and provided that Walker would receive $400 per

---

[2] Excerpts of deposition testimony and copies of deposition exhibits
referenced herein are included in the Appendix, filed
simultaneously herewith.

week during his training period.  (Walker Dep. at 23-26, Exh. 1

(Independent Contractor Agreement, dated July 26, 1993)).  The

purpose behind this training period was to help Walker develop not

only the physical skills necessary to wrestle professionally with

WCW, but also to help him develop the charisma, acting ability, and

uniqueness necessary to carry out an entertaining wrestling match

with minimal instruction.  (Affidavit of James A. Morrison (p/k/a

"J.J. Dillon") (hereinafter "Dillon Aff.") ¶ 5 (a copy of this

affidavit is attached hereto as Exhibit B)).

In April 1994, after Walker's training contract expired, he

began wrestling professionally with WCW pursuant to a one-year

independent contractor agreement.  (Walker Dep. at 30, Exh. 3

(Independent Contractor Agreement, dated April 25, 1994)).  Walker

still lacked the level of excitement, wrestling skills, uniqueness

and acting ability necessary to be a successful talent with WCW.

(Affidavit of Joseph N. Hamilton ("Hamilton Aff.") ¶¶ 5-6 (a copy

of this affidavit is attached hereto as Exhibit C)).  Accordingly,

Walker continued to train at the Power Plant, even after he

received his wrestling contract.  (Walker Dep. at 31-32; Hamilton

Aff. ¶ 3).  Walker also had not yet perfected his "finishing move,"

which involved walking across the ropes surrounding the wrestling

ring.[3]  (Hamilton Aff. ¶ 7).  It was crucial for Walker to perfect
his finishing move to gain substantial live television time because
WCW fans were unforgiving when it came to blunders and failed
wrestling attempts.  (Deposition of Jimmy R. Hart (hereinafter
"Hart Dep.") at 74-75; Deposition of Martin Lunde (hereinafter
"Lunde Dep.") at 54).

     In a further effort to provide Walker with an opportunity to
develop his potential, WCW again renewed Walker's contract in 1995
and entered into a series of independent contractor agreements with
him through the end of 1997.  (Walker Dep. at 23-43, 51, 65-68,
Exhs. 4-6 (respectively Independent Contractor Agreements, dated
April 25, 1995, April 25, 1996 and April 25, 1997)).  Each of these
agreements provided that WCW could terminate Walker "with or
without cause", so long as Walker was given thirty days notice.
(See Walker Dep. at Exhs. 4 and 5, ¶ 8(b)).  Even so, during this
time, Walker was given a variety of wrestling opportunities that
were commensurate with his skill level and crowd appeal.  (Myers
Aff. ¶ 14).  In fact, Walker wrestled in over eighty events between
1996 and 1997.  (Myers Aff. ¶ 15).

---

[3] Wrestlers often use unique "signature moves" to "defeat" their
opponents at the end of a wrestling match.  Walker's signature move
involved walking on the ropes of the wrestling ring and then
attacking his opponent from the ropes.  Although this is a unique
concept, Walker was often unable to effectively execute this move
and frequently fell off of the ropes when attempting to finish off
his opponent.  (Dillon Aff. ¶ 7).

Despite WCW's significant efforts to provide Walker with wrestling opportunities, his performances never generated significant fan interest. Walker simply was unable to develop the charisma, excitement, and uniqueness of WCW's other, more popular wrestlers. (Affidavit of Paul Orndorff (hereinafter "Orndorff Aff.") ¶ 4 (a copy of this affidavit is attached hereto as Exhibit D); Hamilton Aff. ¶ 8). As Walker acknowledges, he lacked flash, uniqueness and excitement. (Walker Dep. at 58-59).

Not only did Walker's deficiencies in these areas limit the venues in which he could wrestle and his ability to generate significant crowd interest or rating revenue for WCW, but the fact that he sprained his right knee and tore his anterior cruciate ligament ("ACL") in that knee in June of 1997 also limited his wrestling opportunities. (Walker Dep. at 62-64, Exh. 6). In fact, for a period of time, Walker was unable to exercise for extended periods without his knee swelling or collapsing on him. (Id. at Exh. 6). In an attempt to return to proper wrestling condition, and because his injury impeded his career development, in 1998, Walker had surgery to repair his torn ACL and spent several months in rehabilitation. (Walker Dep. at 65-66, Exh. 6).

**WCW Terminates Walker's Independent Contractor Agreement And Walker Sues WCW**

In 1998, in an effort to significantly reduce its costs, WCW exercised its right to terminate the contracts of some of its less

skilled and less popular wrestlers, including Walker.   (Walker Dep. at 67).   Upon being informed that his contract would be terminated in light of the cutback, Walker met with WCW Vice President, Eric Bischoff, to discuss his status.   (Walker Dep. at 68-69).   As a result of this meeting, Mr. Bischoff offered Walker a new wrestling contract.   (Id.)   However, Walker rejected the offer and, instead, filed a charge of discrimination against WCW with the Equal Employment Opportunity Commission ("EEOC").   (Walker Dep. at 69-70).   Because no employer-employee relationship existed between Walker and WCW, the EEOC charge was dismissed.   Walker then filed suit against WCW alleging that he was denied wrestling and pay opportunities on account of his race.   (Walker Dep. at 71).

**Walker Settles His First Lawsuit Against WCW And Signs A New Independent Contractor Agreement**

On December 21, 1998, Walker resolved his first lawsuit against WCW, and the case was dismissed.   (Id.)   Pursuant to the settlement agreement between Walker and WCW ("the Settlement Agreement"), Walker voluntarily released any and all claims arising from or relating to his contractual relationship with WCW, the termination of his contract by WCW, and all other claims that could have been made as of the date of the Settlement Agreement.   (Walker Dep. Exh. 10 at ¶ 3).

Despite the fact that he had previously alleged that WCW somehow discriminated against him, Walker also sought, as part of

the Settlement Agreement, the opportunity to continue wrestling
with WCW. (Walker Dep. Exh. 10 at ¶ 2). Therefore, pursuant to
the Settlement Agreement, on January 1, 1999, Walker entered into
yet another independent contractor agreement with WCW, which paid
him $100,000 per year. (Walker Dep. Exh. 11 (Independent
Contractor Agreement, dated January 1, 1999 ("1999 Agreement"))).
The 1999 Agreement was for a two-year term, and provided that
"[n]othing [within the agreement] shall be deemed to obligate WCW
to use the services of [Walker] and WCW shall have fully discharged
its obligations [under the agreement] by paying the amount
specified [in the contract]." (Id. at ¶ 11(g)).

Upon entering into the 1999 Agreement, the parties agreed that
Walker would spend additional time at the Power Plant, so as to
enable him to regain ring fitness, given that he had recently
undergone knee surgery. (Walker Dep. at 76). Additional training
time also was needed because Walker still had not mastered his
finishing move and lacked the skills necessary to succeed on WCW's
more popular televised events. (Dillon Aff. ¶ 9).

