**S**

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 1 3 2003

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BOBBY WALKER,                          )
                                       )
        Plaintiff,                     )
                                       )     Civil Action File No.:
v.                                     )     1:00-CV-0367-CC
                                       )
UNIVERSAL WRESTLING                    )
CORPORATION f/k/a                      )
WORLD CHAMPIONSHIP WRESTLING,          )
INC., TURNER SPORTS, INC.,             )
TURNER ENTERTAINMENT GROUP,            )
INC. and TURNER BROADCASTING           )
SYSTEM, INC.,                          )
                                       )     **JURY TRIAL DEMANDED**
        Defendants.                    )
_____)


**PLAINTIFF WALKER'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**


                Cary Ichter
                Charles J. Gernazian
                Michelle M. Rothenberg-Williams
                **MEADOWS, ICHTER & BOWERS, P.C.**
                Fourteen Piedmont Center
                Suite 1100
                3535 Piedmont Road
                Atlanta, GA  30305
                (404) 261-6020

112

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Walker has established <u>overwhelming</u> evidence demonstrating that Defendants discriminated against him and other African-Americans, including the following:

- Defendants' principal decision-makers routinely used racial slurs such as "nigger" and made many racially offensive remarks, revealing a blatant racial bias against African-American wrestlers;
- WCW has been historically a racist enterprise in which Caucasian decision-makers routinely mistreated African-Americans without any guidelines or established criteria regarding non-discriminatory treatment of wrestlers and without any Turner Defendant to protect African-American wrestlers from systemic discrimination;
- WCW's principal decision-maker as to Walker's wrestling career, Terry Taylor, routinely referred to Walker as a "nigger," stated that "black people wouldn't make it in the business as long as he had something to do with it" (Snakovsky Deposition[1] at 78), and routinely expressed his opinion that black wrestlers could not "draw" (i.e., attract a large crowd) (Bayens at 19, 62-63);
- Compelling Statistical evidence that demonstrates that WCW's practices were racially discriminatory; and
- Additional evidence of race-based decision-making, racial stereotyping, and adverse treatment of African-American wrestlers.

Because Walker has established overwhelming direct, statistical, and circumstantial evidence that WCW had a pattern and practice of discriminating against African-American wrestlers, a <u>jury</u> must decide: (1) whether Defendants maintained a "pattern and practice" of race discrimination; and (2) whether or not Defendants can show that each of its adverse decisions

---

[1] Unless indicated otherwise, all references to a witness and corresponding page numbers will refer to the <u>deposition</u> on file or attached to Walker's Exhibits.

regarding Walker was <u>not</u> made in furtherance of its racially discriminatory practices.

Even if this Court does not find sufficient evidence of a "pattern and practice" of discrimination against all African-American wrestlers, Walker has <u>individually</u> established overwhelming direct, statistical, and circumstantial evidence showing that he was a victim of intentional racial discrimination (as well as illegal race-based decision-making). And although not required to do so, Walker can further demonstrate that summary judgment is inappropriate under the "<u>McDonnell Douglas</u>" method of proof because, notwithstanding Defendants' contentions, Walker mastered his signature move, "walking the ropes."

Similarly, Walker is entitled to a jury trial as to his retaliation claim because even though he mastered "walking the ropes," he was denied opportunities, and was prevented from succeeding because of his previous complaints and lawsuit ("first suit") against WCW and Terry Taylor.  Lastly, Walker is entitled to a jury trial because Taylor inflicted severe harm by his outrageous conduct directed at Walker.

## STATEMENT OF FACTS

### A.   WCW'S DECISION-MAKING PROCESS WAS RACIALLY BIASED

Throughout its entire history, WCW's executives and upper management were exclusively Caucasian. (Goodly at 32-33; Bischoff at 103).  In addition to its top executives (Eric Bischoff and Vince Russo), WCW had a committee ("Booking Committee") of decision-makers ("Bookers") who selected wrestlers for WCW events and developed storylines for the wrestlers.  (Schiavone at 13-14; Bischoff at 47-49; Smith at 13-14, 129; Disclosures of Expert Testimony of J. Steve Hicks ("Hicks Report") at 1, Tab S).  When the Bookers selected a wrestler they wanted to promote, by providing opportunities in main events, they providing a wrestler with a **"push."**  (Juster at 127-128; Bruce at 12-13; Hicks Report at 2-3, Tab S).

The Booking Committee was exclusively Caucasian; WCW never had an African-American, Asian-American, or Hispanic work on the Booking Committee.  (Schiavone at 18-19; Williams at 116; Russo at 67; Anderson at 189).  WCW never posted an available "booking" position, and WCW employees joked that the Committee was a "good old boys network."  (Bayens at 25-26).  Indeed, having an African-American on the Booking Committee "never seemed to be something that was a possibility."  (Bayens at 25-26; see also Boulware at 119, Tab AA (WCW officials "picked

- 3 -

their buddies and their White counterparts and didn't hire anyone that was Black").

Several qualified African-Americans, including Plaintiff Patterson, tried to become members of the Booking Committee, but the Caucasian decision-makers denied them the opportunity. (Williams at 233-234; Anderson at 134-138; Morrison at 206-209; Smith at 95-97). Also, even though Pez Whatley, Kazuo Onoo, and Lash Huffman, who also have filed claims against WCW, each complained to Turner Human Resources Manager Timothy Goodly that WCW did not have any African-American Bookers, WCW never responded to their complaints by allowing a minority to work on the Booking Committee. (Whatley at 74, Tab BB; Onoo at 70-71; Goodly at 89).

In addition to the Bookers, WCW also had "agents," who executed the mechanics of the match and went over the scripts with the wrestlers. (Russo at 62, 67; Morrison at 24). WCW never had an African-American work as an agent. (Boulware at 77, Tab AA).

Selection of Wrestlers From The Power Plant

Although many wrestlers trained at WCW's training facility, the Power Plant, WCW did not maintain any policy or guidelines regarding the manner in which wrestlers from the Power Plant

- 4 -

would receive contracts, television exposure, or wrestling
opportunities:

> There was no formal process . . . could have been any
> number of ways that that might have happened . . . One way
> might have been that there was a student who caught the eye
> of booking people or the director of the power plant or
> whatever whom they thought was ready to take that next
> step.

(Juster at 126-127; see also Bruce at 82-83; Ferrara at 55).

Brenda Smith, the administrative assistant to Power Plant
manager Jody Hamilton, testified that Hamilton distinguished
between Black and White wrestlers by using what she termed
"racial slurs within the wrestling lingo." (Smith at 19-20).
Smith further concluded that Hamilton was participating in race-
based decision-making when he spoke on the phone to the Bookers,
using code words "jiggerboggie" and "lackey" to designate
African-American wrestlers.  (Smith at 19, 21-22, 122).  Smith
testified that "when the booking committee came over to look at
different wrestlers," they "specifically watched the Caucasians
that Mr. Hamilton suggested."  (Smith at 132, 136).

B.   **WALKER'S RELATIONSHIP WITH DEFENDANTS**

In 1993, Walker tried out at WCW and was selected to train
at the Power Plant.  Walker was a very hard worker and was a
"big strong guy that could do a lot of good moves."  (Bruce at
71-72).  Walker chose the stage name "Hardwork" to become a star
and a role model to young persons, by showing them that hard

- 5 -

work and perseverance leads to success.   (Bruce at 75; Walker

Dep. at 57-58; Walker Aff. ¶ 1, Tab A).

Walker Is Occasionally Used At WCW As A "Token" African-American
and Learns of WCW's Widespread Racism

Despite his hard work and ability, WCW utilized Walker only

as a token African-American.  Indeed, Trainer Mulligan

specifically informed Walker that "the only reason that you are

here is because they need color on TV."  (Walker at 162-163).

On one occasion, Walker was walking past the room where the

Bookers regularly met to decide the storylines ("war room") and

heard "what nigger we got tonight?"  (Walker at 210-211).  When

Walker began developing the skills to become a successful

wrestler, Booker Sullivan informed him that one of the reasons

why Walker would not succeed at WCW was that "[he was] black and

this is still a good old redneck company."  (Walker at 149-150,

194).

Terry Taylor informed Walker that "the only reason you got

a job is you are black."  (Walker at 145).  Similarly, Taylor

stated to Walker and wrestler Ernest Miller that, "y'all are

only here because you are black.  Other than that you wouldn't

be here."  (Walker at 180-181; see also, Onoo at 188).

Because Taylor was not giving him opportunities, Walker

spoke directly to Taylor about his status and future.  Soon

- 6 -

thereafter, Walker was told that Taylor did not "appreciate a black man questioning him." (Walker at 146, 204).

## WCW Terminates Walker's Contract; Walker Formally Complains Of Terry Taylor's Racial Bias And Then Sues WCW And Terry Taylor

When WCW terminated Walker's contractual relationship, Walker sent separate letters to WCW President Eric Bischoff and Turner Sports President Dr. Harvey Schiller, informing them that Taylor has a "deep dislike for blacks." (Pls.' Exs. 10, 15, Tabs B and C).

Walker then filed his first suit, which became well-known throughout WCW. (Kearce at 64-65; see also Hart at 76 ("the rumor was out about [Walker] having lawsuits")).

## WCW Fails To Meaningfully Respond To Walker's Complaints Of Racial Bias

Although Bischoff was aware of Walker's complaints regarding Taylor, Bischoff did not investigate the complaints. (Bischoff at 122-125). Bischoff stated, that it was "a human resource issue." (Id. at 126). In contrast, Tim Goodly, who was responsible for WCW's Human Resources at that time, testified that he had no "official" duties regarding wrestlers and took no action himself against Taylor in response to Walker's or any African-American's complaints about Taylor's racial bias. (Goodly at 63, 83.) Moreover, notwithstanding the complaints,

Taylor remained in the same position with the same authority at WCW.  (Id. at 83-85).[2]

WCW Settles Walker's First Suit And Treats Walker Adversely

Even though Walker negotiated a new contract in connection with settling his first suit, he was then required to continue to train at the Power Plant for a lengthy period of time.  No other wrestler who was also under contract and had his experience was similarly required to do so.  (Walker Aff. ¶ 13, Tab A).  Also, after settling the first suit, WCW stopped sending Walker the wrestling schedules ("booking sheets"), even though WCW had always sent them to Walker before his suit.  (Walker Dep. at 153-154).

Although Walker was very successful in the limited opportunities provided him by WCW, WCW retaliated against him by refusing to use him on its main shows or giving him any meaningful opportunities.

## ARGUMENT AND CITATION OF AUTHORITY

Summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact," Cornelius v. Town of Highland Lake, 880 F.2d 348, 351 (11th Cir. 1989), or

---

[2] Although **Taylor** worked for another wrestling organization for a period of time, he returned to WCW and was readily accepted back at WCW.  (Bischoff at 133).  Taylor then soon resumed his old position as WCW's "top booker." (Miller at 57, 71-77; Walker Aff. ¶ 27, Tab A).

if reasonable minds could differ on the inferences arising from undisputed facts.  See Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992).  In assessing the record, the Court may not weigh evidence or make credibility determinations.  See Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 181 (11th Cir. 2001).  In sum, Rule 56 merely requires Walker to present "sufficient evidence" in order to require a fact-finder to resolve the "parties' different versions of the truth at trial."  First Nat'l Bank v. City Serv. Co., 391 U.S. 253, 288-289 (1968).

I.   **PLAINTIFF IS ENTITLED TO A JURY TRIAL BECAUSE HE HAS PRODUCED OVERWHELMING EVIDENCE OF INTENTIONAL DISCRIMINATION.**[3]

Defendants imply that Walker is restricted to proving discrimination under the methodology set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798 (1973).  Defendants' position is misplaced because a plaintiff is not restricted to one method of proving discrimination.  As stated by the Supreme Court, the McDonnell Douglas framework is "merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."  United States Postal Service Bd. of Governors

---

[3] Walker is presently seeking relief under Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 1981.  And for all the reasons set forth in Plaintiff Norris' Response, Walker can proceed under both of these

- 9 -

v. Aikens, 460 U.S. 711, 715 (1983); see also, Costa v. Desert Place, Inc., 299 F.3d 838, 855 (9th Cir. 2002) ("nothing compels the parties to invoke McDonnell Douglas").

As set forth infra, the Eleventh Circuit has recognized that a plaintiff can rely on pattern and practice, direct, and/or McDonnell Douglas evidence to prove discrimination. Walker has established each of these types of evidence, and thus shows that he can easily persuade a trier of fact that Defendants discriminated against Walker.  See Aikens, supra at 716 (stating that trial courts should not treat discrimination "differently from other ultimate questions of fact").

A.   WALKER HAS ESTABLISHED PATTERN AND PRACTICE EVIDENCE.

Because Walker can demonstrate a "pattern and practice" of discrimination, "a rebuttable presumption that each plaintiff was a victim of discrimination obtains, and the burden shifts to the employer to prove that each individual employment decision was not made in furtherance of its illegal policy." Hipp v. Liberty National Life Ins. Co., 252 F.3d 1208, 1227-28 (11th Cir. 2001).

Although "pattern and practice cases" are ordinarily raised by the Equal Employment Opportunity Commission ("EEOC"), or by class action plaintiffs, the courts have also allowed plaintiffs

statutes.  In any event, the analysis regarding Walker's evidence of discrimination is the same under each statute.

in individual cases to prove discrimination through "pattern and
practice evidence." <u>Cox v. American Cast Iron Pipe Co.</u>, 784
F.2d 1546, 1559 (11th Cir. 1986)(noting that although pattern and
practice cases usually involve class actions, the individual
plaintiffs showed pattern and practice where sex discrimination
was "the company's standard operating procedure"); <u>see also</u> <u>Tye</u>
<u>v. Houston County Bd. of Educ.</u>, 681 F. Supp. 740, 745 (M.D. Ala.
1987) (stating that individual plaintiff was entitled to
presumption of discrimination where she established a pattern
and practice of sex discrimination).

