ORIGINAL

Jan. 14, 2003

*DEPUTY CLERK*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BOBBY WALKER,                          )
                                       )
        Plaintiff,                     )
                                       )     Civil Action File No.
v.                                     )     1:00-CV-0367-CC
                                       )
UNIVERSAL WRESTLING,                   )
CORPORATION f/k/a                      )
WORLD CHAMPIONSHIP WRESTLING,          )
INC., TURNER SPORTS, INC.,             )
TURNER ENTERTAINMENT GROUP,            )
INC. and TURNER BROADCASTING           )
SYSTEM, INC.,                          )
                                       )
        Defendants.                    )
                                       )

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Comes now Bobby Walker and respectfully submits (pursuant to Rule 56.1) his response to Defendants Universal Wrestling Corporation (f/k/a World Championship Wrestling, Inc.) ("WCW"), Turner Sports, Inc. ("TSI") and Turner Broadcasting System, Inc., ("TBS"), showing the Court the following:

1.      Walker does not dispute SMF No. 1.

2.      Walker disputes SMF No. 2.  Although Defendant WCW designated wrestlers and other performers to be independent contractors, as a matter of law these workers were employees of WCW.  Under the terms of the of the standard Independent Contractor Agreements ("ICA") WCW entered into with virtually

115

all of its contract talent, performers were not allowed to compete with WCW either during or after the term of their contracts.  Additionally, WCW's standard ICA forbid performers from doing **any kind of work** without the express permission of WCW.  This rule was reinforced by JJ Dillon on April 30, 1999, when he sent a memo to "All WCW Talent" regarding schedules "including personal appearances."  See Pl. Ex. 49, attached herewith at Tab 1[1]; Morrison Dep. at 172.   In his memo, Mr. Dillon advised all wrestlers that "all requests for days 'off' must be requested in advance and approved by JJ Dillon."  Mr. Dillon also told the wrestlers that during time "off," wrestlers could not make personal appearances unless those appearances were first approved by WCW.  Under the policy announced by Mr. Dillon, if a wrestler was approached about a personal appearance, he would be required to refer the request to Mr. Dillon.  Mr. Dillon would decide whether to approve the appearance.  WCW would then collect the appearance fee, and the wrestler would be required to share the fee with WCW.   WCW exercises complete control over wrestlers' performances --- deciding every detail of every performance --- from the specific dates and times to the consequences for being late or missing a

---

[1] All references to Tabs 1-5 refer to documents attached herewith.  All other lettered references to Tabs relate to Walker's separate Exhibits.

scheduled performance.  Any failure to comply with this policy would be considered a breach of contract.

3.    Walker does not dispute SMF No. 3.

4.    Walker disputes SMF No. 4.  During its entire existence, WCW only made money during a brief period of time. According to John E. Kampfe, the Senior Vice President and Chief Accounting Officer for TBS, WCW lost millions of dollars on an annual basis "from the day Ted Turner bought it…up until roughly 1997, 1998 time frame."  See Kampfe Dep. at 14-15.  As of June 30, 1997, TBS funded $76,607,338 of losses and asset acquisitions by WCW.  Id. at 113-14.  WCW was profitable for a very short period of time sometime between 1997 and 1999 and then began to lose money again.  Id. at 15, 72.

5.    Walker disputes SMF No. 5.  WCW never lost any of its own money because all of it losses were financed by its parent corporation Defendant Turner Broadcasting, Inc. ("TBS").  As of June 30, 1997, TBS funded $76,607,338 of losses and asset acquisitions by WCW.  Id. at 113-14.  WCW was profitable for a very short period of time sometime between 1997 and 1999 and then began to lose money again.  Id. at 15, 72-73.  During that period, TBS financed WCW's losses because having access to WCW programming allowed TBS's subsidiaries to "boast about its ratings" because the WCW program "was the highest rated cable show on television."  Id. at 42.  TBS financed WCW's losses for

access to WCW programming.  Id. at 73-74.  WCW did not have to worry about the cost of talent because TBS covered that cost, **and TBS never told WCW to cut its cost of talent.**  Id. at 61.