By Walker's own admission, he was given various wrestling
opportunities with WCW during 1999 and 2000, including the
opportunity to wrestle on the "Saturday Night" show. (Walker Dep.
at 76-77, 151; Hart Dep. at 75). The "Saturday Night" shows were
the best fit for Walker's skill level because he frequently fell

off the ropes when attempting to complete his finishing move and
could not improvise as well as the more popular wrestlers.  (Lunde
Dep. at 47-54; Deposition of Paul Orndorff (hereinafter "Orndorff
Dep.") at 72-74; Deposition of Paul W. "Terry" Taylor, Jr., III
(hereinafter "Taylor Dep.") at 12-13).  Because the "Saturday
Night" shows were taped, Walker's mistakes could generally be
edited.  (Hart Dep. at 75).  In many of these matches, because
Walker was not a crowd favorite, the match was scripted in his
opponent's favor.  (Id.; Walker Dep. at 215; Myers Aff. ¶ 15;
Hamilton Aff. ¶ 6).

Toward the end of the term of the 1999 Agreement, WCW used
Walker less for several reasons.  In addition to lacking the
requisite skills for the more popular televised events, Walker also
had developed a reputation for being difficult to instruct.  (Lunde
Dep. at 47-54).  These were factors that WCW considered when
determining the types and number of opportunities to provide him.
(Lunde Dep. at 47-54; Dillon Aff. ¶ 4).  Moreover, in the beginning
of 2000, when WCW eliminated its "Saturday Night" show due to
financial difficulties, the opportunity to use Walker in a taped
environment where his mistakes could be edited was further reduced.
(Dillon Aff. ¶ 7; Myers Aff. ¶ 6).

**WCW Again Attempts To Work With Walker, But Walker Instead Sues WCW Again**

After terminating the "Saturday Night" show in early 2000, WCW again attempted to work with Walker, by developing a new storyline involving his character.  (Orndorff Aff. ¶ 6; Dillon Aff. ¶ 8).  In fact, Kevin Sullivan, the head of the creative team at the time, contacted Walker and asked him to work with a tag team partner to prepare for appearances on WCW's upcoming television shows.  (Orndorff Aff. ¶ 6).  Walker, in an attempt to prepare for these shows, appeared for a few consecutive days at WCW's Power Plant to work with Paul Orndorff, the head trainer at the facility, and Harold Hogue, his new tag team partner.  (Id.)  However, Walker's wrestling efforts were poor and failed to meet WCW's expectations. (Id.)  Walker's timing was off, he was sloppy, he did not try hard, and he lacked excitement.  (Id.)  After spending only a few days at the Power Plant, Walker unilaterally stopped attending training sessions.  (Id. ¶ 7).  Walker then initiated a second (the current) lawsuit for discrimination against WCW.  More specifically, on February 11, 2000, Walker filed the instant action, alleging claims of race discrimination and intentional infliction of emotional distress.  (Walker Dep. at 225-26).

After filing his lawsuit, Walker made no additional attempts to pursue wrestling opportunities with WCW.  (Orndorff Aff. ¶ 8; Dillon Aff. ¶ 9).  WCW did not terminate his contract, however, and

continued to pay Walker's salary.  (Walker Dep. at 219).  Walker's

contract expired by its own terms on December 31, 2000.  (Walker

Dep. at 86; Dillon Aff. At ¶ 10).

**ARGUMENT AND CITATION OF AUTHORITY**

**I.    THE SUMMARY JUDGMENT STANDARD.**

Summary judgment is appropriate if the evidence before the

Court shows that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(c); see Vason v. City of Montgomery, 240

F.3d 905, 907 (11th Cir. 2001).  To survive summary judgment, the

nonmoving party must come forward with concrete evidence in the

form of "*specific facts* showing that there is a genuine issue for

trial."  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S.

574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis

added).

The summary judgment rule applies with equal force in

discrimination cases.  In fact, the Eleventh Circuit recently held:

> While acknowledging that questions of fact in job
> discrimination cases are "both sensitive and difficult"
> and "[t]here will seldom be 'eyewitness' testimony as to
> the employer's mental processes," the [U.S.] Supreme
> Court has told us that "none of this means that trial
> courts or reviewing courts should treat discrimination
> differently from other ultimate questions of fact."  St.
> Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524 (1993).
> ...And quite recently, the [U.S. Supreme] Court rejected
> a rule which would have made it easier for job
> discrimination plaintiffs to get their case to a jury,
> explaining that "[t]o hold otherwise would be

> effectively to insulate an entire category of employment
> discrimination cases from [appropriate] review..., and
> we have reiterated that trial courts should not treat
> discrimination differently from other ultimate questions
> of fact." Reeves, 120 S. Ct. at 2109. ...The long and
> short of it is that the summary judgment rule applies in
> job discrimination cases just as in other cases.  No
> thumb is to be placed on either side of the scale.

Chapman v. Al Transport, 229 F.3d 1012, 1026 (11th Cir. 2000).  As

demonstrated herein, Walker cannot present evidence sufficient to

create a genuine issue of material fact on any of his claims.

Accordingly, Defendants are entitled to summary judgment on all of

Walker's claims.[4]

## II.  SUMMARY JUDGMENT SHOULD BE GRANTED AS TO WALKER'S § 1981 CLAIM BECAUSE WALKER CANNOT PRODUCE ANY EVIDENCE THAT HE WAS DISCRIMINATED AGAINST ON THE BASIS OF HIS RACE.

In a disparate treatment case such as this one, Walker must

prove "intentional discrimination" to prevail.  Reeves v. Sanderson

Plumbing Prods., Inc., 530 U.S. 133, 153, 120 S. Ct. 2097 (2000);

Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101

S. Ct. 1089 (1981).  Because Walker cannot present direct evidence

of discrimination, the proof scheme articulated in McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973),

---

[4] Walker's claims against TSI and TBS are based on theories of
derivative liability.  (Third Amended Complaint ¶¶ 17-29).  Walker
does not claim that either TSI or TBS took any improper actions
against Walker or violated any law as to Walker.  Rather, Walker
claims that WCW took such actions, and that TSI and TBS should be
held accountable due to their purported relationship with WCW.
(Id.)  Because Walker's claims against WCW fail as a matter of law,
Walker's derivative claims against TSI and TBS also fail.

applies to his claim of disparate treatment.  See Burdine, 450 U.S. at 254.  Under the McDonnell Douglas proof scheme, Walker must present circumstantial evidence sufficient to establish a prima facie case of discrimination.  Farrior v. H.J. Russell & Co., 45 F. Supp.2d 1358, 1366 (N.D. Ga. 1999).

The mere presentation of circumstantial evidence is not sufficient to defeat a motion for summary judgment.  Even if a plaintiff can establish a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  Reeves, 530 U.S. at 142. The defendant is not required to prove absence of discriminatory motive, but merely to articulate some legitimate reason for its actions.  Moreover, the defendant's burden is one of production, not persuasion.  See id.; Burdine, 450 U.S. at 253.