A plaintiff is allowed to prove pattern and practice
evidence of discrimination through (1) direct evidence; (2)
statistical evidence, and/or (3) anecdotal evidence that reveals
the employer's "intent" to treat a protected class unequally.
<u>See</u> <u>EEOC v. Joe's Stone Crab, Inc.</u>, 220 F.3d 1263, 1286-1287
(11th Cir. 2000). Walker has established compelling evidence in
each category as shown below.

1. <u>Direct evidence</u>

Walker can establish a pattern and practice of
discrimination through direct evidence because the principal
decision-makers, Terry Taylor, Eric Bischoff, and Vince Russo,
as well as the Bookers, made numerous remarks and statements

that constitute direct evidence of their racial discrimination against all African-American wrestlers, including Walker.

As to Taylor, arguably the most influential decision-maker as to Walker (and each African-American Plaintiff),[4] the record is replete with Taylor's most blatant remarks "whose intent could be nothing other than to discriminate on the basis of [race]." Bass v. Bd. of County Comm., 256 F.3d 1095, 1105 (11th Cir. 2001). Examples of the testimony revealing Taylor's offensively racial bias include:

- Stating to **Walker** that "you're a nigger and you have no talent." (Snakovsky at 76).
- When informed that **Walker** had complained of his racial bias, stating that "I don't know if I'm a racist but I know that . . .[h]e's a nigger with no talent." (Bayens at 19).
- Stating that neither **Walker** nor Hardbody Harris would make it in the wrestling profession because they were "black." (Snakovsky Aff.  at ¶ 7, Tab D).
- When **Walker** was jumping off the ropes, stating "that nigger, he's not good for jumping, so he should go play basketball too." (Snakovsky at 83-84).
- Repeatedly telling African-American Ernest Miller that even though Miller was a good athlete, "the only reason you got a job is because you're black" and that "this company don't market toward blacks; we only have white fans, and [they're only going to] look at you as a nigger." (Miller at 66, 101).
- Stating that, in his opinion, black wrestlers "weren't much of a draw." (Bayens at 19, 62-63).
- Stating that black persons had great physiques because they were genetically inclined or predisposed, but that he questioned their ability to wrestle. (Bayens at 21-22, 64-65).
- Stating that Ernest Miller was "another nigger with no talent." (Bayens at 20).

---

[4] Taylor was known as the "top" or "head" booker as the other bookers were subordinate to him.  (Miller at 197-198).

- Stating that black wrestlers "shouldn't be in our sport, they should be in basketball." (Snakovsky at 78).
- Stating that "a lot of black people wouldn't make it in the business because they are black as long as he had something to do with it." (Snakovsky at 78).
- When renowned wrestler Hulk Hogan was scheduled to begin at WCW, stating that he did not want any black wrestlers on the show; "there won't be any brothers on the show." (Williams Aff. ¶ 40, Tab E; Williams at 54-57).
- In reference to Harrison Norris, stating "that damn Hardbody is a no good nigger." (Snakovsky at 108, 140; Snakovsky Aff. ¶ 18, Tab D).
- Taylor used the "nigger" word quite a bit. (Anderson at 107).
- When watching a match involving Ernest Miller and Sonny Onoo, stating "there's a nigger and a Jap. Who's going to want to watch that?" (Bayens at 67; Miller at 148-149).
- When referring to African-American wrestlers, saying "that stupid nigger" and often used the word "nigger" when he was talking to other WCW officials while traveling on WCW business. (Anderson at 85, 172-173).
- When a Caucasian was scheduled to replace an African-American, stating "don't worry about the niggers, I'll take care of that." (Williams at 110).
- Stating his opinion that wrestling fans are "white" and that blacks don't buy wrestling tickets." (Williams at 111, 114-116; Williams Aff. ¶ 14, Tab E).
- On a very cold winter day, stating that "you better turn on the air conditioner because you know those niggers can't take the cold." (Carr at 92-93, Tab Z).
- When African-American wrestler Tony Carr was going to participate in a WCW event in Montana, stating that "no one would believe there were niggers in Montana." (Carr at 139, Tab Z).
- Apparently referencing to a demographic survey that was done by a Turner Defendant, informing African-American Rocky Boulware that "Turner told us we don't need to use you all niggers." (Boulware at 71, 124-125, Tab AA).

WCW President Eric Bischoff also made many statements

unequivocally revealing his intent to discriminate, as follows:

- Stating that wrestling was a "white man's sport" and that is why WCW did not have many black wrestlers.  (Williams Aff. ¶ 12, Tab E).
- Stating that blacks were not paying to watch WCW events live and that they would rather watch it on TV. (Anderson at 177; Walker at 178).
- When observing Plaintiff Norris, he stated that "that's too niggerish for my television." (Anderson at 90, 177-178).
- When observing another African-American wrestler, he stated that "we need to get that crack nigger off the TV." (Anderson at 76-77, 202).
- Using the word "nigger" in relation to wrestlers on more than one occasion. (Kearce at 42).
- On one occasion, while removing African-American wrestlers from the schedule, indicating that it was "white night." (Whatley at 132-134, Tab BB; Smith at 57; Walker at 177-178).
- When Plaintiff Patterson tried to get a job at WCW, telling him that "we don't need no niggers." (Patterson at 76, 93).
- Instructing Bookers not to worry about "pushing a black or a nigger." (Anderson at 177).
- Asking why WCW was "pushing some of the blacks and some of the niggers on our television show?" (Anderson at 74-75).

Similarly, <u>Vince Russo</u>, Bischoff's successor, made

blatantly racist remarks, demonstrating his intent to also

discriminate against African-Americans:

- Agreeing that African-American wrestlers were not as good workers as the white wrestlers.  (Snakovsky at 82).
- Often using racial slurs, including "nigger" when referring to wrestlers.  (Sullivan at 55-56).
- Calling African-Americans "Moolions," referring to a tribe from Africa.  (Sullivan at 56).
- Indicating his racial bias by specifically referring to "blacks" or "the brothers."  (Williams at 94-96).

- 14 -

- Stating that "whites rule wrestling."  (Williams Aff. ¶ 12, Tab E).
- Stating that "black folks don't buy wrestling tickets anyway, wrestling fans are white."  (Williams at 94-96).
- Indicating that WCW was going to have a "white champion" because that was the way he wanted it.  (Williams Aff. ¶ 12, Tab E).
- Using the word "nigger" on more than one occasion.  (Kearce at 38).

Thus, Taylor's, Bischoff's and Russo's statements are direct evidence of discrimination; the statements reveal racial discrimination against African-American wrestlers, without any inference or further inquiry. See Price Waterhouse v. Hopkins, 490 U.S. 220 (1989) (finding direct evidence where a decision-maker believed that women were not capable of functioning as senior managers); Haynes v. WC Kaye and Co., 52 F.3d 928, 930-31 (11th Cir. 1995) (finding direct evidence where decision-maker stated that "women were simply not tough enough" and that "it would require a man to do the job"); Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555 (11th Cir. 1990) (finding discrimination where decision-makers stated that the program "needed a black director").

Lastly, the Bookers' constant and frequent use of racial slurs, including "nigger," (see Sullivan at 13-14; Yother at 13-16; Smith at 131; Anderson at 83-84, 109-111, 174-175; Boulware at 49-50, Tab AA; Juster at 116-117; Williams at 252; Schiavone at 16-24; Walker at 210-211; Kearce at 29, 31-33, 41), also

- 15 -

constitutes direct evidence of discrimination.  See Miles v. MNC Corp., 750 F. 2d 867, 873-76 (11th Cir. 1985) (characterizing evidence of racially derogatory remarks as direct evidence).

Accordingly, Walker has established ample direct evidence of a pattern and practice of racial discrimination against African-American wrestlers.

### 2.   Statistical evidence

Mr. Walker has produced convincing statistical evidence, through the expert testimony of Dr. David W. Rasmussen, who is the  James H. Gapinski Professor of Economics, which conclusively demonstrates that WCW's practices were discriminatory. Using appropriate benchmarks regarding the available applicant pool, Dr. Rasmussen concluded that WCW's practices demonstrated standard deviations which are "far beyond the standard" that "indicates that chance accounts for the under-representation of African-Americans at WCW." (Supplemental Expert Report at 5, Tab F).

Dr. Rasmussen also did an analysis of the statistical breakdown regarding WCW wrestlers who received the highest salaries, and found a "less than one chance in 100 that this outcome" could occur by chance alone.  (Disclosures of Expert Testimony of Dr. Rasmussen at 18, Tab T).  Walker's statistical evidence, therefore, further establishes a pattern and practice

of discrimination.  See EEOC v. Joe's Stone Crab, Inc., supra,
at 1287.

### 3.  Anecdotal evidence

In addition to the compelling direct and statistical
evidence, Walker has also established ample anecdotal evidence
of discrimination:

> a.  WCW's decision-making process was racially
> biased.

WCW's practice of allowing exclusively Caucasian decision-
makers to use informal methods of selecting its wrestlers
further demonstrates a pattern and practice of race
discrimination.  Rowe v. General Motors Corp., 457 F.2d 348, 359
(5th Cir. 1972); see also, Robert's v. Gadsden Memorial Hospital,
1988 U.S. App. LEXIS 19507 at *14-15 (11th Cir. 1988)
(defendant's informal methods of selection "necessarily and
intentionally favored those who moved within his social circles
- i.e., white people").

In Rowe, the Court held that the defendant's exclusively
Caucasian, and completely subjective decision-making process,
was a "ready mechanism for discrimination against blacks, much
of which can be covertly concealed, and for that matter, not
really known to management."  Rowe at 359.  The Court further
noted that "we and others have expressed a skepticism that black

persons dependent directly on the decisive recommendations from whites can expect non-discriminatory actions." Id.

Similarly, WCW's exclusively Caucasian decision-makers were able to readily perpetuate the dominance of Caucasian wrestlers. Significantly, although the Turner Defendants provided Human Resource managers to assist WCW, these managers did not even have "any official duties as related to [wrestling] talent." (Goodly at 63). Loretta Walker, a Turner Human Resource manager assigned to WCW, testified that she was not responsible for preventing discrimination against wrestlers because they were not deemed to be "employees." (Walker at 12-13). Furthermore, although the witnesses are completely inconsistent as to who, if anybody, was responsible for ensuring that the wrestlers were not victims of discrimination,[5] the evidence is clear that no Turner or WCW employee/officer who had even minimal training in equal opportunity or anti-discrimination laws took any responsibility for ensuring that the African-American wrestlers were being treated fairly, which is evidence of discrimination. See Rowe, supra, at 359 (finding that Defendants' decision-making process violated Title VII, in part, because "there are

---

[5] Compare Goodly at 65-67 (testifying Bischoff and possibly Myers and Busch were responsible) with Loretta Walker at 21 (testifying that although she was Human Resource Manager for employees, she did not know who was responsible for protecting wrestlers from discrimination).

- 18 -

no safeguards in the procedure designed to avert discriminatory practices").

        b.    WCW demonstrated racial bias in the scripting and staging of wrestling events.

WCW's pattern and practice of discrimination is also illustrated in the manner in which it scripted its matches. Perhaps most illustrative is when WCW directed a Caucasian manager, Colonel Parker, to dress like a "southern gentleman" and lead his African-American wrestling tag team, "Harlem Heat" into the arena shackled in chains.  In short, the wrestlers were "dressed like slaves," and Colonel Parker was dressed like a "slave owner." (Kearce at 34-36).

Also, during a main event, WCW instructed a Caucasian wrestler, Buff Bagwell, to appear in the ring with his face painted black in order to mock African-American Ernest Miller. Taylor even commented to Miller: "he [looks] like you.  He look[s] like a nigger."  (Miller at 149).  WCW officials also frequently wanted African-American wrestlers to dress like "pimps" based on the racial stereotype that black men are pimps. (Miller at 194-195; Norris at 180).

        c.    African-American wrestlers were treated differently at WCW's Power Plant.

Although Caucasian "rookies" performed limited manual labor at the Power Plant, the evidence establishes racial disparities

regarding the amount of physical labor performed by African-American wrestlers.  (Smith at 27-28; Davis at 77).  As Walker testifies, the black wrestlers "didn't have a choice" because if they did not work the managers believed that they had a "bad attitude," but white wrestlers often left early without doing physical work or helping out.  (Walker at 102-103).

Similarly, as explained by a WCW trainer, whenever a Caucasian trainee made a mistake, the Caucasian was given another opportunity. (Whatley at 101, Tab BB).  In contrast, when African-American wrestlers faltered, WCW officials concluded that he "didn't want to be there" or "had a bad attitude." (Id.)

> d.   In response to Walker's first suit, WCW pushed African-American wrestlers to deflect racial allegations.

Throughout its entire history, the only two times that WCW made an African-American the heavyweight champion, it was facing a charge of or suit for racial discrimination.  In January 1992, WCW received notice of an EEOC charge filed by African-American wrestler Ranger Ross.  (Ross EEOC Charge, Tab G).  Instead of adequately responding to Ross' allegations, in August 1992, WCW made another African-American, Ron Simmons, its first African-American heavyweight champion.  (List of Champions, Tab U).  In addition to the suspicious temporal connection, WCW official

- 20 -

Olie Anderson admitted that WCW was promoting African-Americans to respond to racial complaints at that time. (See Anderson Interview, Tab H) (explaining that a WCW official stated, "we've taken a black team and we've made them champion so that they wouldn't have any bitch from a racial point of view").