WCW was involved in significant hiring during 1999.  On March 31, 1999, Diana Myers reported to Dr. Harvey Schiller, the President of Turner Sports that WCW had just entered into new contracts with two new wrestlers (costing $895,000) and had given two wrestlers raises (costing $115,000), for a net talent cost increase of $1,010,000.  See Pl. Ex. 75; Tab 2.  Following those increases in costs, WCW was "$1,858,000 **under budget** for 1999."  See Pl. Ex. 75; Tab 2.  During May 1999, WCW added 13 new talents, gave two wrestlers raises, and terminated two contracts for a net increase in talent cost of $58,714.  See Pl. Ex. 76; Tab 3).  In her May report, Myers reported to Schiller that "we are currently $100,000 **under budget** for 1999." See Pl. Ex. 76; Tab 3).

A memo from Myers to Bischoff and Bill Busch dated June 9, 1999, reported on New ICAs (Independent Contractor Agreements) and Trainees, listing thirty (30) new performers with WCW for the first six months of the year, representing an increase in payroll to new personnel of $2,709,514.  See Pl. Ex. 64; Tab 4).

Finally, Defendants offer no meaningful statistics to support their claim that WCW "began to produce fewer and fewer" events in 1999.  Accordingly, Plaintiff denies the assertion.

- 4 -

6.    Walker disputes SMF No. 6.  The fact that WCW was losing money never determined the number of wrestlers kept under contract because WCW knew that TBS would fund any and all of its losses, and TBS never directed WCW to reduce the size of its talent pool. See Kampfe Dep. at 61.

7.    Walker admits only that WCW stopped airing its Saturday Night Show.

8.    Walker does not dispute SMF No. 8.

9.    Walker does not dispute SMF No. 9.

10.   Walker does not dispute SMF No. 10.

11.   Walker disputes SMF No. 11.  Although it appeared that the purpose behind the first six months of the Power Plant training program was to physically train Walker, Mr. Walker contends that he was used at the training plant, in part, to serve as one of the token African-Americans to appear solely for the purposes of making sure that WCW minimally had African-Americans participate.  (Walker Dep. at 102-103).  Walker and other black wrestlers were expected to do janitorial work (sweeping, cleaning bathrooms, hauling garbage), to load and unload trucks and to move wrestling rings for upcoming events. See Norris Dep. at 42-43.

12.   Walker does not dispute SMF No. 12.

13.   Walker disputes SMF No. 13.  Even as early as 1994,
Mr. Walker had developed the requisite skills and abilities to
be a successful wrestler with WCW.   (Walker Aff. at ¶ 3).

14.   Walker disputes SMF No. 14.  Mr. Walker continued to
train at the Power Plant because WCW would not give him
opportunities to wrestle at a sufficient number of WCW events.
(Walker Dep. at 171).

15.   Walker disputes SMF No. 15.  He had "not yet"
perfected walking the ropes as he had not even begun learning
this maneuver at the time he signed his 1994 Agreement.   (Walker
Aff. at ¶ 2).

16.   Walker disputes SMF No. 16.  Defendants have
mischaracterized *Jimmy Hart's* testimony.  Mr. Hart testifies
that he encouraged Bobby Walker to perform the finishing move of
"walking the ropes" and wanted him to walk the ropes even if it
mean that he fell off the ropes.  (Hart Dep. at 74-75).  Also,
Orndorff told Walker that if Walker fell, the opponent could
then capitalize on Walker's loss of momentum in the match.
(Walker Aff. at ¶ 21).