Once such a reason is articulated, any presumption of discrimination arising out of the prima facie case "simply drops out of the picture."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-511, 113 S. Ct. 2742 (1993).  The plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered . . . were not [the] true reasons, but were a pretext for discrimination."  Burdine, 450 U.S. at 253; Reeves, 530 U.S. at 143.  The plaintiff must present "concrete evidence in the form of specific facts which show that the defendant's proffered reason is

mere pretext.  Mere conclusory allegations and assertions will not suffice."  Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).  "The ultimate burden of persuading the trier of fact that [the] defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  St. Mary's Honor Center, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253).

As shown below, Walker cannot establish that WCW intentionally discriminated against him because of his race by denying him opportunities.  Moreover, Walker's hostile work environment and retaliation claims lack legal and factual support.  Therefore, Defendants are entitled to summary judgment on Walker's § 1981 claims.

### A.  Walker Cannot Establish That He Was Denied Wrestling Opportunities Because Of His Race.

Most of Walker's allegations boil down to a "failure-to-promote" or "failure-to-advance" type claim:  Walker alleges that WCW failed to provide him with opportunities to wrestle on televised events and/or in more prestigious matches because of his race.  (Third Amended Complaint ¶¶ 44-47, 54).  Walker has not and cannot produce any evidence that WCW actually and intentionally refused to give him additional wrestling positions "because of" his race.  Oncale v. Sundowner Offshore Servs., Inc. 523 U.S. 75, 78, 118 S. Ct. 998 (1998).  Walker cannot present evidence sufficient to establish a prima facie case of failure to promote, because not

only was Walker given substantial opportunities to wrestle, the record is devoid of any evidence establishing that Walker was qualified for the wrestling opportunities about which he complains.

The record establishes that Walker wrestled in over eighty events while he was under contract with WCW.  (Myers Aff. ¶ 15). The record further establishes that WCW made numerous attempts to use Walker in its wrestling programs, such as the "Saturday Night" show, that were compatible with his skill level and his likelihood of making wrestling errors.  (Hart Dep. at 75).  Also, after WCW terminated its "Saturday Night" show, WCW developed a new storyline for Walker, in an attempt to provide him with additional wrestling opportunities.  (Orndorff Aff. ¶ 6).

Though Walker asserts that he should have been permitted to wrestle on more live televised events, the record establishes that Walker lacked the skills necessary to wrestle on WCW's more popular events.  (Lunde Dep. at 47-54; Ordorff Dep. at 72-74; Taylor Dep. at 12-13; Dillon Aff. ¶¶ 7,9; Orndorff Aff. ¶ 8).  Because wrestling matches are a form of entertainment and are scripted, charisma, crowd appeal, uniqueness, character, persona and acting ability are prerequisites for a wrestler to receive frequent wrestling opportunities on WCW's more popular live televised events.  (Dillon Aff. ¶ 4).  Walker simply lacked the requisite charisma, persona, crowd appeal and acting ability to qualify for

such opportunities.  (Dillon Aff. ¶¶ 6-7, 9; Orndorff Aff. ¶ 8).
Other impediments to Walker's ability to wrestle on WCW's more
popular shows were the facts that Walker did not take instruction
well, lacked the creativity necessary to improvise on stage, and
was frequently unable to successfully execute his signature move of
walking on the ropes.  (Lunde Dep. at 47-54; Orndorff Dep. at 72-
74; Taylor Dep. at 10-13; Dillon Aff. ¶ 7).  The fact that Walker
frequently fell from the ropes when attempting to finish off an
opponent prevented WCW from placing him on live, televised events,
because there was no way for WCW to edit out such errors.  (Hart
Dep. at 75; Lunde Dep. at 48-49).  It is for these reasons, and not
because of Walker's race, that he was limited to wrestling in non-
live televised and less popular events.  (Dillon Aff. ¶ 7).

     Not only does the undisputed record evidence establish that
Walker lacked the basic skills necessary to be a highly successful
wrestler for WCW, but the record also shows that by early 1999, WCW
was experiencing and responding to a business downturn and had less
need for mediocre wrestling talent.  (Myers Aff. ¶ 7).  Thus, WCW
was in no position to give additional opportunities to lesser
performers.  Because it is undisputed that such a downturn
occurred, that there was less need for mediocre wrestling talent
and that Walker was properly considered a lesser performer, Walker
is unable to make out a prima facie case of failure to promote.

Walker also has failed to make out his prima facie case of disparate treatment with respect to advancement opportunities because he has not pointed to any white wrestler within WCW who lacked charisma and crowd appeal, was mediocre wrestler, lacked uniqueness in persona and character, and had a low success rate for completing his finishing move, but was, nonetheless, given more and better wrestling opportunities than Walker was given.  See Pashoian v. GTE Directories, 208 F. Supp. 2d 1293, 1308 (M.D. Fla. 2002) (explaining that to succeed on a disparate treatment claim for failure to promote, a plaintiff must establish "that similarly situated or less qualified [individuals] were promoted or transferred" to the position about which the plaintiff complains).

Walker claims that Disco Inferno, Chris Canyon, Evan Courageous, Billy Kidman, Lash LaRue, Hugh Morris and Bill Goldberg were "similarly situated" white wrestlers who received greater opportunities than him.  (Walker Dep. at 194-99).  In making this assertion, however, Walker relies on nothing more than his own subjective opinion.  Walker's mere opinion that he was more qualified than other wrestlers who received opportunities to wrestle on WCW's more popular events is insufficient.  See Lee v. GTE Florida, Inc., 226 F.3d 1249, 1254 (11th Cir. 2000) (explaining that "an employee's own opinions about his . . . qualifications do not give rise to a material factual dispute")(quoting Simms v.

Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Svcs.,
165 F.3d 1321, 1329-30 (10th Cir. 1999), cert. denied, 528 U.S.
815, 120 S. Ct. 53 (1999)); see also Ramsey v. Leath, 706 F.2d
1166, 1170 (11th Cir. 1983) (instructing that an employee's
subjective belief does not establish a jury issue).

In any event, to sustain a claim of discrimination, Walker
must do more than establish that he was more qualified than the
wrestlers who received the opportunities about which he complains.
Denney v. City of Albany, 247 F.3d 1172, 1187 (11th Cir.
2001)(quoting Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253-54
(11th Cir. 2000) (quotations omitted)).  "Disparities in
qualifications are not enough in and of themselves to demonstrate
discriminatory intent unless these disparities are so apparent as
virtually to jump off the page and slap you in the face."  Id.; see
also Miller v. Bed, Bath & Beyond, Inc., 185 F. Supp. 2d 1253, 1271
(N.D. Ala. 2002).  Here, Walker cannot even establish that the
wrestlers to whom he points were similarly situated to him with
respect to wrestling skills, charisma, crowd appeal, persona,
uniqueness, the ability to take instruction well, and acting
ability.  Because he is unable to meet this lesser burden as to
these other wrestlers, he most certainly cannot establish that he
was obviously *more qualified* than they were.  Accordingly, Walker

cannot establish a prima facie case of discrimination based on denial of opportunity, and this claim fails as a matter of law.