Similarly, after Plaintiffs Walker and Norris filed their complaints of race discrimination in February 2000, WCW once again responded by making another African-American, Booker T, the heavyweight world champion on July 9, 2000. Significantly, Taylor told Russo that he wanted to "take the heat off" the racial allegations. (Snakovsky Aff. ¶ 20, Tab D; Snakovsky at 99-100). Indeed, virtually every witness agrees that the circumstances under which Booker T became the champion were very unusual. (Williams at 151-160, 165; Schiavone at 22-26).

WCW's actions after the event are also revealing. For example, Schiavone recalls conducting an initial interview with Russo about Booker T's championship, but this interview was not aired and WCW had Schiavone tape a second interview. (Schiavone at 29-33). As to the initial interview tape, Assistant Producer Michelle Bayens stated:

> I knew that when the tape came back and they put it up and I asked about why all the secrecy, and they said because there was a lot of discriminating things, or that could be construed as discriminatory within the interview, so they - the powers that be had to take a

look at it to see whether it could air or not.  And a
second interview was shot just in case.

(Bayens at 99).[6]

Thus, a reasonable jury could conclude that WCW's conduct

including belatedly and reluctantly promoting African-Americans

to deflect racial allegations, as well as its many concerns

about the racial issues surrounding Booker T, further shows that

it was engaged in discrimination.

> e.   WCW personnel admit racial slurs, race
>      discrimination and lack of diversity.

Turner's Human Resource manager, Goodly, admitted to Walker

that he was aware of discrimination at WCW, but that he "had a

job too."  (Walker at 254).  Goodly also noticed a lack of

diversity in the upper talent at WCW, (Goodly at 69-73), and

suggested to Bischoff that WCW should get a "fresh set of eyes,"

such as Konan (Hispanic) or Booker T (African-American) on the

Booking Committee, (Goodly at 89-91).  Goodly also acknowledged

that WCW's practice of not using African-Americans as world

champions might be a "red flag of discrimination" that could

lead to differing opinions as to the practice of not selecting

African-American champions.  (Goodly at 95-97; see also Goodly

at 176 ("I just didn't think we had strategies in place to

---

[6] Bayens further recalls, "I know they talked about him [Booker T] being Black
and if that was an issue.  I don't remember the answers."  (Bayens at 104).
She also states, "yes, it was a great concern."  (Bayens at 100-106).

- 22 -

market diverse talent, to market all talent as well as the competition")).

In addition, other WCW employees' knew about the obvious discrimination and racism at WCW.  (See Bayens at 94 ("When you take a step back . . . [minority wrestlers] were treated less favorably or weren't promoted because of the color of their skin"); Kearce at 27-28 (testifying about "bigotry" and "racism" at WCW); Collins Aff. at ¶¶ 3-5, Tab J (observing that "Caucasians dominated WCW")).

> f.   WCW discriminated against African-American wrestlers in merchandising.

Walker has established evidence that WCW disparately merchandised its wrestling products, such as T-shirts and other props, based on race.  (Miller at 117-119; see also, Williams at 69-72 (testifying that although many of the younger fans requested more merchandise for the African-American wrestlers, WCW did not adequately merchandise for minority wrestlers)).

Moreover, WCW officials Taylor and Arn Anderson admitted that WCW did not merchandise items for African-Americans because black people "don't buy anything when they come to the show" and "white people ain't [going] buy merchandise T-shirts with black faces on it."  (Miller at 120).

g.   WCW discriminated against African-American
     employees.

In considering WCW's pattern and practice of racial
discrimination, evidence that WCW discriminated against African-
American non-wrestling employees is revealing.  WCW only
employed about 12% African-Americans.  Of these, only two were
mid-level managers, and none were senior managers.  (See Smith
Aff., Tab I; Collins Aff. ¶ 4, Tab J).  Indeed, even Goodly
acknowledges that minority representation at WCW was not
"consistent with what [he] knew to be good HR practice."
(Goodly at 49).

In addition:

• WCW routinely favored Caucasian personnel who had less
  experience than more qualified African-Americans.  (Smith
  at 39-42, 44-45, 151-152, 180-181, 189; Williams at 217-
  222).
• WCW's Security manager Doug Dillinger expressly refused to
  hire a "black" security person.  (Williams at 134-135; Carr
  at 111, Tab Z).
• A Caucasian supervisor requested security personnel to
  check the bags and belongings of African-Americans, but did
  not similarly request that the security personnel to check
  the belongings of the Caucasians.  (See Neal Aff. ¶ 7, Tab
  K).

Accordingly, only a jury can decide whether all of the
above-described evidence, when considered collectively,
demonstrates a pattern and practice of racial discrimination.
See Hipp v. Liberty National Life Ins. Co., 252 F.3d 1208, 1227-

- 24 -

28 (11th Cir. 2001) (the proper method of adjudicating pattern
and practice cases is to submit a verdict form to the jury).

B.   WALKER IS ENTITLED TO A JURY TRIAL BECAUSE HE HAS
     ESTABLISHED DIRECT EVIDENCE OF RACE DISCRIMINATION.

Even if the Court does not find sufficient direct evidence
of a pattern and practice of discrimination, the above-
referenced evidence, (see supra at pp. 12-15), nevertheless
constitutes direct evidence of discrimination against Walker.
Where an individual plaintiff establishes direct evidence of
discrimination, summary judgment is inappropriate.  See Taylor
v. Runyon, 175 F.3d 861, 866 (11th Cir. 1999) (stating that
judgment as a matter of law is not appropriate where non-movant
presents direct evidence).

As noted above, WCW's principal decision-makers, Taylor
(who was the principal decision-maker as to Walker), Bischoff,
and Russo each made blatantly discriminatory remarks that
establish "the existence of discriminatory intent behind their
adverse decisions regarding Walker "without any inference or
presumption."  Standard v. ABEL Serv., Inc., 161 F.3d 1318, 1330
(11th Cir. 1998).  Moreover, Russo, Bischoff and especially
Taylor's remarks demonstrate a fundamental belief that African-
Americans, as a class, were not as suited for the wrestling
business as were Caucasians.  Thus, Walker has established
direct evidence that WCW discriminated against him.  See Burrell

v. Bd. of Trustees, 125 F.3d 1390, 1394 n.7 (11th Cir. 1997)

("[s]uch statements because of their breadth -- may obviate the

need for inferences about the speaker's motivation for a wide

category of employment decisions"); see also EEOC v. Alton

Packaging Corp., 901 F.2d 920, 924 n.6 (11th Cir. 1990)

(decision-makers comments constituted direct evidence where the

statements indicated "a decidedly negative attitude toward black

people").  Thus, because Walker has established direct evidence

of discrimination, summary judgment is inappropriate.

C.    WALKER IS ALSO ENTITLED TO A JURY TRIAL BECAUSE HE CAN
      EASILY ESTABLISH DISCRIMINATION UNDER THE MCDONNELL
      DOUGLAS METHOD OF PROOF.

1.    Walker Can Establish a Prima Facie Case of
      Discrimination.

Although Defendants argue that Walker cannot make out a

"prima facie case," Defendants misconstrue Walker's claims, as

well as the applicable law.  Defendants attempt to characterize

Walker's case as a "failure to hire" or a "failure to promote"

case.  Walker, however, is not alleging that he was denied

promotion to one particular position.  Instead, he is alleging

that although he had a contractual relationship with WCW, it

discriminated against him by failing to provide him with the

training, exposure, and push that was provided to Caucasians.

Although Defendants contend that Walker must show that he

is "obviously more qualified," (DB at 19), than a particular

- 26 -

Caucasian, the cases upon which Defendants rely relate to situations where a plaintiff's <u>sole</u> evidence is the comparison of his/her qualifications to the person that received a particular position.  See e.g., <u>Dennis v. Columbia Colleton Medical Center</u>, 290 F.3d 639, 648 (4th Cir. 2002) (evidentiary standard that a plaintiff's superior qualifications must "slap one in the face" only applies where a plaintiff's "<u>sole</u> evidence of pretext is the superior qualifications of the plaintiff").

Moreover, this Court should not compare Walker's qualifications with Caucasians <u>after</u> they received the very opportunities that were denied Walker.  Rather, the Court must allow a jury to decide whether Walker was as qualified as Caucasian wrestlers who were given the "push" to become popular, successful, and well compensated.

Indeed, all of the Power Plant wrestlers were relatively inexperienced at wrestling before live or televised audiences and needed regular television exposure to succeed. (Ferrara at 51).  Power Plant wrestlers also needed some direction and assistance when performing before live audiences and speaking. For example, WCW biggest Power Plant success, Bill Goldberg, was provided significant microphone training and was told what to do in his matches to help him become successful.  (Bruce at 44; Walker at 105).

Nevertheless, even though WCW refused to push him, Walker can still show that he was more qualified than Caucasian wrestlers who received a push.  For example, a factual question exists as to whether Walker was better than Caucasian wrestlers such as Chris Kanyon, who became fairly successful at WCW. According to Walker's wrestling expert, Sergeant Steve Hicks, Walker was equal to Kanyon even though WCW pushed Kanyon and provided more air time.  (See Hicks Aff. ¶ 14, Tab L). Significantly, when asked whom he would select as a tag team partner, Bruce selected Walker over Mr. Kanyon. (Bruce at 71-72 (stating that he would select Walker, in part, because Walker was a "big strong guy with lots of moves"); see also, Kearce at 82 (testifying Walker was more talented than WCW Caucasian superstar Lex Luger)).[7]

Summary judgment is also inappropriate because a wrestler's success was limited only by the creative imaginations and intentions of the Caucasian Bookers.  (See Sullivan at 35 (testifying to the fallibility of process because matches were "not real"); see also Hicks Aff. ¶¶ 9-11, Tab L).  Indeed, WCW made an actor, David Arquette, WCW's world heavyweight wrestling

---

[7] Mr. Walker also shows he was as qualified or more qualified than many Caucasian wrestlers who received the opportunities denied him, including those identified by Defendants.  (DB at 18).  Also, Walker was better than Caucasian Tank Abbott, who made over five times what Walker made.  (See Bruce at 72 (selecting Walker over Abbott); Schiavone at 53 ("I thought Bobby was a lot better" than Tank Abbott)).  Also, Walker was similar to Caucasian

champion even though Arquette had no demonstrable "wrestling"
experience.  As noted by a WCW producer, WCW could have made
Walker a superstar because WCW can "make anybody they want to a
superstar."  (Kearce at 82).

Thus, Walker has established a prima facie case of
discrimination, especially in light of his statistical evidence
and Defendants' subjective decision-making process. See <u>Crawford
v. Western Electric Co.</u>, 614 F.2d 1300, 1315-1320 (Former 5th
Cir. 1980) (plaintiffs established prima facie case where
subjective criteria was used and plaintiffs' evidence showed
Caucasians were generally advanced more readily).

      2.   <u>The Court should reject Defendants' non-
           discriminatory reasons that are not supported by
           a "clear and reasonably specific" factual basis.</u>

Although Walker recognizes that a defendant's burden of
production in identifying non-discriminatory reasons for adverse
employment actions is light, a defendant is nevertheless
required to identify its non-discriminatory reasons <u>and</u> support
them with a "clear and reasonably specific" factual basis.  See
<u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 258
(1981).

Defendants' Motion fails to specifically identify the
alleged nondiscriminatory reasons upon which they now rely to

---

wrestlers Akeia and Wright in his abilities, but WCW gave these Caucasians
much better treatment and opportunities.  (Hicks ¶ 15; Tab L).

defend their adverse treatment of Plaintiff.  It appears,

however, that Defendants now assert the following three alleged

non-discriminatory reasons for their adverse treatment of

Walker:

1)   Walker "frequently fell from the ropes," (DB at 17);
2)   Walker purportedly lacked the requisite wrestling "skills,
     charisma, persona, uniqueness, excitement, persona, and
     acting ability" ("lack of skills"), (DB at 19); and
3)   WCW purportedly was experiencing a "business downturn" in
     "1999" and had "less need for mediocre talent" ("business
     downturn"), (DB at 20).

The Court should reject both the "lack of skills" and the

"business downturn" reasons because Defendants have failed to

provide a clear and reasonably specific factual basis for these

vague and very broad assertions regarding Walker.

The Supreme Court's requirement of a "clear and reasonably

specific" non-discriminatory reason is critical because a court

needs "objective factors that can be tested against other

testimony and evidence."  Chapman v. A.I. Transport, 229 F.3d

1012, 1034 n. 25 (11th Cir. 2000).  As set forth by the Supreme

Court, in Texas Dep't of Community Affairs v. Burdine, 450 U.S.

248, 258 (1981), Walker must be entitled to a "full and fair

opportunity" to demonstrate pretext.

Unlike Defendants' proffered reason of "walking the ropes,"

which can be rebutted, Defendants remaining reasons are so non-

specific and factually baseless that Walker should not have to

rebut them.  See Chapman, supra at 1034 (noting that a defendant
cannot obtain summary judgment by merely stating, "I did not
like his appearance," without further explanation); IMPACT v.
Firestone, 893 F.2d 1189, 1194 (11th Cir. 1990) (a "mere
statement that employer hired the 'best qualified person' leaves
no opportunity for the employee to rebut the given reason as a
pretext").