17.  Walker disputes SMF No. 17.  The only white trainees
who were required to be unpaid laborers were "rookies," i.e.,
those who were new at the Power Plant.  Only blacks and white
"rookies" were required to do janitorial work, load and unload
trucks or build and break down rings.  Marcial Davis, a black

wrestler who trained at the Power Plant, testified that only blacks and white "rookies" were required to clean the facility. See Davis Dep. at 77.  If white and black wrestlers were training and a truck arrived to be loaded, only the black wrestlers would be directed to load the truck.  (Id. at 81; Walker at 121).

18.  Walker disputes SMF No. 18.  Mr. Walker denies Defendants' contention that they renewed Walker's contract "in a further effort to provide Walker with an opportunity to develop his potential," as Mr. Walker has established evidence demonstrating that the intent was to provide him with minimal wrestling opportunities rather than to provide him with a genuine opportunity to succeed at WCW.  (Walker Dep; Walker Aff. at ¶¶ 13-25).

19.  Walker disputes SMF No. 19.  (Walker Aff. at ¶ 6).

20.  Walker disputes SMF No. 20.  Mr. Walker was not given "significant creative freedom to choreograph his matches" because he was rarely used in matches.  Also, Taylor harassed Walker about Walker's ideas.  (Walker Aff. at ¶ 27.).

21.  Walker disputes SMF No. 21.  Mr. Walker was not given the "creative freedom to develop," as he was prevented from developing into a wrestler because of his race.  Furthermore, Taylor frequently demanded Walker to change his name, his

gimmick and his character.  (Walker Dep. at 79-80; Aff. at ¶
27).

22.  Walker disputes SMF No. 22.  WCW never made
"significant efforts."  To the extent that Mr. Walker did not
generate the extent of "fan interest" of WCW's "more popular
wrestlers" the failure to generate the fan interest was based on
the discrimination of Defendants rather than Mr. Walker's
abilities.  Furthermore, Mr. Walker shows that he was able to
generate "excitement."  Indeed, he was so exciting in one of his
wrestling performances in Germany that a paraplegic, who was
unable to move her hands ordinarily, was able to make a fist.
(Walker Dep. at 39-40).  As to "uniqueness," Mr. Walker has
established ample evidence that his finishing move of "walking
the ropes" was quite unique as few others in the wrestling
industry were able to perform this maneuver.

23.  Walker disputes SMF No. 23.  Defendants'
discriminatory animus, not Mr. Walker's wrestling deficiencies
limited the venues in which he could wrestle and his ability to
generate significant crowd interest.  See Walker Brief.

24.  Walker disputes SMF No. 24.

25.  Walker disputes SMF No. 25.  Mr. Walker's torn ACL did
not "impede" his career.  (Walker Dep. at 49-50; Aff. at ¶ 24).

26.  Walker disputes SMF No. 26.  Mr. Walker shows that his termination in 1998 was a result of the discriminatory bias of Terry Taylor.  ( Tab C).

27.  Mr. Walker admits he met with WCW Vice President, Eric Bischoff.

28.  Walker disputes SMF No. 28.  Mr. Walker did not file a charge of discrimination against WCW because he wanted to reject WCW's wrestling contract.  Instead, he filed a charge of discrimination against WCW because Eric Bischoff took no steps in response to Mr. Walker's complaints of Taylor's discriminatory bias.  Also, Walker wanted protection so WCW could not terminate the relationship with cause.  (Walker Aff. at ¶ 11).

29.  Walker disputes SMF No. 29.  Furthermore, Mr. Walker contends that although the EEOC made a determination that there was no employer-employee relationship, the legal determination of that issue should be resolved by a Federal Court.

30.  Walker does not dispute SMF No. 30.

31.  Walker does not dispute SMF No. 31.

32.  Walker does not dispute SMF No. 32.

33.  Walker disputes SMF No. 33.  Mr. Walker denies Defendants' contention that WCW "somehow" discriminated against him as he has established ample evidence that he was actually discriminated against.  See Walker Brief.