**B.   WCW Has Articulated Legitimate, Nondiscriminatory Reasons For Not Providing Walker With Additional Wrestling Opportunities.**

Walker's failure to promote/advance claim also fails because WCW has established that it had legitimate, nondiscriminatory reasons that explain why Walker was not provided with additional, more prestigious wrestling opportunities.  The record establishes that Walker received less prestigious wrestling opportunities because he lacked the basic skills necessary to be a highly successful wrestler within WCW.  The record also establishes that in 1999, WCW was experiencing and responding to a business downturn and had less need for mediocre wrestling talent.  (Myers Aff. ¶¶ 6-7).  Accordingly, WCW was in no position to give additional opportunities to lesser performers, such as Walker.  Because Walker cannot dispute that such a downturn occurred, that there was less need for mediocre wrestling talent and that he was considered a lesser performer, he is unable to establish that the nondiscriminatory reasons offered by WCW are a pretext for discrimination.  Accordingly, Walker's claim fails.  See Burdine, 450 U.S. at 256 (1981) (to survive summary judgment, a plaintiff must directly persuade the court that a "discriminatory reason more likely motivated [WCW] or indirectly [prove discrimination] by

showing that [WCW]'s proffered explanation is [pretextual and] unworthy of credence").

### C. Walker Cannot Establish That He Was Subjected To A Racially Hostile Environment.

Walker also alleges that while with WCW, he was subjected to a racially hostile environment. (Third Amended Complaint ¶ 55). In support of his hostile environment claim, Walker points to alleged derogatory statements that were supposedly made by WCW employees, to his claim that he was "required" to clean up and assemble the wrestling ring while at the Power Plant, and to WCW's decision not to provide him with additional wrestling and pay opportunities. (Walker Dep. at 207-15). With respect to the alleged statements about which he complains, Walker simply points to a few statements that were allegedly made, at random, during a seven-year time frame (from July 1993 to December 2000), some of which were made either outside of his presence to a third party, or by a third party in the form of hearsay or unconfirmed conjecture.[5]

---

[5] According to Walker, these are the statements that were allegedly made outside of Walker's presence: (1) "Blacks won't pay to see a Nitro. They would rather see it on t.v."; (2) "Get that nigger off my ropes"; (3) "What nigger we got tonight"; and (4) "This is white night because no niggers going to be on the show." Walker also alleges that the following statements were made to him: (1) "You're only here cause you're black"; (2) "Only reason you're here is because they need color on t.v."; (3) "You're black and this is still a good old redneck company. And Terry Taylor don't like you"; and (4) Terry Taylor did not "appreciate a black man questioning him." (Walker Dep. at 144, 146, 149, 152, 163, 176-80).

To succeed on his hostile work environment claim, Walker must demonstrate that the alleged actions of WCW "altered the condition of the workplace, creating an objectively abusive and hostile atmosphere." Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). "For example, the racial slurs allegedly spoken . . . had to be so 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.'" Id. (quotations omitted). Factors that must be considered in assessing a hostile work environment claim include the frequency and severity of the alleged discriminatory conduct, whether the conduct was threatening or humiliating, and whether it unreasonably interfered with Walker's performance with WCW. Id. at 1521-22. In light of this standard, Walker's claim fails, because even assuming the truth of every incident that Walker describes in support of his claim, these incidents are insufficient as a matter of law to create a racially hostile environment.[6]

The record establishes that the alleged statements about which Walker complains were allegedly made at various times over a seven-

---

[6] Walker does not know the dates on which these statements were allegedly made. Any conduct that occurred prior to December 21, 1998 may not be relied upon by Walker in support of his hostile environment claim because such conduct is barred by the release in his Settlement Agreement. (Walker Dep. at Exh. 10, ¶ 3).

year period.  (Walker Dep. at 144, 146, 149, 152, 163, 176-80, 207-
15).  Such sporadic comments, although inappropriate if made, are
insufficient to establish that the environment at WCW was permeated
with racial hostility.  See Hudson v. Norfolk Southern Railway Co.,
209 F. Supp. 2d 1301, 1314 (11th Cir. 2001); Ealey v. Dekalb County
Hosp. Auth., 59 Fair Empl. Prac. Cases (BWA) 1803, 1998 WL 384902
(N.D. Ga. 1988) (explaining that instances of racial slurs must be
more than sporadic to be sufficient to support a hostile work
environment claim); see also Henson v. City of Dundee, 682 F.2d
897, 904 (11th Cir. 1982) (explaining the "mere utterance of an
ethnic or racial epithet which engenders offensive feelings in an
employee does not rise to a Title VII [or § 1981] violation" and
that isolated incidents of harassment are not actionable).

     The Eleventh Circuit has clearly stated that infrequent, petty
annoyances do not give rise to the level of severity and
pervasiveness necessary to establish a hostile environment claim.
Harris, 510 U.S. at 21; E.E.O.C. v. Beverage Canners, Inc., 897
F.2d 1067, 1068 (11th Cir. 1990).  The alleged discriminatory
conduct about which Walker complains was far from "commonplace;" it
was not harsh or severe; and it was not physically threatening, as
must be established for his claim to succeed.  See Edwards, 49 F.3d
at 1521 (explaining that racial slurs must be so "commonplace,

overt and denigrating that they create an atmosphere charged with racial hostility"). Accordingly, this claim fails.

Not only does the uncontroverted evidence show that these alleged statements were sporadic in nature, but the record also establishes that the vast majority of the alleged statements were not even directed towards Walker or made in his presence, but rather, were simply unconfirmed hearsay and conjecture. (Walker Dep. at 144, 146, 149, 152, 163, 176-80, 207-15). Walker may not rely on hearsay statements of this type to defeat summary judgment. See Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1135 (11th Cir. 1996) (instructing that inadmissible hearsay cannot be offered to defeat a summary judgment motion when it is not reducible to admissible form at trial); Evans v. McClain of Georgia, Inc., 131 F.3d 957, 962 (11th Cir. 1997) (concluding that the court correctly dismissed hearsay evidence because it was "not significantly probative" and was based on "gossip, common knowledge and the hearsay statement of an unidentified representative"); see also Edwards, 49 F.3d at 1520-21 (concluding that hostile environment claim was without merit because many of the alleged statements were either speculation or hearsay, and because there was insufficient information as to when the alleged statements were made).

Walker's hostile environment claim also fails because he cannot support his allegation with "any specific examples of how

[the alleged] discriminatory conduct . . . had a deleterious effect on his [work] performance." See Mitchell v. Carrier Corp., 954 F. Supp. 1568, 1578 (M.D. Ga. 1995), aff'd, 108 F.3d 343 (11th Cir. 1997); see also Evans v. Pemco Aeroplex, 1998 WL 1048470, No. CIVACV96-S-2801-S (N.D. Ala. Feb. 23, 1998) (explaining in case in which five incidents of racist conduct occurred, including the use of nooses and the letters "KKK," that without evidence that the incidents affected [the plaintiff's] work performance, the court could not conclude that the alleged harassment was sufficiently severe and pervasive to alter a term or condition of employment). In this case, not only has Walker failed to establish that his performance was affected by the alleged acts of discrimination, he has, to the contrary, claimed that his performance at WCW was so exemplary as to warrant advancement.  (Walker Dep. at 194-202, 204-07).  Walker can offer no evidence of the kind of "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. at 21.