Moreover, as to "lack of skills," the Court should note
that these Defendants have consistently proffered virtually the
same alleged non-discriminatory reasons regarding other African-
Americans whom Defendants denied meaningful opportunities.
Incredibly, Defendants are simultaneously seeking summary
judgment in Plaintiff Norris' case because he too "lacked the
basic skills necessary to be a highly successful wrestler."
(See DB Norris at 18, Tab M).  Defendants also argued, in a
similar race case brought by African-American wrestler Tony
Carr, that Mr. Carr "lacked unique wrestling skills, physique,
demeanor, and other characteristics of WCW's better performers."
(See DB Carr at 13, Tab N).  Indeed, when WCW denied allegations
raised by African-American wrestler Robert Ross in 1993, he too
purportedly "lacked the charisma and ability to generate
widespread interest in his matches."  (DB Ross at 9-10, Tab O).

- 31 -

Furthermore, "business downturn," as a purported non-discriminatory reason, makes absolutely no sense in Walker's case because WCW was not even making <u>any</u> decisions as to Walker in 1999.  Defendants admit that Walker had a contract that expired in December 2000.  (DB at Ex. 11).  If anything, a jury could conclude that WCW preferred to discriminate and retaliate against Walker, rather than get any value out of its contractual relationship with him, which did not expire until December 31, 2000.

Accordingly, except for their contention that "Walker could not walk the ropes," Defendants have not provided a factual basis for any of their alleged non-discriminatory reasons.  As such, these reasons should be rejected.  <u>See</u> <u>Burdine</u>.

> 3.   <u>Walker has demonstrated that all purported non-discriminatory reasons are pretext for race discrimination.</u>
>
>> a.   Defendants rely on testimony from witnesses who were not Walker's decision-makers and have demonstrated racial bias

Defendants strategically avoid reference to Taylor, instead relying on four witnesses for their broad assertions regarding Walker: WCW Power Plant managers Orndorff and Hamilton, Manager Morrison ("Dillon"), and WCW Agent Lunde.  **The Court should disregard their testimony because these individuals were not even the actual decision-makers as to Walker.**  Orndorff denies

that he had any authority to "push" a wrestler on the main
events while he was manager at the Power Plant.  (Orndorff at
29).  Similarly, Hamilton states that although he provided
Taylor and other Bookers with his "opinions" about the
wrestlers, he did not think that his recommendations influenced
the decision-making process. (Hamilton at 29-31).  Dillon, who
now confidently testifies that "WCW's decision not to renew
Walker's contract had nothing to do with his race," (Dillon Aff.
¶ 10, Ex. B to DB), could not even specifically recall whether
Walker was terminated or that his contract was not renewed,
(Dillon at 145; see also Lunde at 14 (testifying that Bischoff
was the decision-maker, but that Bischoff based his decisions on
information from Taylor)).

Thus, because these individuals either deny responsibility
for the adverse decisions affecting Walker, or did not play a
significant role as to Walker, the Court should disregard their
testimony.  See IMPACT, supra at 1194 (rejecting Defendants'
purported non-discriminatory reason because defendants did not
even offer proof of reasons by "any person who made the
employment decision").

Moreover, **each of these individuals demonstrated their
racial bias against African-Americans.**  Defendants take the
anomalous position that Walker was not qualified to wrestle on

- 33 -

WCW's main events, as a matter of law, even though the persons who belatedly deem him "unqualified" have demonstrated racial bias against African-Americans.  Jody Hamilton made numerous statements, including using the word "nigger," and other racially derogatory statements while he was the manager at WCW's Power Plant.  (Smith at 19-21, 34, 122; Patterson at 30, 95-97, 117; Whatley at 95-97, Tab BB; Reeves at 59; Carr at 55, 97, Tab Z; Boulware at 59-61, 73, 150, Tab AA).  Paul Orndorff also made numerous racial comments and racial slurs, even concluding that "niggers" were what was wrong with America.  (Anderson at 106-107; 170; Hart at 117; Onoo at 254-255; see also Boulware at 23-33, 72-73, Tab AA).

Although the evidence also suggests that Hamilton and Orndorff wanted to "push" Walker, despite their admitted prejudices, only a jury can decide whether their belated, inconsistent assessment of Walker is also racially biased. (See, e.g., Hart at 117 (testifying that Orndorff stated that some black wrestlers were "good," but "then you got some of the wrestlers that are niggers")).

To the extent that Defendants rely on Dillon's and Lunde's testimony, they too demonstrated racial bias against African-Americans, including using racial slurs such as "nigger." (Sullivan at 13-14; Yother at 13-16; Smith at 131; Anderson at

75, 83-84, 109-111, 174-175; Boulware at 49-50, Tab AA; Juster at 116-117; Williams at 252; Schiavone at 16-24; Walker at 210-211; Kearce at 29, 31-33, 41).  Accordingly, this Court cannot conclude, as a matter of law, that Walker lacked the requisite skills to become a successful wrestler, and it certainly should not base any such finding on these witnesses' assertions.

> b.    Walker has established pretext because Defendants' reasons are filled with inconsistencies and contradictions.

Defendants' belated explanations as to why WCW did not promote and push Walker is replete with internal inconsistencies and contradictions, thus demonstrating that its reasons are pretextual for discrimination.  See Sheridan v. E.I. Dupont de Nemours, 100 F.3d. 1061, 1072 (11th Cir. 1997) (noting that "weaknesses, and implausibilities, inconsistencies, incoherencies, or contradictions" in defendants' reasons could lead a reasonable fact-finder to find them "unworthy of credence").

The Court need only compare Hamilton and Orndorff's affidavits with the statements they made prior to the lawsuit and then review their deposition testimony. For example, Hamilton states in his December 16, 2002 Affidavit that "Walker failed to master his signature move."  (Hamilton Aff. ¶ 7, Ex. C to DB).  In his deposition, however, Hamilton testified that he

thought "walking the ropes" was **spectacular**" and that he told

Taylor "it was spectacular."[8]  (Hamilton at 41-42).  Hamilton had

also told Jimmy Hart, "you know, Bobby Walker can draw pretty

good." (Hart at 74).  Furthermore, Hamilton told Walker that

"walking the ropes" was something that "no one else could do"

and that Hamilton would "push" Walker if he were in control of

the decision-making process.  (Walker Aff. ¶ 7, Tab A).

Similarly, although Orndorff now states that Walker "lacked

the charisma, uniqueness and excitement of WCW's more popular

wrestlers," Orndorff testified that he thought Walker was a

"hell of an athlete" and always "pushed" for Bobby Walker.

(Orndorff at 66, 72).  Indeed, Orndorff recommended Bobby Walker

to Kevin Sullivan and Jimmy Hart.  (Orndorff at 66).  Orndorff

also told Walker that he had "very good abilities," that walking

the ropes was "different," and that wrestling fans wanted to see

such a maneuver.  (Walker Aff. ¶ 8, Tab A).

Moreover, the Court should compare Defendants' post hoc

declarations with the testimony of WCW witnesses Hart and Bruce.

Bruce states that Walker "had good agility, was a good learner

of wrestling techniques, and was a big strong guy who had a lot

of good moves."  (Bruce at 71-72, 78; see also, Bruce at 76 ("I

---

[8] Although the Affidavit that Defendants attach may not rise to the level of a
"sham affidavit", this Court certainly should consider the material
inconsistency between Mr. Hamilton's views of Walker's "walking the ropes" as
set forth in his deposition, and what he now states in the Affidavit.

would have used Bobby, yes")).  Similarly, Jimmy Hart, who was

the person ostensibly responsible for the Saturday night show,

testified as follows:

> And so I wanted to use Bobby, because I felt like, you
> know, Bobby being youthful and young, and not because of
> his color or anything else.  Because I wanted talent for
> our Saturday night show . . .I wanted to use him on our
> shows, because number one, we needed talent.

(Hart at 74-76).

Thus, a reasonable jury could certainly conclude that

Defendants' inconsistencies as to Walker's <u>actual</u> abilities

reveal their proffered reasons merely mask WCW's racial

discrimination.

>           c.   Walker has demonstrated pretext because
>                Walker did not lack the requisite skills to
>                be a successful wrestler.

<u>Walker Mastered His Signature Move "Walking the Ropes"</u>

Although Defendants contend that "uniqueness" is a

prerequisite to receiving exposure on WCW's popular live events

(DB at 16), Defendants refused to push Walker even though he

mastered a unique signature maneuver called "walking the ropes."

The gimmick of walking the ropes was interesting because it

shows "agility" and was a good maneuver or a wrestling

performance.  (Ferrara at 41-45).  Moreover, it was <u>very</u> unique.

(<u>See</u> Bruce at 74  ("I can't do it");  Kearce at 74 ("nobody else

really did that maneuver"); <u>see also</u>, Hamilton at 42-43 (noting

- 37 -

that walking the ropes was "very unusual"; "not many people can do that")).

Notwithstanding Defendants' contention that a fall is the death knell in a match,[9] many WCW wrestlers fell, slipped, or made mistakes along the way.  For example, Caucasian wrestler Billy Kidman had fallen from the ropes while doing various wrestling maneuvers on live television, but was pushed to superstar status, nevertheless.  (Walker Aff. ¶ 9, Tab A; Hicks Aff. ¶ 17, Tab L).

Indeed, Jimmy Hart testified that he wanted Bobby to walk the ropes, regardless of whether Bobby fell or not because "you need to do stuff that is different, that'll be something very clever."  (Hart at 75).  Moreover, Walker's videotape evidence, which Defendants completely ignore, conclusively establishes that Walker succeeded in mastering this maneuver. (Pls.' Ex. 95, Tab Y; Kearce at 73-78; see also Hicks Aff. ¶ 16, Tab L).  Thus, because Walker mastered walking the ropes, he has convincingly demonstrated pretext for WCW's discrimination.

Walker generated excitement

---

[9] Mr. Walker does not concede that any falls he made before he mastered his maneuver is at all significant.  Furthermore, as noted by two of the witnesses, Walker may have fallen not because of lack of skills, but because of moisture on ropes from sweat.  (Schiavone at 51; Kearce at 123).  Moreover, Walker was told that even if he fell, the match could proceed fine because his opponent could capitalize on the fall and use the opportunity to get an advantage over Walker at that point in the match.  (Walker Aff. ¶ 21, Tab A).

Walker never admitted, as Defendants suggest, that he "lacked flash, uniqueness and excitement." (DB at 7). Although Walker portrayed an honest, hard working character, who was not "cocky" or "flashy," he did it with determination and "attitude." (Walker at 90). Moreover, he unequivocally testified that "walking the ropes," the climactic end result to his "hardwork," was very "exciting." (Walker at 90-92). Indeed, a **paraplegic fan was so excited about Walker's maneuver that she made a fist for the first time in her life. Her parents told Walker, "it's something about walking the ropes . . . I have never seen her with so much excitement." (Walker at 92).**

Thus, Walker is not merely relying on his own "subjective opinion" as to his abilities. (See <u>supra</u>; see also, Kearce at 71 (testifying that although Walker was a good wrestler, Walker did not get all the opportunities he should have received); Williams at 60 (Walker was "very well built and the kids loved him. They were just wild about him"); Snakovsky at 135 (Walker was a very good athlete and professional wrestler. He had great skills . . . he was great at getting on top of the ropes and doing his job"); Hicks Aff. at 13-17, Tab L).

          d.    Statistical evidence - additional evidence of pretext.

In addition to establishing pattern and practice evidence, Walker's statistical evidence further demonstrates pretext.  See Teamsters v. United States, 431 U.S. 324 (1977); see also Washington v. Brown & Williamson Tobacco Corp., 756 F. Supp. 1547, 1554 n.5 (N.D. Ga. 1991), aff'd 959 F.2d 1566 (11th Cir. 1992) (statistical disparities, "which are insufficient to demonstrate a pattern and practice of discrimination, might still be relevant to making out a prima facie case or proving pretext").  Accordingly, based on all of the compelling evidence of pretext, a reasonable jury could certainly conclude that WCW's contentions regarding Walker are all pretextual to mask discrimination.

> e.   Circumstantial evidence – additional evidence of pretext.

Even if the Court somehow does not find that the constant racial slurs and blatantly racist comments constitute direct evidence, the Court must consider all such slurs and remarks because they amply demonstrate pretext.  See Damon v. Fleming Supermarkets of Florida, Inc. 196 F.3d 1354, 1361 (11th Cir. 1999) (holding that although statements regarding a discriminatory animus toward older managers did not constitute direct evidence, the evidence did constitute "probative circumstantial evidence of age discrimination").

Walker further establishes pretext based on additional circumstantial evidence of discrimination.  <u>See</u> <u>Ross v. Rhodes Furniture, Inc.</u>, 146 F.3d 1286, 1290 (11th Cir. 1998).  As noted <u>supra</u>, Walker has established significant anecdotal evidence of discrimination.  (<u>See</u> <u>supra</u> at 17-24).  Even assuming this Court does not find a pattern and practice of discrimination, the court must consider Walker's additional evidence of pretext.

Accordingly, even if this Court applies <u>McDonnell Douglas</u>, Defendants are not entitled to summary judgment because Walker has established an abundance of evidence from which a reasonable jury could conclude that WCW discriminated against Walker.  <u>See</u> <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 255 (1981) (plaintiff is entitled to "directly persuade" the Court that a "discriminatory reason more likely motivated" adverse treatment).

## II.   **WALKER IS ENTITLED TO A JURY TRIAL BECAUSE HE HAS ESTABLISHED EVIDENCE OF ILLEGAL RACE BASED WRESTLING DECISIONS**

In addition to establishing blatant racist discrimination, Walker demonstrates evidence of race-based decision-making, which is illegal, regardless of the specific intent, or racial animus, of the decision-makers.  <u>Equal Employment Opportunity Commission v. Joe's Stone Crab, Inc.</u>, 220 F.3d 1263, 1284 (11th Cir. 2000); <u>Miller v. Bed, Bath & Beyond, Inc.</u>, 185 F. Supp. 2d

1253, 1254-65 (N.D. Ala. 2002) ("[I]t is well established that making work assignments along the lines of race or color is forbidden . . . .").