34.   Walker does not dispute SMF No. 34.

35.   Walker does not dispute SMF No. 35.

36.   Walker disputes SMF No. 36.  Mr. Walker admits only that he agreed to work out, for a very short period of time, at the Power Plant.  (Walker Aff. at ¶ 13).

37.   Walker disputes SMF No. 37.  Mr. Walker did not need "additional training time" as he had mastered his finishing move of "walking the ropes."  Moreover, Mr. Walker had a acquired all the skills he needed to succeed on WCW's more popular televised events with the exception of receiving a "push" and television exposure by Defendants.  (Walker Aff. at ¶¶ 13, 14).

38.   Walker disputes SMF No. 38.  Mr. Walker was not given various "opportunities."  Although he was scheduled to wrestle on a few occasions, in 1999 and 2000 on the Saturday night show, and although he was successful in his appearances, he was not provided with "opportunities."  (Walker Aff. at ___).

39.   Walker disputes SMF No. 39.  Mr. Walker did not "frequently" fall off the ropes.  (Exhibit 75, Tab 2).  (Kearce Dep. at 70-75; Ex. 95; Tab 5; Walker Aff. at ¶ 25).

40.   Walker disputes SMF No. 40.  WCW never edited Mr. Walker's performances on Saturday night show.  (Kearce Dep. at ___; Ex. 95).

41.   Walker disputes SMF No. 41.  Mr. Walker prevailed in every Saturday night show performance.  (Exhibit 75; Tab 2).

42.  Walker disputes SMF No. 42.  Mr. Walker denies the
characterization that he has a "reputation for being difficult
to instruct."  (Walker Aff. at ¶ 17).

43.  Walker disputes SMF No. 43.  Mr. Walker was not used
in 2000 because of racial discrimination and because he had
pursued a lawsuit against Defendants beginning in February,
2000.  (Walker Aff. at ¶¶ 12-20).

44.  Denied.  (Walker Aff. at ¶¶ 18-21).

45.  Walker disputes SMF No. 45.  With the exception of
participating in one dark match, prior to a Thunder event with
African-American wrestler Harold Hogue, Mr. Walker was never
asked to work with a tag team partner to prepare for appearances
on WCW's upcoming television shows.  Indeed, Mr. Walker never
did have a tag team partner.  Although Mr. Walker heard that
there were some discussions involving Harold Hogue, he was never
specifically told or provided the opportunity to develop a tag
team with Mr. Hogue.  (Walker Aff. at ¶ 18).

46.  Walker disputes SMF No. 46.  See response to statement
of fact number 45, supra.

47.  Walker disputes SMF No. 47.  In fact, Orndorff was
always very positive toward Walker while Walker was training
under his supervision.  (Walker Aff. at ¶ 21).

48.  Walker disputes SMF No. 48.  Mr. Walker only stopped
attending training sessions at the Power Plant after he realized

- 11 -

once and for all that WCW was not going to give him a chance.
Also, after he had successfully wrestled in his last WCW match,
he was never going to be used again.  Thus, Mr. Walker, after
seven years of training at the Power Plant, reluctantly stopped
trying to get an opportunity at WCW.  (Walker Aff. at ¶¶ 23).

49.  Walker admits only that he filed this lawsuit on
February 11, 2000.

50.  Walker disputes SMF No. 50.  Mr. Walker did everything
he could to get opportunities until he was forced to give up
trying.  (Walker Aff.).

51.  Walker disputes SMF No. 51.  Mr. Walker objects to the
use of "however" as WCW was merely waiting for his contract to
expire.  (Walker Aff. at ¶ 14).

52.  The terms of the contract speak for themselves.

53.  Walker disputes SMF No. 52.  Mr. Walker's contract was
not renewed because WCW had no interest in continuing a
relationship with Mr. Walker, and refused to offer Mr. Walker
any wrestling opportunities, or any compensation for providing
any services to WCW.  (Walker Aff. at ¶¶ 12-25).

Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

**MEADOWS, ICHTER & BOWERS, P.C.**
Fourteen Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA   30305
Telephone:   (404) 261-6020
Telecopy:    (404) 261-3656



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**

To: ALL WCW TALENT         CC: Eric Bischoff
                                Bill Busch
From: J.J. DILLON                Diana Myers
                                Alan Sharp
Date: APRIL 30, 1999

Subject: TALENT SCHEDULES, INCLUDING PERSONAL APPEARANCES

We have had several recent situations where talent were needed on short notice for WCW business ("house show" substitution, personal appearance, etc.) only to be informed by the individual talent that they had made a previous commitment not approved by WCW (movie project, charity appearance, autograph session, etc.) that caused a conflict.     In order to avoid a reoccurrence of these situations from this point forward, please be advised that all requests for days "OFF" must be requested in advance and approved by J.J. Dillon.    If you are planning a vacation, wanting to attend the wedding of a friend or planning to attend a school reunion, etc., you must request the time off in advance. THIS INCLUDES ANY AND ALL PERSONAL APPEARANCES (INCLUDING AUTOGRAPH SESSIONS), WHETHER FOR CHARITY OR INVOLVING AN APPEARANCE FEE.

Talent Relations has been given approval on a trial basis to authorize personal appearances for talent that involve payment to talent of a fee payable from a source outside our company.     These personal appearances will only be considered "Authorized Appearances" if they are scheduled through WCW.     The talent involved and WCW will share any fee involved, with the majority of any appearance fee going to the talent that makes the appearance.     All of these non WCW related personal appearances will be voluntary (therefore not regarded as a workday if there are limitations in the WCW talent contract) and subject to the approval of the talent. Appearance fees are usually determined by the fair market value, and if approached, WCW will attempt to get a fair appearance fee, which is subject to the approval of the talent.     If you are approached concerning an appearance, please have the party contact J.J. Dillon to comply with our appearance approval process.     This usually involves a contract for the appearance, which assures the validity of the request.     All appearance fees are received in advance by WCW, which assures the talent will be paid in accordance with the agreement.     ALL APPEARANCES NOT CLEARED BY WCW WILL BE REGARDED AS "UNAUTHORIZED" AND YOUR PARTICIPATION IN AN "UNAUTHORIZED APPEARANCE" COULD BE INTERPRETED AS A BREACH OF YOUR CONTRACT.

This represents a great opportunity for an added revenue stream for WCW talent.     This should continue beyond a trial basis, if we all work within the system.     If you have any questions or comments, please call J.J. Dillon at (404) 603-3832.     Thank you.



PLAINTIFF'S
EXHIBIT

49

WCW 010262
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

## _____2_____

(To be scanned in place of tab)

A Time Warner Company

## MEMO

TO:        Dr. Harvey Schiller

CC:        Eric Bischoff
           David Payne
           Matt Stroer
           Bill Busch

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      March 31, 1999

---

The following is a synopsis of the Talent Contract Changes for March 1999. The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.

We added two (2) new talent:                          $895,000
(David Abbott, Brian Yandrisovitz)

We negotiated increased contracts for two (2) talent:  $115,000
(Glenn Gilbertti, Ron Reis)

Impact to WCW Total Talent Commitment (increase):     $1,010,000

With this increase and our variables, we are currently $1,858,000 under budget for 1999.



PLAINTIFF'S
EXHIBIT
75

WCW 019229
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

$3$

(To be scanned in place of tab)



World Championship Wrestling
A Division of Turner Sports
One CNN Center
Box 105366
Atlanta, GA 30348-5366

## MEMO

TO:        Dr. Harvey Schiller

CC:        Eric Bischoff
           David Payne
           Matt Stroer
           Bill Busch

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      May 28, 1999

---

The following is a synopsis of the Talent Contract Changes for May 1999. The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.

| | |
|---|---|
| We added thirteen (13) new talent:<br>(David Fliehr, Emory Hail, and eleven trainees) | $457,600 |
| We negotiated increased contracts for three (3) talent:<br>(Jacobus Strauss, and two(2) former non-contract<br>talent Scott James and Steve James) | $51,714 |
| We terminated two (2) contracts:<br>(Steve McMichael, Kevin Wacholz) | $450,000 |

With this increase and our variables, we are currently $100,000 under budget for 1999.