Finally, any argument by Walker that he was required to help clean up the Power Plant and to help assemble and take down the wrestling ring does not salvage his claim.  As Walker has admitted, white wrestlers at the Power Plant also were required to perform

these services as part of the training program.  (Walker Dep. at

102).  Because cleaning up the Power Plant and assembling the

wrestling ring were race-neutral requirements, Walker cannot rely

on that evidence in support of his hostile work environment claim,

and this claim fails.  See, e.g., Smith v. Mount Sinai Medical Ctr.

Of Greater Miami, Inc., 36 F. Supp. 2d 1341, 1346 (S.D. Fla. 1998).

> **D.    Walker Cannot Establish That WCW Retaliated Against Him
> Because Of Any Alleged Complaints About Race
> Discrimination.**

Walker apparently also alleges that, as a result his filing

his first lawsuit in 1998, and his alleged complaints of

discrimination to Eric Bischoff and other members of the creative

staff in 1999, WCW retaliated against him by allowing the 1999

Agreement to expire in December 2000 and by refusing to provide him

with additional, more prestigious wrestling opportunities.

(Complaint ¶¶ 60-61).  Despite these bald assertions, Walker cannot

demonstrate that WCW took any adverse action against him in

retaliation for his purported complaints.

A prima facie claim of retaliation requires proof of three

elements:  (i) that plaintiff engaged in statutorily protected

conduct; (ii) that plaintiff suffered an adverse employment action;

and (iii) that the adverse action was causally related to the

protected conduct.  Farley v. Nationwide Mut. Ins. Co., 197 F.3d

1322, 1336 (11th Cir. 1999).  In this case, Walker has failed to

provide any evidence that he suffered any adverse action after purportedly complaining about race discrimination.

The record establishes that, after Walker allegedly complained to Eric Bischoff in February of 1999 about the alleged discrimination at WCW, WCW continued to offer him opportunities to wrestle for another *twenty-two* months, until his contract *expired* in December 2000.  (Walker Dep. at 86, 142).  Likewise, after Walker filed his first discrimination lawsuit in February 1998, WCW gave Walker *a new contract* at his demand in January of 1999, and continued to pay Walker his full salary until the 1999 Agreement *expired* in December 2000.  Therefore, contrary to Walker's allegations, WCW did not *terminate* his contract and did not take any adverse action against Walker because of any alleged discrimination complaints.

Additionally, Walker's claim fails because he cannot establish a causal connection between the expiration and nonrenewal of his 1999 Agreement and his complaints of discrimination.  In fact, the record establishes that once Walker's contract expired, it was not renewed because Walker was not among WCW's top talent, and because Walker showed no interest in continuing to pursue a career with the organization.  (Dillon Aff. ¶¶ 9-10).  Moreover, WCW was forced, because of a business decline, to be more selective with respect to the quality of wrestlers that it retained.  (Myers Aff. ¶ 6).  Even

though WCW had attempted to work with Walker and had invested significant time and money in Walker to provide him with the opportunity to develop his skills, once the "Saturday Night" show was cut at the beginning of 2000, there was no real place for Walker, given his continued deficiencies as a wrestler and performer. (Dillon Aff. ¶ 7). Accordingly, once his contract expired, it was not renewed. (Id. ¶¶ 9-10).

Moreover, because Walker was one of a number of independent contractors affected by WCW's decision not to continue contracting with its less talented wrestlers, he has failed to establish a causal connection between the expiration of his contract and his complaints of discrimination. See Leblanc v. TJX Companies, Inc., 214 F. Supp. 2d 1319, 1330 (S.D.Fla. 2002) (explaining that where the plaintiff's termination was inevitable, even before the complaint of discrimination was filed, the plaintiff failed to establish a causal connection between the complaint and the adverse employment action).

Finally, Walker cannot establish a causal connection between the expiration of his contract and his complaints of discrimination because no temporal proximity exists between the events. As discussed above, Walker continued wrestling with WCW for almost *three years* after filing his first lawsuit, and for *twenty-two* months after he allegedly complained to Eric Bischoff about

discrimination.    Because no temporal proximity existed between the making of his complaints and the alleged adverse employment action, WCW's motion for summary judgment should be granted as to Walker's retaliation claim.    See Wascura v. City of South Miami, 257 F.3d 1238, 1248 (11th Cir. 2001) (explaining that a substantial delay between the complaint and the adverse action, and the absence of other evidence establishing causation, justifies judgment as a matter of law for the employer); Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999) ("[t]he more than 15-month period that elapsed between [the] grievance and the alleged adverse employment actions belies [the] assertion that the former caused the latter").

Walker also alleges in support of his retaliation claim that because he complained of discrimination to Eric Bischoff and because he filed his first lawsuit against WCW, WCW retaliated against him once be began wrestling under the 1999 Agreement by failing to allow him opportunities to advance within the organization.    (Third Amended Complaint ¶ 61).    However, Walker cannot establish a causal connection between WCW's "failure to advance" him and his complaints of discrimination.    As discussed earlier, Walker was not advanced within the organization because he lacked the wrestling skills, charisma, persona, uniqueness and crowd appeal necessary to make frequent live televised and/or pay-per-view appearances or for other advancement.    Therefore, even

absent his complaints of discrimination, Walker would have been
extended the same wrestling opportunities he received.  Because
Walker cannot show any causal connection between any action taken
by WCW and his alleged complaints, summary judgment should be
granted on Walker's retaliation claim.

**III.  SUMMARY JUDGMENT SHOULD BE GRANTED AS TO WALKER'S TITLE VII
CLAIMS BECAUSE NO EMPLOYER-EMPLOYEE RELATIONSHIP EXISTED
BETWEEN WALKER AND WCW.**

Walker also asserts claims of race discrimination under Title
VII of the Civil Rights Act of 1964.  (Third Amended Complaint ¶¶
54-55).  The undisputed facts of record conclusively establish that
Walker cannot maintain a discrimination claim under Title VII.

A Title VII race discrimination claim requires that an
**employment relationship** exist between the plaintiff and the
defendant.  Holloman v. Northeast Georgia Area Development Comm'n,
740 F. Supp. 1571, 1575 (M.D. Ga. 1990).  Independent contractor
relationships are outside the statute's scope.  See Cobb v. Sun
Papers, Inc., 673 F.2d 337, 339-42 (1982), cert. denied, 459 U.S.
874, 103 S. Ct. 163, 74 L. Ed. 2d 135 (1982); see also Holloman,
740 F. Supp. at 1575 (explaining that if the plaintiff "were an
independent contractor, and not an agent or employee [of the
defendant], then there would be no 'employment relationship'
between the two and [the plaintiff] would not be subject to Title
VII's protections").