Eric Bischoff essentially instructed Bookers not to use African-American wrestlers because "blacks wouldn't buy a ticket to an event but would instead stay at home and watch it on TV." (Anderson at 74-75, 177).  Bischoff asked, "why are we pushing some of the blacks and some of the niggers on our television show?"  (Anderson at 74-75).  Moreover, Taylor and Arn Anderson each admitted that Turner had conducted a survey, and that because black people were not coming to the matches they were not going to "use all the blacks."  (Boulware at 96, 124-125, Tab AA).  Also, WCW personnel acknowledged the belief/perception that African-Americans would not pay to see a live event, or pay for pay-per-views.  (Smith at 58; Anderson at 184-185; Walker at 96-97).

WCW also retained the services of independent marketing companies such as Grace Market Research Inc. to ascertain, among other things, the racial demographics of WCW's viewing audiences.  (See Grace Aff. ¶ 6, Tab Q).  Grace conducted an online research survey for WCW, which asked respondents to provide their racial identity.  (Id.)  Similarly, Defendants conducted a study through Nielson, which provided detailed

findings regarding the racial demographics of WCW's audiences. (Pls.' Ex. 72, Tab R).  In addition, Ferrara states that he attended a presentation from a marketing research firm that reported that more black persons who were watching WCW on television than were actually paying for tickets to see live events.  (Ferrara at 59; see also Sullivan at 23 (testifying that the audience was predominantly white)).

Moreover, the evidence demonstrates that WCW frequently used, or did not use, black wrestlers based on such marketing data.  (Walker at 80; Boulware at 150, Tab AA; Randal Anderson at 74-74, 144-145; Whatley at 132-134, Tab BB; Miller at 66, 101).[10]

Accordingly, based on all of the admissions and statements regarding WCW catering to the racial demographics of the viewing audience, Walker has established ample evidence that Defendants were engaging in illegal race-based decision-making.  See Ferrill v. The Parker Group, Inc., 168 F.3d 468, 472-475 (11th Cir. 1999).

III. **PLAINTIFF IS ENTITLED TO A JURY TRIAL AS TO HIS HOSTILE WORK ENVIRONMENT CLAIM.**

The Court should not grant summary judgment as to Walker's hostile work environment claim because his work environment was

---

[10] At times, WCW even maintained lists of wrestlers, designating the various categories of wrestlers, including the "Mexicans" and "the blacks." (Anderson at 95-97).

permeated with racial insult and racial humiliation.  From the beginning of his relationship through the end, Walker was constantly mistreated insulted, and humiliated because of his race.  Although Walker is not suggesting that each and every case of discrimination demonstrates a hostile work environment, because he was subjected to a racist culture in which every facet of his relationship was tainted by the color of his skin, (Walker at 144, 146, 149, 152, 163, 176-80),[11] he is entitled to recover under a hostile work environment claim especially where, as here, many of the racist comments and slurs were regular, routine, and made in public.  See Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995); see also, Busby v. City of Orlando, 931 F.2d 764, 785 (11th Cir. 1991) ("the fact that many of the epithets were not directed at [the plaintiff] is not determinative" of whether work atmosphere was hostile).

Moreover, because Walker was subjected to a hostile work environment, Defendants are either strictly liable for the conduct of the supervisors, or vicariously liable because they can make no showing that they took any actions whatsoever to "prevent and correct promptly" the racially harassing harm

---

[11] Although Defendants contend that any conduct that pre-dates December 21, 1998, may not be relied upon by Walker, Walker is entitled to establish his hostile work environment claim because it is an entirely new cause of action. Also, he should be able to rely on evidence that occurred prior to December 21, 1998.  See National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

inflicted on Walker.[12]   Faragher v. City of Boca Raton, 524 U.S. 775, 808 (1998).

## IV.   WALKER IS ENTITLED TO A JURY TRIAL AS TO HIS RETALIATION CLAIM

Although Defendants claim that Walker cannot establish a causal connection between protected activity and any adverse actions, Walker has established direct evidence that WCW retaliated against him for complaining of Taylor's racial bias, (Pls.' Exs. 10 and 15, Tabs B, C), and for suing WCW and Taylor for race discrimination.

### A.   Adverse actions

Walker has established that WCW took numerous adverse actions which, if considered collectively, clearly show a pattern of retaliation against Walker after he settled his first suit.  See Wideman v. Wal-Mart, 141 F.3d 1453, 1456 (11th Cir. 1998).  Most significantly, WCW refused to provide him with any meaningful opportunities during this period (1999 and 2000). (Walker Aff. ¶ 14, Tab A).  Although WCW attempted to disguise its intent to retaliate by providing Walker with some matches, the opportunities were few and were limited. (See Kearce at 67 ("I don't believe they let him work like, two or three more

---

[12] Indeed, the only effort WCW made to address the hostile work environment was to conduct a diversity workshop at Goodly's suggestion.  The wrestlers mocked this workshop by fictitiously signing the names of racially controversial people.  (See Pls.' Ex. 18, Tab V).

times.  They gave him an opportunity, but I think it was
slammed")).

In addition, WCW stopped sending Walker booking sheets,
which were routinely sent to contract wrestlers and had always
been sent to Walker before he settled his first suit.  (Miller
at 192; Walker at 153-154).  Also, Walker was required to train
at the Power Plant for an extended period of time even though he
had only needed a few days to get back into top shape. (Walker
Aff. ¶ 13, Tab A).  Other contract wrestlers, who had far less
experience than Walker, were not similarly required to remain at
the Power Plant. (Id.).

Unfortunately, the retaliatory conduct continued, and
although Walker was more than willing to participate in any WCW
event,[13] WCW essentially refused to use him at all and instead
waited for his contract to expire in retaliation for pursuing
his race complaints.  (See Walker Aff. ¶ 14, Tab A).

B.   Evidence of a Causal Connection

Walker has established direct evidence that Defendants
retaliated against him. After Walker settled his first suit,

---

[13] Defendants' insinuation that somehow Walker is to blame for not getting
more opportunities, or a renewed contract, by showing "no interest" in
opportunities at WCW is disingenuous, if not insulting to Walker.  Walker
dutifully trained and labored for WCW for over six years and showed he would
do virtually anything for a meaningful shot at becoming a successful
wrestler.  (See, e.g., Walker at 182; Walker Aff. ¶¶ 23-25, Tab A).

Sullivan told Walker: "Just take the money.   They're not going
to use you."   (Walker at 152).

Similarly, although Hart tried to promote Walker after
Walker settled his first suit, he was prevented from doing so.
(Williams at 60).   Mr. Williams recalls Hart confiding:

> **You know, my heart goes out to Bobby Walker.   He said, you
> know, my hands are tied.   They won't let me do nothing, was
> his own words.**

(Williams at 117).

Further showing that Taylor was behind the retaliatory
conduct, Taylor stated that African-Americans who complained of
racial discrimination could "get to the back of the line."
(Williams Aff. ¶ 38, Tab E (testifying that Taylor "was
indicating that [African-Americans who complained of
discrimination] would be put at the back of other persons
seeking advancement at WCW")).

To the extent that Defendants' proffer the same alleged
non-retaliatory reasons for their adverse treatment, Walker has
demonstrated that all such reasons are pretextual.   Indeed,
Walker was most successful as a wrestler after he settled his
first suit because of the added pressure to succeed.   Walker
testifies:

> And when I came back in '99, even though I was aware, if
> you mess up, you're basically gone, but so I decided in my
> head, okay, do it, and I never, there was never a mistake.
> Every one of them [was] done perfectly.

- 47 -

(Walker at 202-203; <u>see also</u> Kearce at 74 (testifying Walker got positive reaction from crowd when he walked the ropes)).

Similarly, when Walker wrestled Harold Hogue, in his <u>last</u> WCW match, Walker had a great match even though he was scripted to lose.  He "walked the ropes," and the people went berserk. (Walker at 80-81).  After the match, WCW announcer Bobby Heenan stated, "I've never seen a match like that before in my life. Great match."  Similarly, Mike Tenay said, "I don't know why they're not using you."  (Walker at 81).

Nevertheless, despite Walker's success in the ring, and despite his mastering of his unique maneuver of "walking the ropes," after this last match, WCW refused to provide him with another chance to further showcase his talent and his signature move.

Accordingly, Walker has established ample evidence of a causal relationship between his protected activity and the adverse consequences he suffered.

**V.** **PLAINTIFF IS ENTITLED TO A JURY TRIAL AS TO HIS CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Walker seeks to recover against Defendants for their negligent retention of Terry Taylor, who intentionally inflicted emotional distress upon Walker.

Walker submits that the evidence is sufficient to demonstrate that Taylor's conduct was outrageous and beyond the bounds of common decency.  Among other things, (see supra), Taylor intentionally tried to injure Walker through other wrestlers.  For example, Caucasian wrestler Steve Regal warned Walker, "Bobby, Terry Taylor told me" to "try to hurt you or make you look bad in the ring."  (Walker at 181).  Thus, a reasonable jury could conclude that Taylor's cumulative outrageous acts, intentionally directed at Walker, were "beyond the bounds of common decency."  See Coleman v. Housing Authority of Americus, 191 Ga. App. 166, 169, 381 S.E.2d 303 (1989) ("workplace is not a free zone" for causing emotional distress).

### CONCLUSION

For the foregoing reasons, Walker submits that Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted this 13th day of January, 2002.

Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No.: 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

- 49 -

**MEADOWS, ICHTER & BOWERS, P.C.**
Fourteen Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA  30305
(404) 261-6020

                              Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

This is to certify that I have this date served opposing counsel to this action with the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** by hand delivering a copy of the same, addressed as follows:

> Eric Richardson, Esq.
> Evan Pontz, Esq.
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia   30308-22165

This _13th_ day of January, 2002.

_Charles Gernazian_
Charles J. Gernazian
Georgia Bar No. 291703

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 13 2003

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Davis v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1716-CC;
Saengsiphan v. World Championship Wrestling, Inc. and
Turner Sports, Inc., Civ. File No. 1-00-CV-1719-CC;
Speight v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1718-CC;
Worthen v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1717-CC;
Reeves v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1720-CC;
Easterling v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1715-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports,
Inc., Civ. File No. 1:00-CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner
Sports, Inc., Civ. File No. 1:00-CV-0369-CC
Walker v. World Championship Wrestling, Inc., Turner
Sports, Inc., Civ. File No. 1:00-CV-0367-CC;
Patterson v. World Championship Wrestling, Inc., Turner
Sports, Inc., Turner Entertainment Group, Inc. Civ. File
No. Civ. File No. 1:01-CV-1152-CC

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS TO WHICH THERE EXIST GENUINE ISSUES TO BE TRIED

Pursuant to Local Rule 56.1(b)(2), in response to

Defendants' Motion for Summary Judgment, Plaintiff Bobby Walker,

hereby files this Statement of Material Facts to Which There

Exist Genuine Issues to be Tried, showing the Court the

following:

112

## I.   DISPUTED FACTS REGARDING WCW'S HISTORY OF ITS TREATMENT OF AFRICAN-AMERICANS

1.

In 1993 or 1994, when baseball legend **Henry ("Hank") Aaron participated in a WCW** event, the existing WCW president, Bill Watts, stated that he did not want "that nigger on my TV." (Randall Anderson Dep. at 102.)

2.

Bill Watts was a very "bigoted individual" who used racial slurs or racially derogatory language about "every other sentence."   (Juster Dep. at 119.)

3.

Bill Watts referred to the compensation that he paid to legendary African-American wrestler Junkyard dog as "slave wages."   (Juster Dep. at 118.)

4.

Ole Anderson, a "Booker" who worked on WCW's "Booking Committee," which determined the storylines for WCW wrestling matches, told Thunderbolt Patterson, an African-American wrestler, that the Turner and WCW officials did not really consider him "as [a] person)"; "you are a nigger -- you will never be a promoter like you want to be." (Patterson Dep. at 42-43.)

5.

In the mid-nineties Black Jack Mulligan, a WCW trainer, informed Bobby Walker that "the only reason you're here is because they need color on the TV."  (Bobby Walker Dep. at 162-163.)

6.

Timothy Goodly, the Turner Sports Human Resource manager who was assigned to provide Human Resource support to WCW, acknowledged that the fact that WCW only had Caucasians become world champions "might be considered a red flag" as to whether WCW's decision-making process was discriminatory. (Goodly Dep. at 95-97.)

## II.  WCW'S MANAGEMENT WAS VIRTUALLY ALL CAUCASIAN

7.

With the exception of Valerie Ragsdale, WCW's Senior Webmaster from 1997 to 1999, and Pie Smith, a mid-level manager at WCW's merchandising warehouse, WCW did not have any African-American managers.  (Goodly Dep. at 34, 37-39; Loretta Walker Dep. at 18, 49-50.)

8.

Although Tim Goodly identified Ms. Pamela Collins as an African-American mid-level manager, (Goodly Dep. at 38-39), WCW

never actually provided Ms. Collins a management position, as
she remained the call-center "coordinator."   (Collins Aff. ¶¶ 3-
4, Tab J; see also Plaintiffs' Ex. 5, Tab X.)

9.

Goodly acknowledged that the minority representation at WCW
"was not, I guess, consistent with what I knew to be good HR
practice."   (Goodly Dep. at 49.)

III. **DISPUTED FACTS AS TO WHETHER TURNER SPORTS, TBS, TEG, and
WCW MAINTAINED ANY POLICY OR PROCEDURE TO ENSURE THAT WCW
DID NOT DISCRIMINATE AGAINST WRESTLERS**

10.