PLAINTIFF'S
EXHIBIT
7 6

*A Time Warner Company*

WCW 019227
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

## 4

(To be scanned in place of tab)



TO:        Eric Bischoff
           Bill Busch

FROM:      Diana Myers

DATE:      June 9, 1999

RE:        New ICAs and Trainees

| Name | Salary (1st year) |
|---|---|
| **Cornell, Richard** (trainee-referred by Kanyon) | **$ 26,000** |
| **Davis, Marcial** (trainee) | **$ 31,200** |
| **Durham, Michael** (Public Enemy) | **$170,000** |
| **Fliehr, David** (David Flair) | **$ 45,000** |
| **Forrester, Ryan** (trainee-referred by Kanyon) | **$ 20,800** |
| **Funk, Allen Eric** (trainee) | **$ 31,200** |
| **Gruner, Pete** (Billy Kidman) | **$300,000** (increase from $125,000) |
| **Hail, Emory** (Emory Hale) | **$ 85,000** |
| **Helms, Gregory Shane** (referred by Kanyon) | **$ 45,000** |
| **Hugger, Jon** (trainee) | **$ 15,600** |
| **James, Scott** (Scott Armstrong) | **$ 52,143** (increase from $31,286) |
| **James, Steve** (Steve Armstrong) | **$ 52,143** (increase from $31,286) |
| **Jindrak, Mark Robert** (trainee) | **$ 39,000** |
| **Jones, Allen** (trainee-referred by Kanyon) | **$ 20,800** |
| **Massengale, Jason** (trainee-referred by Kanyon) | **$ 20,800** |
| **Moore, Shannon** (referred by Kanyon) | **$ 45,000** |
| **Norris, Harrison** (trainee) | **$ 39,000** |
| **Palumbo, Charles** (trainee) | **$ 39,000** |
| **Petty, Ted** (Public Enemy) | **$170,000** |
| **Rodman, Dennis** | **$1,000,000** |
| **Roman, Sammy Lee** (trainee) | **$ 26,000** |
| **Sanders, Michael** (trainee) | **$ 31,200** |
| **Siaki, Sonny Uaita** (trainee) | **$ 31,200** |
| **Skipper, Elix** (trainee) | **$ 39,000** |
| **Strauss, Jacobus** (Jakes) | **$ 75,000** |
| **Thornton, Randy** (Swoll) | **$350,000** ($50k signing bonus) |
| **Tilton, Kevin** (trainee) | **$ 15,600** |
| **Wilson, Luther** (referred by Kanyon) | **$ 45,000** |
| **Yokley, Jay Brett** (trainee) | **$ 15,600** |
| **Yun, James** (trainee-referred by Kanyon) | **$ 20,800** |

PLAINTIFF'S EXHIBIT 9

*A Time Warner Company*

**WCW 018865
CONFIDENTIAL**



# EXHIBIT / ATTACHMENT

_5_

(To be scanned in place of tab)

**EXHIBIT 5 IS THE VIDEOTAPE EVIDENCE ATTACHED TO PLAINTIFF WALKER'S APPENDIX AS PLAINTIFFS' EXHIBIT 95, TAB Y**

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties in the foregoing matter with the foregoing **Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts** by hand delivery addressed as follows:

> Eric Richardson, Esq.
> Evan Pontz, Esq.
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-22165

This _____ day of January, 2003.

Michelle M. Rothenberg-Williams