To determine whether a particular individual is an employee or an independent contractor, courts employ common law principles of agency.  See Cobb, 673 F.2d at 341.  Among the factors to be considered in determining whether an individual is an employee or an independent contractor are the hiring party's right to control, the level of skill required, the source of equipment and tools, the duration of the relationship, the method of payment, the provision of employee benefits, the tax status of the parties and the intent of the parties.  Nationwide Mutual Ins. Co. v. Darden, 503 U.S. 318, 333-34, 112 S. Ct. 1344 (1992).  Applying the above factors, the undisputed evidence establishes that Walker was an independent contractor with WCW, not an employee.

First, WCW exercised minimal control over the means and the manner of Walker's performance as a professional wrestler.  (Walker Dep. at 103).  Walker was given significant creative freedom to choreograph his matches and to achieve the predetermined result. (Id.; Dillon Aff. ¶ 5).  Walker also developed his own persona, character, stage name, costume and gimmick.  (Third Amended Complaint ¶¶ 39-40; Walker Dep. at 99-100; Dillon Aff. ¶ 5).

Further, professional wrestling requires significant specialized skills.  By Walker's own admission, he underwent extensive training to develop the skills necessary to be a professional wrestler with WCW.  (Walker Dep. at 25-27; 31-32).

This factor also supports the conclusion that Walker was an independent contractor, and not an employee.

Likewise, Walker's 1999 Agreement with WCW was for a short and fixed term, Walker received no fringe benefits, and he paid his own taxes.  (1999 Agreement, ¶ 2).

Lastly, the parties indisputably understood and intended an independent contractor relationship.  Walker admitted that he was an independent contractor with WCW during all times relevant to this lawsuit.  (Walker Dep. at 27, 75-76).  Moreover, the agreement Walker signed expressly states that Walker was providing services to WCW as an independent contractor, and not as an employee.  The agreement was also labeled on the first page as an "Independent Contractor Agreement."  (1999 Agreement, ¶ 2).  All of the above facts establish that Walker was an independent contractor, and not an employee, of WCW.

This Court has previously considered the issue of whether a professional wrestler for WCW was an independent contractor for purposes of Title VII.  In Ranger Ross v. World Championship Wrestling, Inc., Civil No. 1:93-CV-1206-JEC (N.D.Ga. 1994) (unpublished opinion),[7] the Court concluded that, because the plaintiff professional wrestler had a certain level of control over his performance in matches and creativity for his character, he was

---

[7] A copy of the Court's opinion is attached hereto as Exhibit E.

an independent contractor and not an employee for purposes of Title
VII.  (Id. at 15-18).  Likewise, in this case, given the control
Walker had over the performance of his duties and his performance
in wrestling events, and all of the factors noted above, the
requisite employment relationship did not exist between Walker and
WCW for Title VII to apply.  Therefore, summary judgment should be
granted as to all of Walker's Title VII claims.[8]

## IV.  SUMMARY JUDGMENT SHOULD BE GRANTED ON WALKER'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM BECAUSE WCW DID NOT ENGAGE IN ANY EXTREME OR OUTRAGEOUS CONDUCT.

Walker contends that WCW, by allegedly engaging in racially
discriminatory conduct, intentionally inflicted severe emotional
distress on him.  (Third Amended Complaint ¶¶ 63-64).  This claim
is baseless.

To establish a claim for intentional infliction of emotional
distress under Georgia law, a plaintiff must establish:  (1)
intentional or reckless conduct; (2) extreme and outrageous conduct
by the defendant; (3) severe emotional distress suffered by the
plaintiff; and (4) a causal connection between the conduct and the

---

[8] Even assuming arguendo, that the requisite employer-employee
relationship did exist between Walker and WCW, Walker's Title VII
claim still fails for all of the same reasons that Walker's § 1981
claims fail.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318,
1330 (11th Cir. 1998) (explaining that "both Title VII and Section
1981 have the same requirements of proof and use the same
analytical framework").

emotional distress.  <u>Hendrix v. Phillips</u>, 207 Ga. App. 394, 395, 428 S.E.2d 91, 92-93 (1993).

To be "extreme and outrageous," the alleged conduct must be so "terrifying or insulting as naturally to humiliate, embarrass or frighten" the plaintiff and so severe that "no reasonable man could be expected to endure" these actions.  <u>Beck v. Interstate Brands Corp.</u>, 953 F.2d 1275, 1276 (11th Cir. 1992).  Liability for intentional infliction of emotional distress does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."  <u>Ward v. Papa's Pizza To Go, Inc.</u>, 907 F. Supp. 1535, 1540 (S.D. Ga. 1995).  Thus, when a plaintiff alleges that conduct such as race discrimination constitutes intentional infliction of emotional distress, the alleged conduct must be severe, such as an on-going pattern of explicit and oppressive harassment that includes or resembles a physical assault.  <u>See Coleman v. Housing Auth. of Americus</u>, 191 Ga. App. 166, 381 S.E.2d 303 (1989).  When the alleged conduct is racial epithets and race-based decisions in carrying out a contract, it must be combined with extreme and graphic threats such as of bodily harm, dismemberment and death.  <u>See Brown v. Manning</u>, 764 F. Supp. 183, 185 (M.D. Ga. 1991).

In this case, Walker cannot provide any evidence of conduct by WCW that satisfies the requirements of "extreme and outrageous"

1066873_8.DOC

behavior.  To the contrary, Walker testified that there is nothing other than WCW's alleged acts of discrimination that caused him emotional harm.  (Walker Dep. at 222-24).  Because, as set forth above, there is no evidence that WCW discriminated against Walker, and because Walker must establish more than just alleged discriminatory conduct to sustain his emotional distress claim, summary judgment should be entered on this claim.  Beck, 953 F.2d at 1276 (discharge of employee for allegedly discriminatory reasons insufficient to support emotional distress claim); Ward, 907 F. Supp. at 1542 (concluding that repeated refusal to hire an individual under circumstances that could constitute unlawful discrimination insufficient to establish an emotional distress claim); Borden v. Johnson, 196 Ga. App. 288, 395 S.E.2d 628 (1990) (establishing that demotion or discharge for whatever reason, even discriminatory reason, does not give rise to an emotional distress claim).

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion for Summary Judgment on all of Walker's claims asserted in this action should be granted, and all of Walker's claims should be dismissed.

This 17th day of December, 2002.

TROUTMAN SANDERS LLP


JOHN J. DALTON
Georgia Bar No. 203700
JAMES A. LAMBERTH
Georgia Bar No. 431851
ERIC A. RICHARDSON
Georgia Bar No. 233873
EVAN H. PONTZ
Georgia Bar No. 583577

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

Attorneys for Defendants

## CERTIFICATION

Pursuant to Local Rule 7.1(D), I certify that this Memorandum of Law has been prepared with one of the fonts and point selections ("Courier New 12") approved by the Court in Local Rule 5.1(B).


This 17th day of December, 2002.

_____
Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BOBBY WALKER,                          )
                                       )
                   Plaintiff,          )
                                       )        CIVIL ACTION FILE
v.                                     )
                                       )        NO. 1:01-CV-0367-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., and               )
TURNER BROADCASTING SYSTEM, INC.,      )
                                       )
                   Defendants.         )

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of this

*MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY*

*JUDGMENT* upon the interested parties by hand delivery to:

Cary Ichter
Kelly Jean Beard
Charles Gernazian
Michelle M. Rothenberg-Williams
MEADOWS, ICHTER AND BOWERS, P.C.
Eight Piedmont Center, Suite 300
3525 Piedmont Road
Atlanta, GA  30305

This 17th day of December, 2002.

Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

DEC 1 7 2002

LUTHER D. THOMAS, Clerk
By _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BOBBY WALKER,                          )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )     CIVIL ACTION FILE
                                       )     NO. 1:00-CV-0367-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., and TURNER        )
BROADCASTING SYSTEM, INC.,             )
                                       )
            Defendants.                )

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants Universal Wrestling Corporation (f/k/a World Championship Wrestling, Inc.) ("WCW"), Turner Sports, Inc. ("TSI") and Turner Broadcasting System, Inc. ("TBS") submit this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment as to all claims brought by Plaintiff Bobby Walker.

1.  WCW created, produced, and marketed professional wrestling events during the 1990s and through March 2001, which were seen by live audiences and/or aired on various television networks and pay-per-view cable and satellite systems. (Affidavit of Diana Myers (hereinafter "Myers Aff.") ¶ 3).

2.  The wrestlers and other on-screen wrestling talent who appeared in WCW's wrestling events generally provided their services to WCW as independent contractors, either through formal

98

written contracts or without written agreements.  (Myers Aff. ¶ 4).

3.   WCW's wrestling events, both live and taped, were created by a creative team of writers and producers at WCW, with the goal of entertaining wrestling fans and general audiences nationwide.  (Myers Aff. ¶ 4).

4.   After having much commercial and financial success in the mid-to-late 1990s, WCW's business suffered a sharp downturn in 1999.  (Myers Aff. ¶ 6).

5.   In 1999, WCW lost significant sums of money and, thus, only added new talent that it perceived was likely to generate substantial revenue, began reducing the compensation of existing talent, and began producing fewer and fewer wrestling events. (Myers Aff. ¶ 7).

6.   Because of the downturn and reduced number of productions, in 1999 and over the next two years, WCW had less and less need for wrestling services, including on-screen talent, trainers, and creative staff.  (Myers Aff. ¶ 7).

7.   WCW even terminated some of its televised events, including a taped television show commonly referred to as its "Saturday Night" show, in early 2000.  (Myers Aff. at ¶ 6).

8.   Despite WCW's efforts, WCW's business downturn continued, and in March 2001, WCW sold certain of its assets,

ceased its operations, and changed its name to Universal Wrestling Corporation.  (Myers Aff. at ¶ 8).

9.  Walker first became affiliated with WCW in July 1993, when he began training, pursuant to a written contract, at WCW's Power Plant facility.  (Deposition of Bobby L. Walker, Jr. (hereinafter "Walker Dep.") at 23).

10.  Walker's training contract ran through October 17, 1993 and provided that Walker would receive $400 per week during his training period.  (Walker Dep. at 23-26, Exh. 1 (Independent Contractor Agreement, dated July 26th, 1993)).

11.  The purpose behind this training period was to help Walker develop not only the physical skills necessary to wrestle professionally with WCW, but also to help him develop the charisma, acting ability, and uniqueness necessary to carry out an entertaining wrestling match with minimal instruction.  (Affidavit of James A. Morrison (p/k/a "JJ Dillon") (hereinafter "Dillon Aff.") ¶ 5).

12.  In April 1994, after Walker's training contract expired, he began wrestling professionally with WCW pursuant to a one-year independent contractor agreement.  (Walker Dep. at 30, Exh. 3 (Independent Contractor Agreement, dated April 25th, 1994)).

13.  At the time that Walker entered into the 1994 Agreement, Walker still lacked the level of excitement, wrestling skills,

uniqueness and acting ability necessary to be a successful talent with WCW.  (Affidavit of Joseph N. Hamilton ("Hamilton Aff.") ¶¶ 5-6).

14.  Walker, accordingly, continued to train at the Power Plant, even after he received his wrestling contract.  (Walker Dep. at 31-32; Hamilton Aff. ¶ 3).

15.  Upon signing the 1994 Agreement, Walker also had not yet perfected his "finishing move," which involved walking across the ropes surrounding the wrestling ring.  (Hamilton Aff. ¶ 7).

16.  It was crucial for Walker to perfect his finishing move to gain substantial live television time because WCW fans were unforgiving when it came to blunders and failed wrestling attempts.  (Deposition of Jimmy R. Hart (hereinafter "Hart Dep.") at 74-75; Deposition of Martin Lunde (hereafter "Lunde Dep.") at 54).

17.  While training at the Power Plant, Walker, like many of the white trainees and/or wrestlers at the Power Plant, helped clean up the Power Plant and to assemble and take down the wrestling ring as necessary.  (Walker Dep. at 102).

18.  In a further effort to provide Walker with an opportunity to develop his potential, WCW again renewed Walker's contract in 1995 and entered into a series of independent contractor agreements with him through the end of 1997.  (Walker

Dep. at 23-43, 51, 65-68, Exhs. 4-6 (respectively Independent
Contractor Agreements, dated April 25th, 1995, April 25th, 1996
and April 25th, 1997)).

19.   Walker was afforded a variety of wrestling opportunities
that were commensurate with his skill level and crowd appeal, and
he wrestled in over eighty events between 1996 and 1997.   (Myers
Aff. ¶¶ 14-15).

20.   During his wrestling matches, Walker was given
significant creative freedom to choreograph his matches as he saw
fit to achieve the predetermined result.   (Dillon Aff. ¶ 5).

21.   Walker was also given the creative freedom to develop
his stage name, character and gimmick.   (Dillon Aff. ¶ 5).

22.   Despite WCW's significant efforts to provide Walker with
wrestling opportunities, Walker's performances never generated
significant fan interest because he simply was unable to develop
the charisma, excitement, and uniqueness of WCW's other, more
popular wrestlers.   (Affidavit of Paul Orndorff (hereinafter
"Orndorff Aff.") ¶ 4; Hamilton Aff. ¶ 8).

23.   Walker's wrestling deficiencies limited the venues in
which he could wrestle and his ability to generate significant
crowd interest or rating revenue for WCW.   (Orndorff Aff. ¶ 4;
Hamilton Aff. ¶ 8).

24.   The fact that Walker sprained his right knee and tore his anterior cruciate ligament ("ACL") in that knee in June of 1997 also limited his wrestling opportunities.  (Walker Dep. at 62-64, Exh. 6).

25.   In an attempt to return to proper wrestling condition, and because his injured knee impeded his career development, in 1998, Walker had surgery to repair his torn ACL and spent several months in rehabilitation.  (Walker Dep. at 65-66, Exh. 6).

26.   In 1998, in an effort to significantly reduce its costs, WCW exercised its right to terminate the contracts of some of its less skilled and less popular wrestlers, including Walker. (Walker Dep. at 67; Hamilton Aff. ¶ 8).

27.   Upon being informed that his contract would be terminated in light of the cutback, Walker met with WCW Vice President, Eric Bischoff, to discuss his status.  (Walker Dep. at 68-69).