WCW did not have any policies or procedures to ensure that
wrestlers were not discriminated against.   (Ferrara Dep. at 52;
Smith Dep. at 95; Loretta Walker Dep. at 21.)

11.

Ed Ferrara, a Booker, was not aware of any WCW official
that had communicated that WCW needed not to discriminate
against wrestlers.   (Ferrara Dep. at 52-53.)

12.

Human Resource Manager Timothy Goodly was only concerned
with WCW "employees" in fulfilling his job duties as Director of
Human Resources for WCW; Goodly didn't have "any official duties
as related to talent."   (Goodly Dep. at 63.)

13.

As to the persons who were supposedly ensuring that WCW did not discriminate in its handling of contracts with wrestlers, Goodly testified that Eric Bischoff, WCW's President, was primarily responsible, but possibly Diana Meyers, WCW's attorney, and Bill Busch, a Vice President at WCW, as well. (Goodly Dep. at 65-67.)

14.

Loretta Walker, who replaced Timothy Goodly as the person responsible for providing human resource support to WCW, testified that she did not know who, if anybody, was responsible for ensuring that the wrestlers did not suffer discrimination. (Loretta Walker Dep. at 6-13.)

15.

Loretta Walker agreed that she did not have any duties with respect to the wrestlers because it was Turner's practice not to provide assurance that persons who were classified as independent contractors would be treated in a fair and non-discriminatory manner.  (Loretta Walker Dep. at 12-13.)

16.

Loretta Walker did not believe that she had any duty to ensure that workers classified as independent contractors at

Turner Entertainment Group ("TEG") or Turner Studios were free
from discrimination in the workplace.  (Loretta Walker Dep. at
23, 73-74.)

17.

Although Loretta Walker testified that an "independent
contractor" who had an issue regarding discrimination could have
reported it to WCW's attorney, Diana Myers, Ms. Walker was not
aware of any actions taken by Diana Myers to ensure that the
persons performing on a contract basis at WCW were not
discriminated against based on their race.  (Loretta Walker Dep.
at 74-75, 79.)

18.

Diana Myers stated that if an "independent contractor at
WCW felt he was discriminated against, he should complain to
J.J. Dillon."  (Myers Dep. at 175.)

19.

Even though Goodly did not have an official role as to WCW
wrestlers, he noticed a lack of diversity and therefore told
Eric Bischoff, WCW's President, that WCW needed more "diverse
talent."  (Goodly Dep. at 69-70.)

20.

In response to Goodly's suggestions, Bischoff stated that he was going to ensure that the talent pool at the Power Plant would be diverse, but Goodly was not aware of any actions taken to ensure that any minorities at the Power Plant actually received exposure or meaningful opportunities to succeed. (Goodly Dep. at 74-78.)

21.

Goodly admitted to Bobby Walker that he was "aware" of WCW's discrimination, but he had a "job" too.  (Bobby Walker Dep. at 254.)

IV.  **DISPUTED FACTS REGARDING WCW'S DECISION MAKERS USING RACIAL SLURS AND/OR DEMONSTRATING RACIAL BIAS**

   A.   **TERRY TAYLOR**

      1.   **Taylor's Role at WCW**

22.

Terry Taylor worked on WCW's Booking Committee beginning in 1996; Taylor was also responsible for locating and recruiting wrestling talent and for working in talent relations.  (Taylor Dep. at 44.)

23.

Terry Taylor was also specifically involved in selecting WCW wrestlers from the Power Plant; he "worked pretty close with

-7-

the Power Plant and the young guys" and frequently went to the

Power Plant to evaluate wrestlers.   (Lunde Dep. at 13-14.)

24.

Jody Hamilton, manager of the Power Plant, testified that

Terry Taylor was one of the principal persons who evaluated the

wrestling talent at the Power Plant.   (Hamilton Dep. at 29.)

25.

Terry Taylor was also responsible for working with some of

the wrestlers on their wrestling moves and techniques.   (Ferrara

Dep. at 51.)

### 2.    Taylor's Statements and Remarks

26.

Terry Taylor used the word "nigger" quite a bit."   (Randall

Anderson Dep. at 107.)

27.

Terry Taylor would say "that stupid nigger" when referring

to an African-American wrestler, and often used the word

"nigger" when talking to other WCW officials while traveling on

WCW business.   (Randall Anderson Dep. at 85, 172-173.)

28.

On one occasion, Terry Taylor stated that "there [wouldn't]

be any brothers on the show" because he did not want any

African-Americans to take the "limelight" from a Caucasian

wrestler, Hulk Hogan.  (Williams Aff. ¶ 39, Tab E; Williams Dep. at 54-57).

29.

There were no African-Americans on the televised portion of above-described WCW show.  (Id.)

30.

Terry Taylor stated "that damn Hardbody is a no good nigger."  (Snakovsky Dep. at 108, 140; Snakovsky Aff. ¶ 18, Tab D.)

30.

Terry Taylor frequently used racial slurs, including "nigger" when referring to WCW wrestlers and while working on the Booking Committee.  (Sullivan Dep. at 51.)

31.

Terry Taylor stated to Hardbody Norris, "why don't you take your dumb ass and black self and get the hell out of here?" (Snakovsky Dep. at 62.)

32.

Terry Taylor constantly used the word "nigger" whenever he was talking about African-American people and African-American wrestlers.  (Snakovsky Dep. at 75-77; Snakovsky Aff. at ¶ 4, Tab D.)

33.

Michelle Bayens, an assistant producer to whom Terry Taylor once confided on a regular basis, testified that when Taylor informed her that Bobby Walker had called him a "racist," he stated, "I don't know if I'm a racist but I know that . . . [h]e's a nigger with no talent."  (Bayens Dep. at 19.)

34.

Terry Taylor stated that neither Bobby Walker nor Hardbody Harris would make it in the wrestling profession because they were "black" and each was a "nigger" with "no talent." (Snakovsky Aff. ¶ 7, Tab D; Snakovsky Dep. at 76.)

35.

Terry Taylor told Rick Reeves, an African-American wrestler, "we've got enough of y'all boys already."  (Reeves Dep. at 54-56.)

36.

Plaintiff Rick Reeves heard Terry Taylor use the word "nigger" in various conversations.  (Reeves Dep. at 85.)

37.

Terry Taylor stated that black wrestlers "weren't much of a draw" in his opinion.  (Bayens Dep. at 19, 62-63.)

38.

Terry Taylor stated that black persons had great physiques because they were genetically inclined or predisposed, but that he questioned their ability to wrestle.  (Bayens Dep. at 21-22, 64-65.)

39.

Terry Taylor stated that Ernest Miller, an African-American wrestler, was "another nigger with no talent . . ." and joked about having called Ernest Miller a nigger to his face.  (Bayens Dep. at 20.)

40.

Terry Taylor stated that black wrestlers "shouldn't be in our sport, they should be in basketball."  (Snakovsky Dep. at 78.)

41.

Terry Taylor stated that "a lot of the black people wouldn't make it in the business because they are black as long as he had something to do with it."  (Snakovsky Dep. at 78.)

42.

As to the African-American wrestler Elix Skipper, Terry Taylor once stated that "I don't care if this kid is good or not.  He is a black kid.  He ain't going nowhere in this business."  (Snakovsky Dep. at 79.)

-11-

43.

On one occasion, when Hardbody Norris, an African-American wrestler, was performing at Disney World, Terry Taylor stated "he ain't never gonna make it in this business" and that he should go back to basketball or ultimate fighting, or whatever he was doing prior to wrestling.  (Snakovsky Dep. at 82-83.)

44.

As to Bobby Walker, when Bobby Walker was jumping off the ropes, Taylor stated "that nigger, he's not good for jumping, so he should go play basketball too."  (Snakovsky Dep. at 83-84.)

45.

Terry Taylor constantly reminded Ernest Miller that Miller only had a job because he was black, and that WCW did not market toward blacks because "we only have white fans and they're [going] to look at you as a nigger."  (Miller Dep. at 66, 101; Hart Dep. at 70-71.)

46.

According to Snakovsky, a WCW performer, Terry Taylor also demonstrated bias against minorities by the "way he would talk to them and his actions towards them."  (Snakovsky Dep. at 98.)

47.

Terry Taylor told African-American wrestler Booker T Huffman that the only reason Huffman was successful was because he was black.  (Goodley Dep. at 81-82.)

48.

When African-American wrestler Ernest Miller was not required to work on a particular occasion, Terry Taylor told him that "I know y'all like to take the day off."  (Miller Dep. at 60.)

49.

Terry Taylor stated that "blacks don't buy wrestling tickets."  (Williams Aff. ¶ 14, Tab E.)

50.

Terry Taylor called Ernest Miller a "nigger" on several occasions.  (Miller Dep. at 66, 99-101.)

51.

Moses Williams, who worked in WCW production, also heard Terry Taylor use the word "nigger" while Terry Taylor was in charge of the Booking Committee.  (Williams Dep. at 108-109.)

52.

On one occasion, when WCW's ring announcer, David Penzer, brought in a Caucasian wrestler to replace an African-American

wrestler, Terry Taylor told him: "don't worry about the niggers, I'll take care of that."  (Williams Dep. at 110.)

53.

Terry Taylor openly stated to Vince Russo, the Creative Director at WCW, that wrestling fans were White and that "Blacks don't buy wrestling tickets."  (Williams Dep. at 111, 114-116; Williams Aff. ¶ 14, Tab E.)

54.

Terry Taylor did not observe African-American wrestlers in their matches.  (Williams Dep. at 113.)

55.

Terry Taylor went out of his way to provide opportunities for white wrestlers even when they did not have any talent, but he would not similarly create opportunities for African-Americans.  (Williams Dep. at 124-125.)

56.

Sharon Hill told Moses Williams that Terry Taylor had stated that Harrison Norris "ain't going to ever make it," and that Taylor called Harrison Norris "the dumb nigger."  (Williams Dep. at 140-141.)

57.

When an African-American wrestler would make a mistake, Terry Taylor would make comments such as "that stupid nigger,"

or "just different stuff like that." (Randall Anderson Dep. at
111.)

58.

On a very cold winter day, Terry Taylor stated, "you'd
better turn on the air conditioner because you know those
niggers can't take the cold." (Carr Dep. at 92-93, Tab Z.)

59.

Terry Taylor once stated that a wrestling association for
Black wrestlers was a "big joke." (Carr Dep. at 103, Tab Z.)

60.

On one occasion, when African-American Tony Carr was going
to play a role as a fan in a show filmed for WCW in Montana,
Terry Taylor said Carr could not play the role "because no one
would believe there were niggers in Montana." (Carr Dep. at
139, Tab Z.)

61.

Apparently referencing a demographic survey that was done
by Turner, Terry Taylor stated that "Turner told us we don't
need to use you all niggers." (Boulware Dep. at 71, 124-125,
Tab AA.)

62.

Terry Taylor admitted to Vince Russo, the Creative Director
at WCW, that he had told Ernest Miller that the only reason why

WCW hired Miller was because Miller was black.   (Russo Dep. at 64.)

63.

When African-American wrestler William "Rocky" Boulware confronted Terry Taylor, and asked Taylor if a Caucasian wrestler got a contract instead of him because he was black, Taylor stated, "What do you think? Yes, it's because you're black."   (Boulware Dep. at 101-102, Tab AA.)

64.

When Rocky Boulware discussed pay differences between his salary and that of Caucasian wrestlers with Terry Taylor, Terry Taylor said that it was "the color of your skin, and you're not in the clique."   (Boulware Dep. at 122-124, Tab AA.)

### 3.   Disputed Facts Regarding WCW's Knowledge Of Taylor's Racial Bias

65.

On March 1, 1998, Plaintiff Bobby Walker sent a letter to Eric Bischoff, the President of WCW, via certified mail, which stated that "Terry Taylor has made statements to me and others about how he felt about blacks" and that "I like I lost my job because of Terry Taylor's deep dislike for blacks."   (Bischoff Dep. at 122-23; Plaintiffs' Exhibit 10, Tab B.)

66.

On March 1, 1998, Mr. Walker sent a letter to Dr. Harvey

Schiller, an executive at Turner Sports, regarding "racial

discrimination," and informed Dr. Schiller that "I felt like I

lost my job because of Terry Taylor's deep dislike for blacks."

(Plaintiffs' Exhibit 15, Tab C.)

67.

Eric Bischoff acknowledges that he knew that Terry Taylor

had remarked that the only reason Ernest Miller was hired was

because he was black.  (Bischoff Dep. at 39.)

68.

Eric Bischoff knew that Terry Taylor had a conflict with

the African American wrestling tag team, the Harlem Heat, and

acknowledges that Taylor's actions or comments regarding the

Harlem Heat were "racially offensive."  (Bischoff Dep. at 41-42,

173.)

69.

Timothy Goodly, the Turner Manager assigned to address

WCW's human resource issues, recalls a discussion with Eric

Bischoff in which Bischoff informed Goodly that Terry Taylor had

upset African-American wrestler Booker T by stating that "It

[was] a good thing [he was] black."  (Goodly Dep. at 81-82.)

-17-

70.

According to Timothy Goodly, the only discipline that Bischoff took against Terry Taylor was in stating to Taylor that the comments were inappropriate.  (Goodly Dep. at 83.)

71.

Taylor remained in the same position on the Booking Committee after Bischoff purportedly reprimanded Taylor. (Goodly Dep. at 83-85.)

72.

In 1999 Taylor left WCW for ten months, but returned to WCW in or about November, 1999 (Taylor Dep. at 29, 37.)