28.   As a result of this meeting, Mr. Bischoff offered Walker a new wrestling contract, which Walker rejected, and Walker instead filed a charge of discrimination against WCW with the Equal Employment Opportunity Commission ("EEOC").  (Walker Dep. at 69-70).

29.  Because no employer-employee relationship existed between Walker and WCW, the EEOC charge was dismissed.  (Walker Dep. at 69-70).

30.  Walker then filed suit against WCW alleging that he was denied wrestling and pay opportunities on account of his race. (Walker Dep. at 71).

31.  On December 21, 1998, Walker resolved his first lawsuit against WCW, and the case was dismissed.  (Walker Dep. at 71).

32.  Pursuant to the settlement agreement between Walker and WCW ("the Settlement Agreement"), Walker voluntarily released any and all claims arising from or relating to his contractual relationship with WCW, the termination of his contract by WCW, and all other claims that could have been made as of the date of the Settlement Agreement.  (Walker Dep. Exh. 10 at ¶ 3).

33.  Despite the fact that he had previously alleged that WCW somehow discriminated against him, Walker also sought, as part of the Settlement Agreement, the opportunity to continue wrestling with WCW.  (Walker Dep. Exh. 10 at ¶ 2).

34.  Pursuant to the Settlement Agreement, on January 1, 1999, Walker entered into yet another independent contractor agreement with WCW, which paid him $100,000 per year.  (Walker Dep. Exh. 11 (Independent Contractor Agreement, dated January 1, 1999 ("1999 Agreement"))).

35.   The 1999 Agreement was for a two-year term, and provided that "[n]othing [within the agreement] shall be deemed to obligate WCW to use the services of [Walker] and WCW shall have fully discharged its obligations [under the agreement] by paying the amount specified [in the contract]." (Walker Dep. at Exh. 11, ¶ 11(g)).

36.   Upon entering into the 1999 Agreement, the parties agreed that Walker would spend additional time at the Power Plant, so as to enable him to regain ring fitness, given that he had recently undergone knee surgery. (Walker Dep. at 76).

37.   Additional training time also was needed because Walker still had not mastered his finishing move and lacked the skills necessary to succeed on WCW's more popular televised events. (Dillon Aff. ¶ 9).

38.   Walker was given various wrestling opportunities with WCW during 1999 and 2000, including the opportunity to wrestle on the "Saturday Night" show. (Walker Dep. at 76-77, 151; Hart Dep. at 75).

39.   The "Saturday Night" shows were the best fit for Walker's skill level because he frequently fell off of the ropes when attempting to complete his finishing move and could not improvise as well as the more popular wrestlers. (Lunde Dep. at 47-54; Deposition of Paul Orndorff (hereinafter "Orndorff Dep.")

at 72-74; Deposition of Paul W. "Terry" Taylor, Jr. III
(hereinafter "Taylor Dep.") at 12-13).

40.  Because the "Saturday Night" shows were taped, Walker's
mistakes could generally be edited.  (Hart Dep. at 75).

41.  In some of these matches, Walker's opponent prevailed
over Walker, because Walker was not a crowd favorite, while in
other matches, Walker prevailed.  (Hart Dep. at 75; Walker Dep. at
215; Myers Aff. ¶ 15; Hamilton Aff. ¶ 6).

42.  Toward the end of the term of the 1999 Agreement, WCW
used Walker less, because, in addition to lacking the requisite
skills for the more popular televised events, Walker also had
developed a reputation for being difficult to instruct.  (Lunde
Dep. at 47-54).

43.  Walker was also used less toward the end of the 1999
Agreement because, in the beginning of 2000, when WCW eliminated
its "Saturday Night" show due to financial difficulties, the
opportunity to use Walker in a taped environment where his
mistakes could be edited was further reduced.  (Dillon Aff. ¶ 7;
Myers Aff. ¶ 6).

44.  After terminating the "Saturday Night" show in early
2000, WCW again attempted to work with Walker by developing a new
storyline involving his character.  (Orndorff Aff. ¶ 6; Dillon
Aff. ¶ 8).

45.   Kevin Sullivan, the head of the creative team at the time, contacted Walker and asked him to work with a tag team partner to prepare for appearances on WCW's upcoming television shows.  (Orndorff Aff. ¶ 6).

46.   Walker appeared for a few consecutive days at WCW's Power Plant to work with Paul Orndorff, the head trainer at the facility, and Harold Hogue, his new tag team partner.  (Orndorff Aff. ¶ 6).

47.   However, Walker's wrestling efforts were poor and failed to meet WCW's expectations because Walker's timing was off, he was sloppy, he did not try hard, and he lacked charisma.  (Orndorff Aff. ¶ 6).

48.   After spending a few days at the Power Plant, Walker unilaterally stopped attending training sessions.  (Orndorff Aff. ¶ 7).

49.   Walker, instead, initiated a second (the current) lawsuit for discrimination against WCW on February 11, 2000, alleging claims of race discrimination and intentional infliction of emotional distress.  (Walker Dep. at 225-26).

50.   After filing the instant lawsuit, Walker made no additional attempts to pursue wrestling opportunities with WCW. (Orndorff Aff. ¶ 8; Dillon Aff. ¶ 9).

51.   WCW did not terminate Walker's contract, however, and continued to pay Walker's salary under the 1999 Agreement. (Walker Dep. at 219).

52.   Walker's contract expired by its own terms on December 31, 2000.   (Walker Dep. at 86; Dillon Aff. ¶ 10).

53.   Walker's contract was not renewed because of his wrestling deficiencies and his apparent lack of interest in pursuing continued opportunities with WCW.   (Dillon Aff. ¶ 10).

This 17th day of December, 2002.

TROUTMAN SANDERS LLP

_Evan H. Pontz_

JOHN J. DALTON
Georgia Bar No. 203700
JAMES A. LAMBERTH
Georgia Bar No. 233873
ERIC A. RICHARDSON
Georgia Bar No. 431851
EVAN H. PONTZ
Georgia Bar No. 583577

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BOBBY WALKER,                              )
                                           )
                Plaintiff,                 )
                                           )        CIVIL ACTION FILE
v.                                         )        NO. 1:00-CV-0367-CC
                                           )
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., and TURNER            )
BROADCASTING SYSTEM, INC.,                 )
                                           )
                Defendants.                )

### CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of

this *DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN*

*SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT* upon the interested

parties by hand delivering a copy of the same to:

        Cary Ichter
        Kelly Jean Beard
        Charles Gernazian
        Michelle M. Rothenberg-Williams
        MEADOWS, ICHTER AND BOWERS, P.C.
        Eight Piedmont Center, Suite 300
        3525 Piedmont Road
        Atlanta, GA  30305

This 17th day of December, 2002.

                     *Evan H. Pontz*
                     Evan H. Pontz
                     TROUTMAN SANDERS LLP
                     Suite 5200, Bank of America Plaza
                     600 Peachtree Street, N.E.
                     Atlanta, GA  30308-2216
                     (404) 885-3000