**B.    ERIC BISCHOFF**

**1.    Bischoff's Role**

73.

Randall Anderson, who worked on the Booking Committee in 1996 and 1997, testified that Eric Bischoff had to approve all decisions made by the Booking Committee.  (Randall Anderson Dep. at 51-53.)

74.

Eric Bischoff was the ultimate decision maker as to the top two or three matches on WCW's main events.  (Bischoff Dep. at 48.)

-18-

Case 1:00-cv-00367-CC   Document 112-1   Filed 01/13/03   Page 71 of 100

75.

At all times that Eric Bischoff was in charge of WCW, he was ultimately responsible for determining which WCW wrestler would become the world heavyweight champion.  (Lunde Dep. at 67-68.)

## 2.   Bischoff's Statements

76.

Eric Bischoff told members of the Booking Committee about a certain age group of Black persons who ostensibly would not watch WCW live events, and indicated that some Blacks wouldn't buy a ticket to an event but would instead stay at home and watch it on TV.  (Randall Anderson Dep. at 177.)

77.

In this context, Bischoff told the members of the Booking Committee that they shouldn't worry about "pushing a Black or a nigger."  (Id.)

76.

Eric Bischoff asked, "so why are we pushing some of the blacks and some of the niggers on our television show?" (Randall Anderson Dep. at 74-75.)

77.

Teddy Long and Harold Hogue, both African American wrestlers, told Bobby Walker that Bischoff had stated that

blacks would not pay to come to a Nitro event and "they'd rather watch it on TV." (Bobby Walker Dep. at 178.)

78.

On one occasion, when African-American wrestler Hardbody Harrison dressed up in a 70's disco outfit and had a big afro, Eric Bischoff stated "that's too niggerish for my television" and "canned" the idea. (Randall Anderson Dep. at 90, 177-178.)

79.

Eric Bischoff once stated that he "couldn't understand why [he was] putting all his money and TV time into a Black guy when they couldn't draw an arena house show." (Randall Anderson Dep. at 199-200.)

80.

On one occasion, when Eric Bischoff saw an African-American on a TV monitor, he stated "we need to get that crack nigger off the TV." (Randall Anderson Dep. at 76-77, 202.)

81.

An assistant producer testified that Eric Bischoff used the word "nigger" in relation to wrestlers on more than one occasion. (Kearce Dep. at 42-43.)

82.

On one occasion, during a wrestling event at the Omni, Bischoff removed all African-American wrestlers from the

-20-

schedule and indicated that it was "white night."   (Whatley Dep.
at 132-134, Tab BB; Smith Dep. at 57; Bobby Walker Dep. at 177-
178.)

83.

When Eric Bischoff denied a contract to Africa-American
Rocky Boulware and Boulware asked J.J. Dillon, a trainer at the
Power Plant, the reason for the denial, Dillon indicated that it
was because Boulware was "Black."   (Boulware Dep. at 135, Tab
AA.)

84.

When Thunderbolt Patterson, an African-American wrestler,
tried to negotiate a contract with WCW through Eric Bischoff and
Bill Busch, Bischoff stated, "we ain't fooling with niggers."
(Patterson Dep. at 31.)

85.

When Thunderbolt Patterson wanted to work as a manager,
Bischoff told him they didn't need any more managers; Bischoff
also stated, "we don't need no niggers."   (Patterson Dep. at 76,
93.)

C.   **VINCE RUSSO**

86.

At or about the time that Vince Russo, WCW's Creative
Director, was hired for WCW, he expressed his belief that Asians

-21-

and Hispanics should not succeed at WCW.   (Plaintiffs' Exhibit 2, Tab W.)

87.

Despite Russo's racist comments, WCW hired/retained Russo to work as its creative director on October 10, 1999.  (Russo Dep. at 15.

88.

During the time that Vince Russo was the Creative Director, he "had the last word" on booking decisions, who would win the championships, and ultimately decided which wrestlers would receive a "push" and television exposure and which wrestlers would not.  (Juster Dep. at 83 -84, 86-87; Ferrara Dep. at 11-14; Lunde Dep. at 67.)

89.

When Terry Taylor stated that the African-American wrestlers were not as good workers as the White wrestlers, Vince Russo agreed and said "they're not as good workers."  (Snakovsky Dep. at 82.)

90.

Vince Russo used racial slurs, including the word "nigger" when referring to wrestlers.  (Sullivan Dep. at 55-56; Williams Dep. at 97-98; Kearce Dep. at 38.)

91.

According to Kevin Sullivan, a member of WCW's Booking Committee, Russo also called African-Americans "Moolions," which (according to Sullivan) refers to a tribe from Africa that battled with Sicilians.  (Sullivan Dep. at 56.)

92.

Vince Russo indicated his racial bias by specifically referring to African-Americans as the "blacks" or "the brothers."  (Williams Dep. at 86-88.)

93.

Vince Russo "went out of his way not to do anything special for Black wrestlers or non-White wrestlers" and focused his attention on Caucasians.  (Williams Dep. at 89.)

94.

In one particular match, Vince Russo wanted Jeff Jarrett, a Caucasian wrestler, to hit African-American wrestler Booker T over the head, hit Booker T's wife and then put a noose around Booker T, as if he were going to hang him.  (Williams Dep. at 92-93.)

95.

Vince Russo stated that "Whites" rule wrestling.  (Williams Dep. at 94-96.)

96.

Vince Russo indicated that "Black folks don't buy wrestling
tickets anyway, wrestling fans are White."  (Williams Dep. at
94-96.)

97.

In response to questions about the future of Booker T, an
African-American wrestler, Russo stated, "if I say we're going
to have a White champion, we'll have a White champion and you
will know we'll have a Black champion when I say we're going to
have one and not before then."  (Williams Dep. at 94-96.)

98.

Moses Williams, who worked on WCW's production team,
personally observed that Vince Russo avoided interaction and
conversation with African-Americans.  (Williams Dep. at 97-98.)

99.

Vince Russo demonstrated his favoritism for Caucasians by
his body language and overall attitude; Russo would take the
time to speak with Caucasian wrestlers, but would not similarly
interact with wrestlers who were Spanish, Oriental, or Black.
(Williams Dep. at 104.)

100.

Vince Russo also stated that wrestling was a "white man sport" and that this was "why we don't have many black wrestlers."  (Williams Aff. ¶ 12, Tab E.)

101.

Vince Russo indicated that WCW was going to have a "white champion" because "that's the way I want it."  (Williams Aff. ¶ 12, Tab E.)

### D.   JAMES MORRISON (J.J. DILLON)

102.

At some point, James Morrison (a/k/a J.J. Dillon) became the manager of Talent and one of the principal decision-makers of WCW Talent.  (Dillon Dep. at 31; Hamilton Dep. at 39.)

103.

J.J. Dillon referred to Moses Williams as the "good nigger" because Moses Williams "didn't make waves."  (Williams Dep. at 27.)

104.

Moses Williams was told that when Darrell Miller, an African-American, sued WCW, Dillon asked why Miller was going to sue the company and asked "why doesn't he be like that good nigger Moses."  (Williams Dep. at 27.)

-25-

105.

J.J. Dillon stated that he thought that a country music western song that used the word "nigger" was a "great" song. (Whatley Dep. at 62-63, Tab BB.)

106.

According to Pez Whatley, a WCW trainer, J.J. Dillon prevented African-Americans from advancing at WCW because J.J. Dillon was "as racist as they come." (Whatley Dep. at 62, Tab BB.)

107.

Teddy Long, a WCW wrestler, informed Bobby Walker that he knew that J.J. Dillon "did not like black persons." (Bobby Walker Dep. at 168.)

108.

Thunderbolt Patterson, an African-American wrestler, considered J.J. Dillon racist based on Dillon's conduct over several years, including Dillon's use of racial slurs such as "niggers." (Patterson Dep. at 101.)

E.   **WCW Bookers**

109.

From 1995 through the end of WCW, the following persons worked as the primary Bookers and writers at WCW:  Kevin Sullivan, Terry Taylor, Jimmy Hart, Annette Yother, Ed Ferrara,

-26-

Dusty Rhodes, Terry Allen, Arn Anderson, Kevin Nash, Greg Gagne,
Ric Flair, Paul Orndorff, and wrestler Glen Gilberti.  (Smith
Dep. at 131; Yother Dep. at 13-16; Schiavone Dep. at 16-24;
Sullivan Dep. at 13-14.)

110.

On one occasion, Arn Anderson and other WCW officials
decided to have Rocky Boulware change his name to "Little
Richard Marley . . . the nigger that was standing out in the
yard;" they joked, "paint the nigger up."  (Boulware Dep. at
49-50, Tab AA.)

111.

Kevin Sullivan routinely used racial slurs, including
"nigger."  (Randall Anderson Dep. at 111; Kearce Dep. at 31-33.)

112.

Randall Anderson, who was a personal friend of Kevin
Sullivan, Terry Taylor, Arn Anderson, and J.J. Dillon,
testified: "I'm just saying they said the racist remark.  And I
know they didn't like blacks too much."  (Randall Anderson Dep.
at 109-110.)

113.

According to Randall Anderson, Arn Anderson would not share
a room with African-Americans.  (Randall Anderson Dep. at 111.)

-27-

114.

Arn Anderson called Teddy Long, an African-American wrestler, a "nigger". (Randall Anderson Dep. at 83, 175; Bobby Walker Dep. at 211.)

115.

Arn Anderson regularly used the term "nigger". (Randall Anderson Dep. at 83-84.)

116.

Both African-American and Caucasian wrestlers told Moses Williams that Arn Anderson did not care for Black wrestlers and that he had his Caucasian favorites. (Williams Dep. at 252.)

117.

On one occasion, when Plaintiff Bobby Walker was walking past the room where the Bookers met to decide the roles of the wrestlers regarding upcoming matches (the "war room"), he heard one of the persons in the war room comment, "What nigger we got tonight?" (Bobby Walker Dep. at 210-211.)

118.

One of WCW's producers testified: "a lot of the guys on the booking committee were, you know, white guys . . . and they just, I don't know, they felt different about putting Mexicans or black people or Asians over." (Kearce Dep. at 29.)

-28-

119.

Members of the Booking Committee "frequently" used racially derogatory language about people's race.  (Kearce Dep. at 41.)

120.

Arn Anderson stated "I ain't piling a bunch of niggers in my car or a bunch of Mexicans in my car."  (Randall Anderson Dep. 174.)

121.

Gary Juster, an executive at WCW, was sure he heard members of the Booking Committee use racial slurs: "virtually every minority, gay person, anyone out of the mainstream was joked about because that's the culture of pro sports, pro entertainment type of locker room."  (Juster Dep. at 116.)

122.

According to Juster, "nothing was sacred" and people constantly joked "about just about everything . . .  even about women, believe it or not."  (Juster Dep. at 117.)

123.

F.    **WCW'S MANAGERS AT THE POWER PLANT**

1.  **Jody Hamilton**

124.

According to Brenda Smith, assistant to the Power Plant Manager, Jody Hamilton, when Jody Hamilton spoke on the

-29-

telephone with WCW officials about wrestlers in the Power Plant, he used words such as "jiggerboggie and lackey" to designate which wrestlers were African-American.  (Smith Dep. at 19, 21, 122.)

125.

Brenda Smith believed that Jody Hamilton was racist based upon the manner in which he treated Caucasian wrestlers as compared to African-American wrestlers; Hamilton "picked on the Afro-Americans more so than he did on the Caucasians, as he pushed the Afro-Americans harder."  (Smith Dep. at 34.)

126.

Brenda Smith stated that when Hamilton saw an African-American wrestler sitting or talking, he would make a statement such as "you need to get up off your lazy behind and do something," but he did not similarly address Caucasian wrestlers.  (Smith Dep. at 34-35.)

127.

Brenda Smith stated that Jody Hamilton "would suggest the Caucasians to the bookers more so than he would the Afro-Americans."  (Smith Dep. at 35.)

128.

Based upon the conversations she overheard with Jody
Hamilton, Smith believed that his comments reflected racial bias
in the wrestling industry.  (Smith Dep. at 20.)

129.

Jody Hamilton told Thunderbolt Patterson that WCW officials
wanted to "keep all the niggers in place."  (Patterson Dep.at
30.)

130.

On one occasion, Hamilton arrived at the Power Plant after
an absence, and, upon observing that many of the new WCW
wrestling trainees were African-American, he responded "oh, a
different color"  and then indicated that this was not
"something [he] expected."  (Whatley Dep. at 95-96, Tab BB.)

131.

Black Jack Mulligan, a WCW trainer, told Pez Whatley,
another WCW trainer, that Jody Hamilton had commented that there
were "too many people of different color" at the Power Plant and
discussed the color of the trainees.  (Whatley Dep. at 97, Tab
BB.)

132.

While manager of the Power Plant, Jody Hamilton stated to Tony Carr, "I don't know who's blowing smoke up your ass they ain't hiring no niggers."  (Carr Dep. at 55, Tab Z.)

133.

On another occasion, Jody Hamilton indicated to Tony Carr that WCW was "not hiring any Blacks, you know."  (Carr Dep. at 55, Tab Z.)

134.

Jody Hamilton made the following comment to Tony Carr: "Martin Luther King started off this problem and that's why Black people are having so much trouble now. -- He started segregation. -- A lot of Black people got, you know, sucked up in it because they weren't smart enough to keep up with the White people, so it's bringing down the society."  (Carr Dep. at 97, Tab Z.)

135.

When African-American performer Rock Boulware was allowed to work as a referee, Hamilton "got mad" and stated to Boulware that "you know that no Black person go over me and become no referee."  (Boulware Dep. at 59-61, Tab AA.)

136.

According to Rocky Boulware, Jody Hamilton regularly used words such as "nigger, buckwheat, crackhead." (Boulware Dep. at 73, Tab AA.)

137.

Jody Hamilton told Rocky Boulware that there was a survey that showed that Black people would not pay $100 or $200 for a ticket and that Turner had said "why use the Blacks? We don't need them." (Boulware Dep. at 150, Tab AA.)

138.

Jody Hamilton told African-American wrestler Rick Reeves that "we got enough of your kind down here." (Reeves Dep. at 59.)

139.

Jody Hamilton told Thunderbolt Patterson: "they don't fool with no niggers that they got problems. You're a problem. They don't want you to influence the other blacks. You asked for your money, you asked for equal opportunity, and they hadn't given it to you." (Patterson Dep. at 117.)

## 2.   Paul Orndorff

140.

According to Randall Anderson, a member of the Booking Committee, Power Plant manager Paul Orndorff "hated blacks." (Anderson Dep. at 106-107.)

141.

Paul Orndorff used the word "nigger" while he was a wrestler at WCW.   (Randall Anderson Dep. at 170.)

142.

On one occasion, Paul Orndorff stated that "some of our black wrestlers are good . . . then you got some of the wrestlers that are niggers."   (Hart Dep. at 117.)

143.

On one occasion, Paul Orndorff stated that the problem with America was that "niggers" were causing crimes and were responsible for "unemployment and rapes."   (Onoo Dep. at 254-255.)

144.

Paul Orndorff told African American wrestler Tony Carr that WCW was not "hiring niggers." (Carr Dep. at 95, Tab Z.)

145.

Paul Orndorff told Rocky Boulware that he had received information from Turner Sports that "black people don't buy

-34-

tickets; they don't use no niggers."   (Boulware Dep. at 72-73,
Tab AA.)

146.

Paul Orndorff also used terms such as "nigger, buckwheat,
and crackhead" to refer to African Americans.   (Boulware Dep. at
72-73, Tab AA.)

**V.   DISPUTED FACTS AS TO WCW PROMOTING AFRICAN-AMERICANS AFTER
PLAINTIFFS FILED SUIT REGARDING RACE DISCRIMINATION**

147.

Although African-American Booker T became the champion on
June 9, 2000, Vince Russo and Terry Taylor indicated that WCW
made him the champion to respond to allegations of race
discrimination.   (Snakovsky Aff. ¶ 20, Tab D; see also Williams
Aff. ¶¶ 20-23, Tab E.)

148.

Terry Taylor told Vince Russo that "they've got this
discrimination against us -- we're going to have to do
something, you know give somebody the belt -- Booker T looked
really good and Booker T is a really great athlete . . . you
know, maybe this will get rid of some of the heat on us right
now."   (Snakovsky Dep. at 86-87, 99-100, 102.)

-35-

## VI.   ADDITIONAL DISPUTED FACTS

149.

Ed Ferrara, a Booker, testified about a presentation from a marketing research firm to WCW, as follows:

> Q.   You understood them to say that basically there was going to be more black persons who were going to be watching it than there are going to actually be paying tickets to the events?
>
> A.   That's what I understood they were trying to get across, the facts they were trying to get across.

(Ferrara Dep. at 59)

150.

WCW maintained lists that designated wrestlers based on their race: "while you have your babyface talent, of course -- You have your heels and you'd have girls.  Then Mexicans.  You'd have blacks."  (Anderson Dep. at 95-97.)

151.

Terry Taylor, Arn Anderson, J.J. Dillon and Dusty Rhodes all indicated to Rocky Boulware that "the Turner people basically told them, when no Black people come to the show, they didn't have to use no Black."  (Boulware Dep. at 96, 124-125, Tab AA.)

152.

Ms. Smith heard rumors that WCW officials believed Blacks "didn't pay for pay-per-views."  (Smith Dep. at 58.)

153.

One of the principal bookers, Kevin Sullivan, testified that he was aware of the racial demographics of WCW's audience, which he believed was "predominantly white."  (Sullivan Dep. at 23.)

154.

Many statements and rumors circulated throughout WCW that there were not enough "blacks" in the viewing audience and that African-Americans would not pay to see a wrestling event live. (Anderson Dep. at 184-185; Bobby Walker Dep. at 96-97.)

155.

Kevin Sullivan commented to Jimmy Hart that WCW had information that black fans were not going to pay for an arena seat.   (Hart Dep. at 68-69.)

156.

Kevin Sullivan told Bobby Walker that WCW normally did not have "black on black" wrestling matches, i.e., a black wrestler opposing another black wrestler in the same match.   (Bobby Walker Dep. at 80.)

157.

At times, Caucasian wrestlers indicated they did not want to wrestler with black wrestlers; for example, Lex Luger had a problem wrestling with African-American Junkyard Dog.  (Randall Anderson Dep. at 113.)

158.

One of WCW's Caucasian decision-makers, testified that a new white wrestler would have a better opportunity than a new black wrestler.  (Randall Anderson Dep. at 154-155.)

159.

Randall Anderson could not identify one African-American wrestler who came to WCW without experience and received intensive training similar to that provided to Caucasian wrestlers.  (Randall Anderson Dep. at 159-160.)

160.

WCW security manager Doug Dillinger told Rocky Boulware that refereeing dog matches was a thing that "the nigger do." (Boulware Dep. at 61-62, Tab AA.)

161.

On different occasions, Terry Taylor, J.J. Dillon and other members of WCW management told Rocky Boulware that he was paid differently because of his race.  (Boulware Dep. at 127, Tab AA.)

-38-

162.

On one occasion Terry Taylor and J.J. Dillon told Rocky
Boulware not to bring his "White woman" around the matches.
(Boulware Dep. at 138, Tab AA.)

163.

When an African-American wrestler was in the ring at the
WCW Power Plant, a Caucasian trainer stated that there was "soul
food in the ring."  (Carr Dep. at 92, Tab Z.)

164.

On one occasion, in the presence of other individuals,
David Crockett, a WCW Booker and executive, told Tony Carr to
"get your Black ass back in there and tape those ropes."  (Carr
Dep. at 100, Tab Z.)

165.

Randy Savage, a Booker and wrestler, told Pez Whatley that
they were going to have changes in the Booking Committee, but
that Whatley would not be selected and then "pointed to
[Whatley's] skin."  (Whatley Dep. at 135, Tab BB.)

166.

WCW trainer Pez Whatley warned African-American wrestlers
that they were not going to get an equal opportunity and that it
was going to be twice as hard for them to succeed.  (Whatley
Dep. at 139-140, Tab BB.)

167.

WCW trainer Pez Whatley concluded that African-American wrestlers had to be "twice as good as the White boys." (Whatley Dep. at 140, Tab BB.)

168.

On one occasion, wrestler Buddy Landell told Pez Whatley that "they ain't going to use you because you know what to do and they don't want no smart niggers working." (Whatley Dep. at 153-154, Tab BB.)

169.

On one occasion, WCW's ring announcer, David Penzer, indicated that WCW was not going to use Pez Whatley on a particular occasion because they already had "a token Black on TV." (Whatley Dep. at 154-155, Tab BB.)

170.

Pez Whatley, who worked in various jobs throughout WCW, stated that it was "not unusual for you to hear amongst the workplace, you know, the n-word or darkie." (Whatley Dep. at 161, Tab BB.)

171.

Pez Whatley testified that, as an African-American male, he had to be careful when interacting with Caucasian females to

make sure that Caucasian males did not perceive him to be trying

to entice the Caucasian females.  (Whatley Dep. at 161, Tab BB.)

172.

On one occasion, Doug Dillinger, head a WCW security,

stated that he didn't want to "hear no more of that nigger

music."  (Whatley Dep. at 167, Tab BB.)

173.

Pez Whatley stated that he heard Caucasian wrestlers Chris

Kanyon and Diamond Dallas Page use the term "nigger" when

referring to other wrestlers.  (Whatley Dep. at 174, Tab BB.)

174.

On one occasion, Pez Whatley heard a Caucasian worker at

WCW state that "I had to wait behind a Darkie too."  (Whatley at

180-181, Tab BB.)

175.

Assistant Producer Michelle Bayens, a Caucasian, stated

that "when you take a step back . . . it can definitely be said

that [minority] wrestlers were treated less favorably or they

weren't promoted because of the color of their skin."  (Bayens

Dep. at 94.)

176.

Some Caucasian wrestlers did not want to wrestle with African-Americans Craig Pittman and Ernest Miller.  (Randall Anderson Dep. at 115-116.)

177.

Production worker Moses Williams often observed the tryouts at the Power Plant, and stated that he bet against African-American trainees "because they were destined to fail" regardless of how good they were.  (Williams Dep. at 43-44.)

178.

WCW Caucasian trainer Mike Wenner did not "communicate well with Afro-Americans", treated Caucasian wrestlers differently, and did not give African-American wrestlers "the same respect that he would give the Caucasians" as he would work the African-Americans harder: [the] "Caucasian would just stop, when the Afro-American had to do 100 more push-ups and more."  (Smith Dep. at 48-49.)

179.

Terry Taylor never said anything positive about any African-American wrestlers.  (Williams Dep. at 54-56.)

180.

WCW routinely trained and assisted Caucasian wrestlers in their development; for example, some Caucasian wrestlers would

-42-

receive round-the-clock personal training, and would receive necessary public exposure, but "I've never known of a Black wrestler they did that for."  (Randall Anderson Dep. at 181.)

181.

Caucasian wrestlers were allowed to practice their public speaking abilities by using a microphone at a CNN studio; African-American wrestlers were not provided with this additional microphone training.  (Randall Anderson Dep. at 182-183.)

182.

The wrestlers routinely used racially derogatory language. (Randall Anderson Dep. at 103.)

183.

Juster stated that he "probably" heard wrestlers use racial slurs because "it was an atmosphere where there was a lot of joking around about virtually everything . . .whether it was racial, ethnic, sexual preference, male/female, political.  It was a rowdy locker room type of atmosphere."  (Juster Dep. at 124-125.)

184.

Several wrestlers did not want to wrestle Hardbody Norris, in part, because he was black.  (Randall Anderson Dep. at 115.)

185.

According to one of WCW's producers, at WCW that "there's a lot of lies thrown around. -- There's a lot of bigotry thrown around. -- There's a lot of racism thrown around. -- There's a lot of sexual harassment thrown around."  (Kearce Dep. at 27-28.)

186.

WCW trainer Pez Whatley testified that African-American wrestlers were overlooked by WCW's Caucasian personnel and gave the following example:  Keith Mitchell, a Caucasian who worked on WCW's production team, and, Annette Yother, a Caucasian who worked on the Booking Committee, often overlooked big strong African-American wrestlers and preferred Caucasians, stating that they thought the Caucasians were "cute or had the long hair enough or they dyed their hair blonde."  (Whatley Dep. at 142-143, Tab BB.)

187.

WCW selected many of the Caucasian wrestlers whom trainer Pez Whatley recommended for advancement, but never used any of the African-Americans he recommended in a main event.  (Whatley Dep. at 144, Tab BB.)

188.

During a match, Willie Worthen, an African-American wrestler, was introduced as "Willie B" in reference to the famous gorilla at the Atlanta Zoo; when Mr. Worthen reported this to WCW trainers, "they just laughed about it."   (Worthen Dep. at 101-102.)

189.

On one occasion, when Booker T. got a tremendous reaction from the crowd, a wrestler asked trainer Dwayne Bruce "do you think that it is because of his super tan? and Bruce responded, "it doesn't take a scientist to figure out everything." (Easterling Dep. at 72-73.)

190.

A cameraman warned Easterling that WCW was a "good ol boys" network and that if someone used the "n" word, he should just "let it slide" if he wanted to succeed.   (Easterling Dep. at 76-77.)

191.

Rocky King stated that WCW was "not hiring no blacks." (Carr Dep. at 49, Tab Z.)

192.

On one occasion, the manager of WCW's Security Department, Doug Dillinger, stated that "yes, I used the N-word and I will use it again." (Williams Aff. ¶ 38, Tab E; Williams Dep. at 132-133.)

193.

Doug Dillinger, expressly stated that he would not have a "black" security person at WCW, and he never did employ an African-American. (Williams Dep. at 134-135.)

194.

When Tony Carr spoke with Doug Dillinger about becoming a security guard, Doug Dillinger informed Mr. Carr that he did not hire Blacks. (Carr Dep. at 111, Tab Z.)

195.

Doug Dillinger never provided any merchandise or WCW paraphernalia to any African-American children. (Williams Dep. at 226-227.)

Respectfully submitted, this _____ day of January, 2003.

Cary Ichter
Georgia Bar No.: 382515
Charles J. Gernazian
Georgia Bar No.: 291703
Michelle M. Rothenberg-Williams
Georgia Bar No.: 615680

**MEADOWS, ICHTER & BOWERS, P.C.**
14 Piedmont Center, Ste. 1100
3535 Piedmont Road
Atlanta, GA  30305
(404) 261-6020 (Telephone)
(404) 261-3656 (Facsimile)

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

This is to certify that I have this date served opposing counsel to this action with the foregoing **PLAINTIFFS' CONSOLIDATED STATEMENT OF MATERIAL FACTS TO WHICH THERE EXIST GENUINE ISSUES TO BE TRIED** by depositing a copy of the same in the United States Mail with adequate postage, addressed to one of the following:

Eric Richardson, Esq.
Evan Pontz, Esq.
Troutman Sanders LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia  30308-22165

This ___13th___ day of January, 2003.

_____
Michelle M. Rothenberg-Williams
Georgia Bar No. 291703