# ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 28 2003

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| BOBBY WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| | ) | |
| v. | ) | NO.  1:00-CV-0367-CC |
| | ) | |
| WORLD CHAMPIONSHIP WRESTLING, INC., | ) | |
| TURNER SPORTS, INC., and | ) | |
| TURNER BROADCASTING SYSTEM, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' REPLY MEMORANDUM
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Plaintiff Bobby Walker's Response to Defendants' Motion for Summary Judgment fails to raise any disputed issues that would require denial of Defendants' Motion.  Instead, it raises numerous irrelevant issues, blatantly mischaracterizes the record and applicable law, and relies on a variety of inadmissible, self-serving, unsupported and conclusory statements, all in a "kitchen sink" effort to create the appearance of a jury question.  Walker's arguments are baseless -- his claims fail as a matter of law.

Walker's race discrimination claims fail because:  (1) Walker was not qualified for the wrestling opportunities that he claims he was denied; (2) Walker cannot establish that similarly-situated white wrestlers and/or trainees were given the wrestling positions about which he complains; (3) Walker cannot establish that he was

subjected to a racially hostile environment at WCW; and (4) Walker

cannot establish that he was subjected to any retaliation or

adverse action for complaining about discrimination.  Walker's

Title VII claims also fail because, despite his after-the-fact

attempts to portray himself as a WCW employee, the record shows he

was an independent contractor.  Walker's mischaracterization of

facts, misstatements of controlling law, self-serving assertions,

and misleading attempts to unfairly portray WCW as an "evil entity"

are unavailing and do not salvage his discrimination claims.

Walker's state law claim for intentional infliction of

emotional distress fails because, by his own admission, this claim

is based entirely on the same facts as his discrimination claim.

Because the undisputed evidence of record demonstrates that

Walker cannot establish all of the essential elements of his

claims, Defendants' Motion for Summary Judgment should be granted

as to all of Walker's claims.

**ARGUMENT AND CITATION OF AUTHORITY**

**I.   SUMMARY JUDGMENT SHOULD BE GRANTED AS TO WALKER'S SECTION 1981
      CLAIMS.**

Walker, either unwilling or unable to articulate a cogent

analysis of his claims under **any** legal theory, makes much of the

fact that race discrimination may be established by using one of a

number of methods:  the direct evidence method, the McDonnell

Douglas proof scheme, or by showing a pattern and practice of

discrimination through the use of statistics and anecdotal evidence.  While this may be true, Walker has failed to establish race discrimination under *any* of these theories.

### A.   Walker Has Failed To Present Direct Evidence Of Discrimination.

Walker incorrectly points to comments allegedly made by Eric Bischoff, Terry Taylor and Vince Russo to try to establish direct evidence of race discrimination.  Despite Walker's assertions, there is <u>no evidence</u> that Bischoff, Taylor or Russo made <u>any</u> of the decisions regarding Walker about which he complains.  Walker has also failed to establish direct evidence because Walker has failed to identify when the alleged comments upon which he relies in support of this claim were made.  In fact, most, if not all, of the alleged comments were made prior to Walker's settlement agreement or more than two years prior to the filing of this lawsuit.  All such statements are barred by the release in Walker's settlement agreement and by the applicable statute of limitations.

As purported "direct evidence" of discrimination, Walker first points to an alleged statement by Eric Bischoff in 1996, in which Bischoff supposedly asked former WCW referee, Randall Anderson, "why are we pushing some of the blacks and niggers on our television show?"  (Walker Br. at 14).  Not only is this statement not "direct evidence" of discrimination -- it has no bearing whatsoever on Walker's claims.

Walker ignores the fact that Bischoff's alleged statement was made **2 years prior** to Walker's settlement of his initial lawsuit against WCW, and over **3 years prior** to him filing this lawsuit. Any purported claim arising from this alleged statement is barred both by the release in Walker's Settlement Agreement with WCW (See Defs.' Initial Brief at 22, n.6; Walker Dep. at Exh. 10, ¶ 3), and by the statute of limitations.  See Alexander v. Fulton County, GA, 207 F.3d 1303, 1346 (11th Cir. 2000).

Walker's reliance on this alleged statement by Bischoff is also erroneous because Walker has not established that Bischoff made any of the decisions regarding Walker about which Walker now complains.  "Remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination."  Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

Walker's assertion that purported statements by Taylor establish direct evidence of discrimination is disingenuous and lacks legal and factual support.  Walker has presented no evidence that Taylor had any involvement in the decisions about which Walker complains.  See Standard, 116 F.3d at 1330 (explaining that racist remarks by non-decisionmakers do not constitute direct evidence of discrimination).  Moreover, although the specific actions forming the basis for Walker's complaint occurred during 1999 and 2000, the

uncontroverted evidence of record establishes that Taylor was not even <u>employed</u> with WCW during most of this time frame.  (Taylor Dep. at 37, 56-58).  Because direct evidence "must speak directly to the discriminatory intent as well as relate to the specific action in question," any statements that Taylor purportedly made prior to the alleged adverse actions taken with respect to Walker do not constitute direct evidence.  <u>Hodges v. Stone Savannah River Pulp and Paper Corp.</u>, 892 F. Supp. 1571, 1577 (S.D. Ga. 1995).  In sum, *Walker cannot establish* "*the requisite nexus between the alleged* [racial slur] *and the defendant[s'] decision* [to not offer him additional wrestling opportunities or to terminate his contract]."  <u>Williams v. Mead Coated Bd., Inc.</u>, 836 F. Supp. 1552, 1571 (M.D.Ala. 1993), <u>aff'd</u> 41 F.3d 668 (11th Cir. 1994).

Finally, Walker points to statements allegedly made by Vince Russo as direct evidence of discrimination.  Walker's reliance upon such alleged statements is, again, misplaced.  The uncontroverted record evidence demonstrates that Russo **at no time** made decisions regarding wrestling opportunities for Walker.  Russo did not even know who Walker was until Walker filed the instant action.  (Russo Dep. at 64).  For the same reasons that Bischoff's and Taylor's alleged statements fail to constitute direct evidence of

discrimination, any assertions of direct evidence based upon alleged statements by Russo also fail.[1]

**B.   Walker Cannot Establish Race Discrimination Under The McDonnell Douglas Framework.**

**1.   Walker Has Not Established A Prima Facie Case Of Failure To Promote.**

Walker has failed to prove a prima facie case of race discrimination under the McDonnell Douglas framework because he cannot establish **that he was otherwise qualified for the wrestling opportunities he sought,** which is an essential element of his prima facie case of discrimination in his failure to promote-type claims. The record is devoid of any competent evidence that Walker was qualified for the positions about which he complains.

In their Initial Brief, Defendants explained the essential prerequisites for wrestlers to receive opportunities in WCW's more popular events, as well as the reasons why Walker was not qualified to receive such opportunities. (Initial Brief at 15-20). In a thinly veiled effort to circumvent his burden of proof, Walker does not identify any particular opportunities or positions he was denied. Instead, Walker summarily argues that he was denied the

---

[1] Walker also alleges that the "constant and frequent use of racial slurs" by WCW bookers establishes direct evidence of discrimination. (Walker Br. at 15). However, Walker has failed to establish that any of the named bookers made decisions in reference to Walker's contract or wrestling opportunities. Many of the statements upon which Walker relies in support of his direct evidence claim also are barred by the settlement agreement and the applicable statute of limitations.

"training, exposure, and push that was provided to Caucasians."
(Walker Br. at 26).   Regardless of Walker's attempts to avoid his
burden, Walker has not produced and cannot produce any evidence
that he was in fact qualified to receive **any** position or **any**
opportunity that he contends he was denied.   Because Walker cannot
produce evidence to satisfy this essential element of his prima
facie case, his claim of discriminatory treatment fails.

Walker also cannot make out a prima facie case of failure to
promote because he cannot establish that "similarly situated or
less qualified [individuals] were promoted or transferred" to the
positions about which he complains.   See Pashoian v. GTE
Directories, 208 F. Supp. 2d 1293, 1308 (M.D. Fla. 2002).   Walker
first argues that the Court should not require him to provide such
evidence because he would have been similarly situated to WCW's
more popular wrestlers had he received more television exposure.
(Walker Br. at 27).   This contention has no basis in fact or law.
As the uncontroverted record evidence shows, Walker received
extensive training and numerous opportunities to wrestle in live
and televised events.   Despite these opportunities, Walker never
developed the requisite skills to become a successful WCW wrestler.
The fact that some Caucasian wrestlers achieved success after
receiving similar training and opportunities to Walker demonstrates

merely that such wrestlers were <u>not</u> "similarly situated" to or "less qualified" than Walker.

Nevertheless, Walker summarily argues that he was somehow more qualified than many Caucasian wrestlers who allegedly received a "push." (Walker Br. at 28). In support of this contention, Walker relies on his own self-serving opinion testimony and vague, unsupported and conclusory assertions by others who either had no input in WCW's talent evaluation process, or, in the case of Plaintiff's supposed wrestling "expert," Steve Hicks, had no involvement with WCW whatsoever.[2] (Walker Br. at 28). This effort is insufficient to defeat the undisputed record evidence contained in Defendants' summary judgment brief.

### 2. Walker Has Failed To Establish That WCW's Proffered Legitimate Nondiscriminatory Reasons For Its Actions Were Pretextual.

Defendants are also entitled to summary judgment because WCW has articulated legitimate, nondiscriminatory reasons for its actions with respect to Walker. In response, Walker dumps into the record a laundry list of irrelevant, conclusory and self-serving statements, mischaracterizes the record evidence, and misstates

---

[2] Notably, Mr. Hicks's opinions regarding Walker are not included in Plaintiff's Expert Report, nor is there any legal basis for this Court to receive "expert" testimony regarding the comparative qualifications of wrestlers. In any event, Mr. Hicks's lay, conclusory and subjective opinion regarding Walker's abilities do absolutely nothing to establish that Walker was more qualified to receive television opportunities and exposure than, for example, a wrestler named Chris Kanyon to whom Walker compares himself.

controlling law, all to try to demonstrate that WCW's proffered reasons were pretextual.  Walker's efforts are unavailing.

Walker argues that "Defendants' belated explanations as to why WCW did not promote and push Walker is [sic] replete with internal inconsistencies and contradictions, thus demonstrating that its [sic] reasons are pretextual for discrimination."  (Walker Br. at 35).  This argument blatantly and repeatedly mischaracterizes testimony and takes it out of context.  For example, Walker argues that both Hart and Hamilton thought highly of Walker's wrestling abilities because Hamilton once stated to Hart, "Bobby Walker can draw pretty well."  (Hart Dep. at 74).  Although Walker infers that this statement relates to Walker's ability to draw crowds, in fact, this testimony relates to Walker's ability to **draw pictures**.  (Id.) (Hart wanted Walker out in the audience so he could sketch pictures because Walker could draw).  Further, Walker asserts that Hamilton told Taylor that "walking the ropes" was "spectacular."  In fact, Hamilton told Taylor that the "idea" of walking the ropes is spectacular.  (Hamilton Dep. at 41-42)).  This statement does not establish, as Walker alludes, that Hamilton thought Walker could effectively execute this move or that Walker was a spectacular wrestler.  In fact, Hamilton's opinion of Walker's wrestling ability was that "sometimes [Walker] was very good; sometimes he wasn't very good."  (Id. at 42.)  Hamilton also testified, without

qualification, that Walker had failed to "master" walking the ropes. (Id. at 43).

In yet another misguided effort to selectively take testimony out of context and employ it to his advantage, Walker asserts that Hart stated that he "wanted to use Bobby...because WCW needed talent." (Hart Dep. at 75). Walker misleadingly omits from this quote that Hart also stated that he frequently told others in reference to Walker, "Look -- because I know Kevin was concerned about [Walker] on TV selling-wise, if [Walker] falls off the ropes, Jesus Christ, tell him don't do it anymore." (Id.) Thus Hart unequivocally indicated his and others legitimate concerns about Walker's abilities and performance as a wrestler.

This testimony, read in its proper context, reinforces and affirms that Walker had not mastered walking the ropes, that Walker did not have the requisite ability to receive opportunities on WCW's more popular live and televised events, and that WCW's explanation regarding why Walker did not receive additional opportunities is not pretext.[3]

Moreover, Walker's unsuccessful attempt to discredit the opinions of Joseph Hamilton, Paul Orndorff, J.J. Dillon, and Martin

---

[3] According to Walker, he also has presented videotape evidence that "conclusively establishes" that he mastered walking the ropes. However, self-serving tapes that Walker has randomly selected cannot "conclusively establish" that Walker mastered anything. (Walker Br. at 38).

Lunde, and to rehabilitate his own conclusory and self-serving statements that he should have been provided more wrestling opportunities, also fails to demonstrate pretext.  Hamilton, Orndorff, Dillon and Lunde were all very familiar with the decision-making processes at WCW and had personal knowledge about the factors used by WCW decisionmakers in determining the abilities of wrestlers and the opportunities they should properly receive. See e.g., (Hamilton Aff. ¶ 4), (Orndorff Aff. ¶ 4), Dillon Aff. ¶ 4).  For these reasons, the four witnesses that Walker criticizes as inadequate clearly have sufficient knowledge and experience with WCW to make an informed judgment about Walker's skill level and his ability to draw crowds and be successful as a wrestler with WCW.

Walker also argues that pretext exists because WCW failed to offer a "clear and reasonably specific" reason for its adverse actions against Walker.  (Walker Br. at 29).  This assertion blatantly disregards the evidence.  WCW explained that Walker was not given additional wrestling opportunities because he lacked charisma and uniqueness, lacked crowd appeal, lacked the ability to entertain, and had frequently failed during his performances to execute wrestling maneuvers in a smooth and error-free fashion. (Initial Brief at 4-7, 9-11).  Such reasons are sufficiently specific to be offered as legitimate, nondiscriminatory reasons. See Watson v. Fort Worth, 487 U.S. 977, 991, 108 S. Ct. 2777, 2787

(1988) (explaining that factors such as "common sense, good
judgment, originality, ambition, loyalty, and tact" often must be
assessed in a subjective fashion and may be relied upon for
purposes of making decisions where such factors are relevant to the
position at issue).[4]

Walker also argues that WCW's reference to its business
downturn with respect to Walker establishes pretext.  According to
Walker, "WCW's business downturn justification makes absolutely no
sense" because "WCW was not even making any decisions with respect
to Walker in 1999."  (Walker Br. at 32).  Walker's argument flatly
contradicts his repeated assertions that WCW failed to provide him
with additional wrestling opportunities during **1999 and 2000**.
(Walker Br. at 8, 45).  Moreover, Walker does not dispute that
WCW's business downturn continued until March 2001, when WCW sold
certain of its assets and ceased its operations.  (Myers Aff. ¶ 8).

In yet another futile attempt to establish pretext, Walker
asserts that a wrestler's qualifications were of no importance to
WCW, because "[a] wrestler's success was limited only by the
creative imaginations and intentions of WCW's white bookers,

---

[4] Walker chides Defendants for purportedly using a "one-size-fits-
all excuse" for all African-American to "whom WCW denied meaningful
opportunities," and claims that the use of such criteria over time
establishes direct evidence of discrimination.  Defendants'
consistent application of the same race-neutral criteria in
determining the type of opportunities to give to its wrestlers and
their likelihood of success with the organization demonstrates a
complete absence of discrimination.

regardless of 'talent' or wrestling experience." (Walker Br. at 28.) This conclusory assertion that WCW could wave a magic wand and make a wrestler successful is without evidentiary support and defies logic. Walker does not dispute that wrestlers were essentially actors, or that charisma and crowd appeal were necessary attributes to succeed as a professional wrestler. Indeed, some wrestlers became popular and successful despite initially receiving little exposure or promotion, while others never achieved the same level of success or popularity regardless of efforts to promote them. (Juster Dep. at 89-93). For example, former WCW wrestler Lex Luger never achieved success in the World Wrestling Federation despite receiving a significant push; whereas, WCW wrestler Bill Goldberg enjoyed great success despite initially receiving only a minimal push. (Id.)

Walker selectively points to the fact that actor David Arquette briefly became WCW's world heavyweight champion, even though Mr. Arquette had no prior "wrestling experience." (Walker Br. at 29). This simply supports WCW's use of non-discriminatory criteria. As WCW has repeatedly expressed, it promoted those wrestlers or performers who it thought had the most potential to appeal to large audiences and draw fan interest, regardless of the individual's race or prior experience, such as a famous actor like David Arquette. (Juster Dep. at 93). Moreover, Walker ignores the

fact that WCW heavily promoted and featured Karl Malone, Dennis Rodman, and Percy Miller (a rapper known as "Master P"), all of whom were famous African-Americans who had no prior wrestling experience, and paid them substantial sums of money. (Bischoff Dep. at 145-49). The fact that African-American performers with no prior wrestling experience were given such opportunities undermines Walker's pretext assertion, and underscores that WCW extended opportunities to any wrestler or performer who was likely to generate substantial revenue for the organization.

Because Walker cannot establish that WCW's proffered nondiscriminatory reasons for its actions taken with respect to Walker are pretextual, his claim of discriminatory treatment fails.

C.   **Walker Has Not Established A Pattern Or Practice Of Race Discrimination.**

Having failed to offer any direct evidence of discrimination or sufficient circumstantial evidence under the McDonnell Douglas proof scheme to establish his claims, Walker makes a baseless argument that he has established a "pattern and practice" of discrimination at WCW. To establish a pattern or practice of discrimination, however, a plaintiff must offer a "combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally." Fletcher v. ADT Security Servs. Inc., 2000 WL 33231616, *2 (N.D.Ga. Feb. 7, 2000). Walker has failed to satisfy

this burden.  Walker's "statistical" evidence does not provide any

basis for a legitimate conclusion about discrimination.  Moreover,

Walker does not point to any practice or pattern that shows any

intent to treat African-Americans as a group different than other

groups.  In fact, Walker does nothing more than repeatedly argue in

support of his pattern and practice claim that all of the decision-

makers at WCW were white and used informal methods of promoting

wrestlers.  Despite this assertion, the Eleventh Circuit has

unequivocally held that "'[n]o matter how medieval a firm's

practices, no matter how high-handed its decisional process, no

matter how mistaken the firm's managers, the [law] does not

interfere.'"  Fletcher, 2000 WL 33231616, at *8 (quoting Elrod v.

Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)).  WCW's

consistent use of race-neutral and subjective criteria in making

decisions, no matter how informal its process, does not establish a

pattern and practice of discrimination.  Moreover, the fact that

many of the decisionmakers at WCW were white adds nothing to

Walker's claim.  He has pointed to no intentionally discriminatory

practice or pattern, and is left with just meaningless statistics

underlying his pattern and practice claim.  This is legally

insufficient to make out such a claim.

    Walker summarily claims that the statistics he offers somehow

show that "chance did not account for" the under-representation of

African-Americans at WCW.  (Walker Br. at 6).  Walker has not
presented any evidence with respect to the number of African-
American applicants, or non-minority applicants, who actually
applied for positions and/or opportunities at WCW.  Nor has he
offered any evidence on the percentage of either group who were
qualified for such opportunities.  Instead, he has relied solely
upon uninformed guesses and speculation as to the general number of
minorities training at WCW's Power Plant or attending random
tryouts to draw his "conclusions."  As the Eleventh Circuit has
instructed, vague allegations of a numbers disparity, "without an
analytic foundation, are virtually meaningless." Brown v. American
Honda Motor Co., 939 F.2d 946, 952 (11th Cir. 1991).  "To say that
very few blacks have been selected by [WCW] does not say a great
deal about [WCW's] practices unless we know how many blacks have
applied and failed and compare that to the success rate of equally
qualified white applicants." Id. at 952; see also Howard v. BP Oil
Co., Inc., 32 F.3d 520 (explaining that for statistical evidence to
be relevant evidence of discriminatory intent in a § 1981 action
for race discrimination, the plaintiff must present evidence as to
how many blacks actually applied and were rejected and evidence of
the success rate of equally-qualified white applicants).  In light
of this standard, Walker's attempt to make a pattern or practice
claim by relying on meaningless "statistics" does not create an

issue of fact in this case.  Brown at 952; Mays v. Union Camp

Corp., 114 F. Supp. 2d 1233, 1241 n.2 (M.D. Ala. 2000) (assertion

that "only one African-American has been promoted" does not

establish pretext).

Walker's statistical theories and conclusions, which lack

proper evidentiary foundation, also are contrary to well-settled

law in the employment discrimination context.  In this context,

"[e]stablishing the percentage of members of a particular group in

the employer's workforce (or a segment thereof), without more,

proves nothing; the essence of statistical proof requires a

comparison."  Barbara Lindemann and Paul Grossman, EMPLOYMENT

DISCRIMINATION LAW 1689 (3d ed. 1996); see also Hawkins v. Ceco

Corp., 883 F.2d 977, 985 (11th Cir. 1989) (holding that evidence

that plaintiff was only African-American salaried employee for a

ten-year period is irrelevant without comparative evidence), cert.

denied, 495 U.S. 935 (1990).  Given that Walker's proffered

statistics thus "prove nothing," his claim that his "expert's"

statistical findings demonstrate evidence of illegal discrimination

at WCW is without merit.  Furthermore, because the statistical

evidence and conclusions proffered by Walker lack fundamental

evidentiary value, as established by Defendants' expert report

(attached hereto as Exh. A), Defendants intend to submit a Daubert

motion to entirely exclude this testimony.[5]  Because Walker cannot produce any competent, admissible or relevant statistical evidence, Walker's pattern and practice claim is baseless.

In a further, desperate attempt to support his pattern and practice claim, Walker points to a number of conclusory, hearsay and unsubstantiated statements, which he mistakenly classifies as "anecdotal evidence" of discrimination.   Although anecdotal evidence may be relevant to a pattern and practice discrimination analysis when combined with a "proper statistical foundation," Equal Employment Opportunity Commission v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000), anecdotal evidence alone rarely, if ever, can show a systematic pattern of discrimination. Id.; Engineering Contractors Ass'n of South Florida, Inc. v. Metropolitan Dade County, 122 F.3d 895, 925 (11th Cir. 1997). Walker's conclusory and unsubstantiated claims are hearsay and are certainly not an example of the rare type of anecdotal evidence that can establish any pattern and practice by WCW to intentionally treat all African-American's as a group differently due to their race.  Ultimately, because Walker has failed to present meaningful statistical evidence to accompany his weak and factually

---

[5] Even if Walker had offered probative statistical evidence, the Supreme Court has cautioned that general determinations as to the composition of a defendant's labor force are of limited usefulness "as to an individual's hiring [or promotion] decision, particularly in the presence of an otherwise justifiable reason" for the decision.  McDonnell Douglas, 411 U.S. at 805 n. 19.

unsupported assertions of anecdotal evidence of discrimination, and
because anecdotal evidence alone is insufficient to support such a
claim, he has utterly failed to establish a claim of a pattern and
practice of discrimination.  Even if anecdotal evidence alone could
make out a pattern and practice claim, the only anecdotal evidence
relied upon by Walker is inadmissible hearsay.[6]

### D.   **Walker Has Not Established That WCW Subjected Him To A Racially Hostile Environment.**

In support of his hostile environment claim, Walker relies on
a number of alleged discriminatory statements, undistinguished by
time, place, or context, that were purportedly made by persons
affiliated with WCW, and he offers speculative statements by non-
decision makers relating to the mindset and intentions of WCW's
decision makers.  Walker also conclusorily asserts, without any
personal knowledge, that "racist comments and slurs were regular,

---

[6]   Walker's claim that white wresters were given another
opportunity when they messed up at the Power Plant, whereas black
wrestlers were not, is an example of his reliance upon unsupported
factual assertions in support of his pattern and practice claim.
This assertion is completely spurious.  It is well-documented that
Walker frequently fell from the ropes when attempting to perform
his finishing move, which unquestionably qualifies as "messing up."
Despite this fact, Walker was given numerous wrestling
opportunities with WCW and was permitted to continue to train at
the Power Plant.

Likewise, Walker summarily asserts that WCW had a pattern and
practice of discrimination because it "disparately merchandised its
wrestling products."  (Walker Br. at 23).  In support of this
assertion, Walker points primarily to the testimony of two
individuals who had no involvement with the merchandising side of
WCW's business.  This allegation is thus unsupported and meritless.
(Id.)

routine and made in public." (Walker Br. at 44). According to Walker, this alleged conduct "subjected him to a racist culture in which every facet of his relationship was tainted by the color of his skin." (Id.)

Walker's hostile environment claim fails because he has not established and cannot establish that he personally was subjected to a racially hostile environment. As this Court has previously held, even if the Court assumes that decisionmakers at WCW "frequently used racial slurs, the relevant inquiry is the extent to which [Walker] was aware of any racial hostility." Dixon v. Young, 2000 WL 33224515 (N.D. Ga. Sept. 21, 2000). In Walker's deposition, when he was asked whether he had ever heard any of WCW's executive officers or other decisionmakers use the word "nigger" or any other racial slur, Walker acknowledged that he never heard anybody call him one. (Walker Dep. at 144, 146, 149, 152, 163, 176-80). Moreover, the only racially derogatory remarks of which Walker has personal knowledge are Taylor's alleged statements that "[Walker was] only at WCW because [he was] black" and that the "only reason Walker was [at WCW was] because they need[ed] color on t.v." (Walker Br. at 12-14). The evidence establishes that any other information that he claims to have relating to the use of racially derogatory language by WCW decision-makers was based upon hearsay. (Walker Br. at 12-14;

Walker Dep. at 144, 146, 149, 152, 163, 176-80).  Walker "can

hardly contend that his environment was racially hostile if he did

not experience the alleged hostility."  <u>Dixon</u>, 2000 WL 33224515,

*6.  Because Walker has failed to establish that he <u>personally</u> was

subjected to an environment in which racial slurs were commonplace

and overt, his hostile environment claim fails.  <u>Id.</u>

    Walker's hostile environment claim also fails because Walker

has not established that the alleged discriminatory conduct

**unreasonably interfered with his work performance**.  Despite

Walker's assertions of discriminatory conduct, Walker does not

assert that the alleged discriminatory conduct had an impact on his

performance as a wrestler.  Therefore, Walker's hostile work

environment claim fails.

    **E.  Walker Has Not Established That WCW Retaliated Against
Him Because Of Any Alleged Complaints Of Discrimination.**

    Walker's claim of retaliation is without merit.  The record is

devoid of <u>any</u> <u>evidence</u> that WCW took <u>any</u> adverse action against

Walker as a result of his alleged complaints of discrimination.

Walker does not dispute that (1) he continued to wrestle with WCW

for nearly 2 years after his purported complaints, and (2) WCW

provided him with numerous additional opportunities to wrestle

during this time period.  Instead, he tries to discount these

opportunities by alleging that Woody Kearce, a WCW production

employee, characterized Walker's opportunities as "few and

limited." (Walker Br. at 45). Contrary to Kearce's irrelevant opinion, the record establishes that WCW placed Walker on those events that were commensurate with his wrestling ability, both before and after his purported complaints of discrimination. In fact, after WCW terminated the only show in which Walker's frequent errors could be edited in 2000, WCW created a new storyline specifically for Walker, in an attempt to provide him with additional wrestling opportunities. (Initial Brief at 11-12). **Walker**, however, failed to take full advantage of this new opportunity and unilaterally stopped training for the new storyline. (Id.)

Walker's retaliation claim also fails because Walker has not established a causal connection between his alleged complaints of discrimination and WCW's decision not to place him on its main events. Walker continued to wrestle at WCW for almost two years after his alleged complaints of discrimination. Walker still asserts, however, that the alleged adverse actions and his alleged complaints were somehow causally related because of a purported statement by Taylor that is, again, undistinguished by time and context. Walker claims that Taylor said, at some point, that those complaining about discrimination could "get to the back of the line." (Walker Br. at 47). Without any causal link between alleged statements and the alleged adverse action, Walker cannot

establish retaliation.  Farley v. Nationwide Mut. Ins. Co., 197

F.3d 1322, 1336 (11th Cir. 1999).  Walker's reliance on this

isolated and irrelevant statement in a misguided effort to buttress

his retaliation claim is simply another example of Walker

attempting to use inadmissible or irrelevant evidence to salvage

his meritless claims.[7]  Walker's retaliation claim should be

dismissed as a matter of law.

**II.   TITLE VII DOES NOT APPLY TO WALKER'S DISCRIMINATION CLAIMS.**

     To fall within the statutory jurisdiction of Title VII,

alleged discriminatory conduct must occur "within the

employer/employee relationship."  Ross v. World Championship

Wrestling, Inc., Civil Action File No. 1:93-CV-1206-JEC.  "[A]n

aggrieved individual may only proceed under Title VII where that

individual is an employee rather than an independent contractor."

Id.  The following undisputed facts establish that Walker was an

independent contractor for WCW, and not an employee:  he was

largely free to choreograph the bulk of his wrestling matches; he

---

[7] Walker also asserts in support of his retaliation claim that WCW
stopped sending him booking sheets after his alleged complaints of
discrimination.  Despite this assertion, Walker mysteriously became
aware of and appeared at all of the matches in which he was
scheduled to wrestle.  Thus, this does not constitute any evidence
of any adverse action causally connected to his alleged complaints.
     Walker also attempts to rely on his own subjective opinion
that his wrestling moves were "perfect" to establish his claim of
retaliation.  However, Walker's subjective opinions about his
qualifications fail to salvage his retaliation claim.  See Lee v.
GTE Florida, Inc., 226 F.3d 1249, 1254 (11th Cir. 2000).

underwent extensive training to perform as a professional wrestler; he was solely responsible for the provision of his equipment and costumes at his own expense; his and WCW's relationship was specifically contracted for a short period; he was not eligible for any benefits provided to WCW's employees; he was responsible for the payment of taxes on money received under his contract with WCW; and both WCW and Walker intended to form an independent contractor relationship. (Initial Brief at 30-33). This Court and other courts have held that identical factors establish an independent contractor relationship. (Ross at 15-18; Wilde v. County of Kandiyoh, 15 F.3d 103, 104-06 (8th Cir. 1994). Because as a matter of fact and law Walker was an independent contractor, and not an employee, his Title VII claim fails.

## III. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON WALKER'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM.

Walker does not dispute that there is nothing other than WCW's alleged discrimination that purportedly caused him emotional harm. Because Walker is required under Georgia law to establish more than just alleged discriminatory conduct to sustain an intentional infliction of emotional distress claim, summary judgment must be entered on this claim. Beck v. Interstate Brands Corp., 953 F.2d 1275, 1276 (11th Cir. 1992); Ward v. Papa's Pizza To Go, Inc., 907 F. Supp. 1535, 1542 (S.D.Ga. 1995).

## CONCLUSION

For all of the foregoing reasons, and the reasons set forth in Defendants' Initial Brief, Defendants' Motion for Summary Judgment should be granted on all of Walker's claims asserted in this action, and all of Walker's claims should be dismissed.

This 28th day of January, 2003.

TROUTMAN SANDERS LLP

JOHN J. DALTON
Georgia Bar No. 203700
ERIC A. RICHARDSON
Georgia Bar No. 233873
JAMES A. LAMBERTH
Georgia Bar No. 431851
EVAN H. PONTZ
Georgia Bar No. 583577

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA 30308-2216
(404) 885-3000

Attorneys for Defendants

## CERTIFICATION

Pursuant to Local Rule 7.1(D), I certify that this Reply Memorandum has been prepared with one of the fonts and point selections ("Courier New 12") approved by the Court in Local Rule 5.1(B).

This 28th day of January, 2003.

_____
Eric A. Richardson
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000



# EXHIBIT / ATTACHMENT

APPENDIX

A

(To be scanned in place of tab)

**Assessment of Dr. David W. Rasmussen's Expert Report for Plaintiffs in Walker, *et al. v.* World Championship Wrestling, Inc., *et al.***

David W. Peterson, PhD
Peopleclick, Inc.
Two Hannover Square, 9th Floor
Raleigh, NC  27601
(919) 645-2800

November 19, 2002

Lisa Grant Harpe, PhD, and Murray S. Simpson, PhD
contributed to the formulation and writing of this report.

**Assessment of Dr. David W. Rasmussen's Expert Report for Plaintiffs in
Walker *et al. v.* World Championship Wrestling, Inc., *et al.***

1. Peopleclick, Inc. is retained by counsel for the defendants to assist with statistical aspects of the cases filed by plaintiffs against World Championship Wrestling, Inc., Turner Sports, Inc., Turner Entertainment Group, Inc. and Turner Broadcasting System, Inc. We respond here to a report submitted by plaintiffs' expert, Dr. David W. Rasmussen.[1] In his report, Dr. Rasmussen claims to provide evidence that World Championship Wrestling, Inc. (WCW) treated African Americans differently than it treated other applicants and contractors with respect to hiring and pay. Having reviewed his report, we conclude that Dr. Rasmussen establishes neither that WCW hired wrestlers in a discriminatory fashion, nor that WCW paid its wrestlers in a manner that discriminated against African Americans. These conclusions rest on Dr. Rasmussen's failure to produce statistical comparisons that focus on the treatment of African Americans relative to other similarly situated applicants and contractors, and to his erroneous application of several statistical models.[2]

**Dr. Rasmussen's Hiring Analysis**

2. Disparate treatment of African Americans occurs when an employer intentionally treats African Americans differently from similarly situated non-African Americans. For example, disparate treatment occurs when an employer requires only African Americans to take a hiring test or when an employer applies different hiring standards for a given position depending on the race of the applicant. In investigating hiring discrimination in these lawsuits, the question of interest is whether WCW treated African-American applicants for wrestler positions differently from other similarly situated applicants. To address this question, one should compare the racial composition of the pool of qualified applicants for wrestler positions to the racial composition of the people hired as wrestlers from that pool. In this way, the hiring choices made by WCW can be contrasted with the range of alternatives reasonably available to it to determine whether its decisions were systematically unfavorable to African Americans.

---

[1] Dr. Rasmussen's report is in Plaintiffs' Rule 26 (a)(2) Disclosures of Expert Testimony of Dr. David W. Rasmussen, filed in the United States District Court for the Northern District of Georgia (Atlanta Division).
[2] Throughout our report, we generally do not contest the correctness of the data on which Dr. Rasmussen relied in conducting his analyses, or the correctness of his summaries of those data, for we have at present no way of verifying either. To the extent that Dr. Rasmussen's underlying data are incorrect or incomplete, inferences drawn from them may be unreliable.

3. Dr. Rasmussen fails to do a direct comparison of new hires to applicants in two important respects. First, instead of using applicants, he uses various estimates of the racial composition of the labor market from which he presumes WCW might reasonably be expected to draw its wrestlers. Second, instead of using new hires in the comparison, he uses all persons retained as wrestlers by WCW as of any time during the period 1996 – 2000. The result is a comparison that does not illuminate the issue of whether WCW treated African-American applicants any differently than it treated other similarly qualified applicants. Furthermore, taking account of the uncertainty in Dr. Rasmussen's labor market estimates, one finds that the racial composition of the wrestlers retained by WCW during 1996 – 2000 is consistent with Dr. Rasmussen's labor market estimates, and consequently this corrected analysis provides no cause to believe that race had anything to do with WCW's hiring decisions. These points are amplified in turn below.

*Dr. Rasmussen Does Not Study Applicants*

4. Unable to identify the pool of individuals who applied for wrestler positions during his period of analysis (1996 – 2000), Dr. Rasmussen bases his statistical analysis on several estimates of the racial composition of applicants for wrestler positions under the tacit assumption that the group of individuals attending WCW's Power Plant wrestling school either constitutes the entire qualified labor force from which WCW did or should draw its wrestlers, or else that the group provides an adequate indication of the racial composition of that labor force. For this purpose, Dr. Rasmussen relies on (i) subjective estimates by certain people of the percentage of African Americans who attended WCW's Power Plant training school, and (ii) a list of persons identified by WCW as having trained at the Power Plant school during the period 1996 – 2000. Dr. Rasmussen augments his statistical analysis with some additional observations based on (iii) the percentage of African Americans in occupations he considers similar to wrestling. As shown below, none of these sources provide a reliable estimate of the racial composition of WCW's qualified labor pool.

5. *Subjective Estimates of Power Plant Trainees.* In Table 1 of his report, Dr. Rasmussen lists the percentages of African Americans at WCW's Power Plant training school subjectively estimated by five individuals. These estimates are diverse, ranging from a low of 10% to a high of 40%. Dr. Rasmussen identifies by name the five people who provided these subjective estimates, but he indicates nothing about their qualifications to make such estimates,

about the question to which they were responding, about the basis for their estimates, about whether they might be motivated either to over- or under-estimate the representation of African Americans, or about the period of time to which the estimates pertain — all issues that affect the reliability of these estimates.

6. *List of Power Plant Trainees.* Dr. Rasmussen also bases an estimate of the racial composition of Power Plant trainees on a list he identifies as Exhibit B to Interrogatory 3 of the Supplemental Response to Plaintiffs' Consolidated First Interrogatories. This he claims is a list "by which the WCW has identified each individual who was a trainee at the Power Plant over the 1996 – 2000 period." He asserts that 13.4% (or 11 out of 82) of the people on this list are African American. Leaving aside issues related to the completeness and accuracy of the list, we note that (i) the 13.4% is, unlike the subjective estimates discussed above, objective – its basis is explicit and one can address its reliability by examining the reliability of the data on which it is based, and (ii) to the extent that the list is not synonymous with the pool of applicants from which WCW might reasonably be expected to hire its wrestlers, the 13.4% estimate is prone to error of various types.

7. Consider first the objectivity of the 13.4%. The list to which Dr. Rasmussen refers apparently names 82 people, and by some process yet unknown to us, a race has been associated with each name on that list. Apparently, each name on the list was at some point considered individually, and a determination made as to the race of that person. Such a process, if done carefully, with accurate information, and applied to a comprehensive list, will yield a much more reliable estimate of the racial composition of the wrestler trainees at the Power Plant than will the offhand or subjective guesses of the sort on which Dr. Rasmussen first relies. Thus, the 13.4% is facially much more compelling an estimate of the racial composition of Power Plant trainees than are any of the subjective estimates.

8. Consider next the approximate nature of the 13.4% estimate. It may fail to be a reliable indication of the labor market from which WCW might reasonably be expected to draw its wrestlers for a variety of reasons. First, WCW may draw its wrestlers not only from the Power Plant, but from other sources as well. Second, the list on which Dr. Rasmussen relies may be incorrect or incomplete. Third, the list may contain some people who are not qualified to wrestle for WCW.

-3-

9. In any event, it is likely that the 82 people on the list are at best just a portion or sample of the people constituting the labor market from which WCW might reasonably be expected to draw. As such it is subject to sampling error, the kind of error that occurs when calculations are based on just a portion of the total population of interest. In the present case, the total population of interest is the collection of people interested in and qualified to provide services as wrestlers with WCW. Even if this sample were chosen from the target population perfectly in accord with statistical sampling protocols, sampling error will almost surely cause the proportion of African Americans in the sample to differ somewhat from that in the target population.

10. When the sample is drawn in accord with acceptable statistical practice, the magnitude of the sampling error can be characterized in the form of a confidence interval. A confidence interval reflects the margin of error associated with an estimate. For example, a survey of voters may indicate that 48% of voters favor a particular bond offering, with a 3% margin of error. This means that while 48% of the people surveyed favor the bond, the actual percentage of the total population which favors the bond is uncertain, but quite likely (usually 95% likely) to be in the range of 48% − 3% = 45% up to 48% + 3% = 51%. This range, from 45% up to 51%, is called the 95% confidence interval for the percentage of voters favoring the bond. In the present cases, the 95% confidence interval for the representation of African Americans within the target population extends from 6.9% to 22.7%.[3] That is, while 13.4% of the people in the sample of 82 wrestlers are African American, that sample could reasonably have been drawn from a population that is anywhere from 6.9% to 22.7% African American. Hence, if the representation of African Americans among newly hired wrestlers were anywhere in the range of 6.9% to 22.7%, no statistical inference of hiring discrimination would be raised.[4]

---

[3] This confidence interval is based on exact left- and right-tail binomial probabilities. There is a simpler calculation often used in practice that yields an approximate 95% confidence interval. In this case that approximate interval runs from 6.0% to 20.8%.

[4] To anticipate a point made later in this report, we note that according to Dr. Rasmussen, 7.5% of the people who wrestled for WCW during 1996 – 2000 were African American. Since 7.5% falls within the range of 6.9% to 22.7%, there is no statistical indication that, relative to their representation in the Power Plant, African Americans were underrepresented among WCW's wrestlers.

-4-

11. *Similar Occupations.* Dr. Rasmussen augments his labor market estimates by considering occupations he considers similar to wrestling. He notes that professional football and basketball require athleticism, speed and the ability to follow a scripted sequence of events. He further notes that the percentage of African Americans in professional football (67%) and basketball (80%) is much larger than the subjective estimates (10% – 40%) of their representation in the WCW training school, his objective estimate (13.4%) of their representation, or the percentage (7.5%) of African Americans among the wrestlers under contract with WCW at some time during 1996 – 2000. Although athletic ability is required of professional football players, professional basketball players and professional wrestlers, the type and amount of public speaking, acting and performing and the type of scripted events that must be followed by the participants differ substantially. Whereas in professional football and basketball, teams focus their athletic abilities on winning within the rules of the game, the focus of professional wrestling is not to win but rather for individual wrestlers to entertain. The script in basketball and football is a plan for scoring; whether or not the plan works is a function of luck and the ability of the players. In wrestling, the winner is foreordained; that is part of the choreography. The job of the wrestlers is to act out that script in the most authentic and entertaining fashion, rather like a ballet. While this requires athleticism, it also requires individual stage presence, the ability to create an artificial and consistent persona, and the ability to act. These are qualities generally not required of a good football or basketball player. There is no particular reason why the racial composition of people interested in and qualified for professional football or basketball teams should match that of people interested in and qualified for retention as wrestlers with WCW.

### Dr. Rasmussen Does Not Study New Hires

12. The data available to Dr. Rasmussen apparently do not permit him to determine the number or racial composition of people awarded contracts as wrestlers by WCW during the period 1996 – 2000. In lieu of this information, Dr. Rasmussen uses the entire group of 232 people who, at any time during 1996 – 2000, had a wrestling contract with WCW and were paid. In effect, Dr. Rasmussen presumes that the number and racial composition of WCW's wrestler workforce over this period are synonymous with those of the new hires over this period.[5] Thus,

---

[5] As the source of his workforce information, Dr. Rasmussen relies on a list of people he identifies as Exhibit A to Interrogatory 3 of the Supplemental Response to Plaintiffs' Consolidated First Interrogatories. It is our

Dr. Rasmussen's hiring analysis reduces to a comparison of WCW's wrestler workforce over the 1996 – 2000 period to the trainees at its Power Plant wrestling school. This is two significant steps removed from a comparison of wrestlers newly hired by WCW to the pools of applicants from which those new hires were selected, and as a consequence Dr. Rasmussen's analysis fails to shed light on whether, among similarly qualified applicants, African Americans were hired in the same proportions as others.

13. One point is abundantly clear – the 232 wrestlers in the WCW workforce were not all hired from the pool of 82 trainees at the Power Plant because 232 is larger than 82. Hence the labor market from which the 232 wrestlers were recruited consists of more than just the Power Plant trainees during 1996 – 2000, or else the list of 82 is incomplete, or perhaps both. Dr. Rasmussen's use of the entire workforce in lieu of new hires overlooks several difficulties, described next.

14. *Failure to Distinguish New Contracts, Renewal Contracts and Existing Contracts.* Dr. Rasmussen characterizes Exhibit A, a spreadsheet containing names of wrestlers and various dollar amounts of pay, as listing the wrestlers under contract with WCW between 1996 and 2000.[6] Some of these wrestlers may be "new hires" in the sense of signing their first contract with WCW sometime between 1996 and 2000. Others may have signed multi-year contracts prior to 1996, and their appearance in Exhibit A reflects either on-going service under an existing contract or a contract renewal, but not a "new hire." Almost surely, WCW's decision-making process for (i) selecting new wrestlers differs from the process for (ii) renewing prior contracts and the process for (iii) honoring contracts currently in effect. Dr. Rasmussen makes no allowance for these differences. Instead, he mistakenly treats the entire workforce – those who were newly hired during 1996 – 2000, those whose contracts were renewed during that time and those whose pre-1996 contracts spilled over into the period – all as though they were newly hired during that time. The use of WCW workforce statistics in this manner overstates the number of new hire decisions actually made by WCW during the 1996 – 2000 period, and is an unreliable guide to the racial composition of the people hired as wrestlers during this time.

understanding that this list does not contain information about the races of the people named, and that the information about race on which Dr. Rasmussen relies comes from one or more of the plaintiffs in these cases.
[6] Plaintiffs' Rule 26(a) (2) Disclosures of Expert Testimony of Dr. David W. Rasmussen, page 4.

15. *Failure to Account for Prior Experience and Success.*  Exhibit A lists a number of people who were "publicly famous in entertainment industries other than wrestling before they became involved with WCW."[7]  Among these are David Arquette, Karl Malone, Dennis Rodman and Reggie White.  Dr. Rasmussen labels these four individuals "disputed," and excludes them from several of his analyses.  His decision to exclude them is tacit recognition that their prior experience and success is relevant and should be a consideration in deciding which African American and non-African American wrestlers should be compared to one another in a hiring study.  Other wrestlers listed in Exhibit A may have prior experience and success with wrestling organizations other than WCW or with WCW itself.  Dr. Rasmussen does not account for these differences in prior experience and success in any of his studies, thus failing to compare wrestlers similarly situated with respect to their prior experience and success.

## Dr. Rasmussen Uses Inappropriate Statistical Models

16. In Table 2 of his report, Dr. Rasmussen compares the racial composition of 228 WCW wrestlers to each of a variety of benchmarks, expressing each disparity as a number of standard deviations based on a binomial probability model.  As an analysis of new hires, this comparison is misleading for reasons already given above, including the uncertainty of the labor market estimates and the uncertainty of the composition of the people about whom hiring decisions were made during the 1996 – 2000 period.  There is an additional error inherent in Table 2 that serves to inflate the numbers of standard deviations, namely the presumption in the statistical calculations that there were 228 (or, in Part B of Table 2, 232) hiring decisions.  While there may have been 228 (or 232) wrestlers on the payroll during those years, the number of hiring decisions made by WCW during that time was almost surely well less than that, due to contracts already in place as of the beginning of that period.  Were there, say, only a quarter of that number of actual new hire decisions made during that time period, the numbers of standard deviations shown in Table 2 would be cut approximately in half.  In particular, the composition of the new hires would be found, by Dr. Rasmussen's analysis, to be well less than two standard deviations away from his 13.4% benchmark, and hence to provide no indication that African-Americans were hired by WCW in disproportionately small numbers.

---

[7] Declaration of Bobby Walker, dated November 7, 2002.

17. In his Table 3 analysis, Dr. Rasmussen compounds this error. He presents a variation in which each of the 228 wrestlers included in his Table 2 is purportedly replicated by the number of years in which each received compensation during the period from 1996 through 2000. Thus, a person among the 228 who received compensation only in one year is counted once, a person who received payment in two years is counted twice, and so forth. In this fashion, the 228 individuals are multiplied up into a group of 681 "salary years." In Dr. Rasmussen's Table 3, the racial composition of this group of salary years is then compared to the benchmarks used in Table 2, again using a binomial probability model.

18. The binomial probability model is inapt for this purpose. One of the assumptions underlying this model is that each of the 681 salary years can reasonably be regarded as having been selected independently of all the others from a very large pool of salary years. But for an individual who has more than one salary year, it is quite obvious that the selection of the second and subsequent salary years derives from some pool *other than the one* from which that individual's first salary year was originally chosen; such decisions are ones of renewal rather than *de novo* selection. Indeed, for a wrestler who has a multi-year contract, there is no selection or renewal decision at all until the contract has run its course.

19. Dr. Rasmussen's method of analysis in Table 3 is a material misapplication of the binomial probability model, and should be accorded no evidentiary weight whatsoever.

*The Composition of WCW Wrestlers is Consistent with Dr. Rasmussen's 13.4% Estimate*

20. Dr. Rasmussen's hiring analysis comes down to a comparison of the representation of African Americans among the 228 (or, in his Table 2B, 232) WCW wrestlers to his estimate of the representation of African Americans in the labor pool from which he believes WCW should be expected to hire its wrestlers. As we discussed above, Dr. Rasmussen's most plausible estimate of the latter is that based on the list of 82 Power Plant trainees, namely 13.4%. As we also noted, there is a margin of error associated with that estimate because it is clearly not based on the entire labor market from which WCW hires. The margin of error from this source (and there are other possible sources of error, which could serve to widen this interval) runs from 6.9% to 22.7%. That is, based on the presumption that 11 out of 82 (13.4%) of the Power Point trainees are African American, it follows that the population from which these people

might be considered a representative sample is composed of African Americans to an extent somewhere in the range of 6.9% to 22.7%.

21. Dr. Rasmussen indicates that 17 of the 228 (7.5%) WCW wrestlers are African American (excluding the "famous ones," namely David Arquette, Karl Malone, Dennis Rodman and Reggie White). But since 7.5% lies within the range of 6.9% to 22.7%, there is no statistical indication here that African Americans have been hired in disproportionately small numbers. If one includes the "famous ones," the percentage rises from 7.5% to 8.6%, again well within the 6.9% to 22.7% confidence interval, again providing no support for the contention that African Americans received less than their fair share of wrestling jobs with WCW.

**Dr. Rasmussen's Pay Analysis**

22. Dr. Rasmussen contends that his report provides evidence of disparate treatment in pay by WCW to the disadvantage of African Americans. To address the merits of a disparate treatment claim concerning pay, one must identify a group of people similarly situated at some point in time in the past and compare the progression of their pay rates over time. Racial disparities in pay progression that cannot be explained by non-discriminatory factors, such as performance or generated revenue, would suggest disparate treatment in regard to pay decisions. Dr. Rasmussen does two analyses of pay. The first fails to produce a racial disparity that is statistically significant, and therefore provides no indication that African Americans were systematically paid less than other WCW wrestlers. His second analysis produces a statistically significant imbalance to the disadvantage of African Americans, but only because he misapplies a statistical test. When correct statistical models are applied to his data, they again produce no statistical indication that African Americans were systematically paid less than other WCW wrestlers. None of Dr. Rasmussen's pay studies identify wrestlers who were similarly situated with respect to their qualifications or past experience, nor do they account for non-discriminatory factors that may appropriately affect wrestlers' pay, such as talent, charisma, wrestling or athletic ability, or ability to generate revenue. These points are amplified below.

*Lack of Statistical Significance and Use of an Inappropriate Statistical Model*

23. Dr. Rasmussen asserts that there were ten wrestlers who, during the period from 1996 through 2000, earned $750,000 or more in a year, a group he calls "the salary elite." In all,

there were 29 instances ("salary years") in which these ten individuals earned $750,000 or more in a year during these five years. Dr. Rasmussen avers that since African Americans account for 7.5% of all salary years during this period, that "we expect that they should receive about that portion" of the 29 salary years in excess of $750,000, which works out to 2.18 salary years. He claims that in fact there were none,[8] and expresses the difference between 2.18 and 0 as a number of standard deviations, obtaining 1.18.

24. First, this result is not statistically significant. That is, the disparity between the expected number of 2.18 salary years and the actual number (according to Dr. Rasmussen) is within the range of variation one would reasonably expect of an employer that does not discriminate. Only if the disparity is greater than about two standard deviations is the inference raised that some factor other than chance may be contributing to the disparity. In this case, the disparity is only 1.18 standard deviations.

25. Second, Dr. Rasmussen has again misapplied the binomial probability model. That model rests on the assumption that the 29 salary years can reasonably be regarded as having been selected independently and at random from a large pool of salary years, 7.5% of which are associated with African Americans. But that is not a reasonable presumption for the same reasons discussed above in connection with Dr. Rasmussen's Table 3. A wrestler who is on a multi-year contract does not undergo "selection" in the years in which his contract assures him of retention. Thus, a wrestler who signs a contract assuring him of a salary in excess of $750,000 in 1997 and in 1998 makes only one deal with WCW that assures him two of Dr. Rasmussen's "elite" salary years, yet Dr. Rasmussen, through his use of the binomial model, counts that single transaction as two separate and independent negotiations. The binomial model is also inapt here because a wrestler who attains a salary level of $750,000 in one year is almost surely more likely to do it again the next year than is the typical wrestler who has never before attained that level. Yet the binomial model presumes that the attainment of a second or third elite salary year is no more probable than the attainment of the first. For these reasons, application of the binomial model in these circumstances produces unreliable results.

---

[8] For purposes of this analysis, Dr. Rasmussen leaves out the four "disputed" wrestlers, two of whom (Karl Malone and Dennis Rodman, both African American) were each paid more than $750,000 in one year.

*Faulty Statistical Reasoning and Another Use of an Inappropriate Statistical Model*

26. Dr. Rasmussen's analysis of the relative amount of time it takes for a wrestler's pay to reach $600,000 is likewise based on a misapplication of statistical reasoning. In Table 5, Dr. Rasmussen indicates that there are two African American wrestlers (B. Huffman and L. Huffman) whose salaries reached $600,000, and that they achieved these salaries after the Huffmans each wrestled for WCW for three years during the period from 1996 through 2000. Dr. Rasmussen's Table 5 indicates that there were two non-African American wrestlers (Goldberg and S. Rechsteiner) who likewise attained a $600,000 pay level after wrestling for WCW for three years during 1996 through 2000. Finally, his table indicates that there are ten other non-African American wrestlers whose pay topped $600,000 in some year during 1996 – 2000, but these wrestlers all previously wrestled for WCW during this period for less than three years.

27. Dr. Rasmussen analyzes these data using a sign test, and once again he has chosen the wrong statistical model for the situation. A sign test is a statistical procedure involving an analogy between a series of observed events that can be summarized as a sequence of plus and minus signs, and the results of tossing a fair coin a number of times in succession. Dr. Rasmussen notes that the three years associated with the two African American wrestlers is more than the number of years associated with ten of the non-African American wrestlers in Table 5, and that these differences can be interpreted as a sequence of minus signs. He concludes that the resulting sequence is "statistically significant with less than one chance in 100 that this could occur by chance alone." To obtain his sequence, he compares the Huffmans' three-year periods with the shorter period associated with each of ten other people in Table 5, noting that each such comparison produces a negative difference in numbers of years. Implicitly likening each of these ten comparisons to the toss of a coin, he then equates these results to a situation in which a coin tossed ten times in succession lands heads up every time. The probability of such an event, assuming the coin is fair, is less than one in 100, just as Dr. Rasmussen indicates, and so he concludes that it takes African American wrestlers statistically significantly longer to reach the $600,000 annual pay level than it does other wrestlers.[9]

---

[9] A probability of less than one in 100 is mathematically equivalent to an imbalance of more than 2.33 standard deviations. Hence, if this were a correct application of the sign test, it would have produced a result showing an imbalance in excess of two standard deviations. As noted in the text, it is not a correct application.

28. Several fallacies underlie this conclusion. First, Dr. Rasmussen does not account for the fact that there are also two non-African-American wrestlers (Goldberg and S. Rechsteiner) with whom, like the Huffmans, a three-year period is associated in his Table 5. He simply ignores these two wrestlers, though their numbers of years are identical to those of the Huffmans. This is clearly illogical and it biases the test in favor of a finding of statistical significance.

29. Consider an extreme case. Suppose that Table 5 contained 300 (instead of just two) white wrestlers each with an associated period of three years. That would surely indicate that three years is the norm, that the two Huffmans fit squarely within the norm, and that there must be something unusual about the ten white wrestlers with whom fewer than three years are associated. One certainly could not logically discard those 300 white wrestlers from the analysis, but that is exactly what Dr. Rasmussen's procedure would do, and he would reach the same conclusion that he does in his report.

30. A second fallacy underlying Dr. Rasmussen's analysis is that he compares the two Huffmans as a single entity against each one of the non-African American wrestlers individually (except for Goldberg and S. Rechsteiner, who, like the Huffmans, have three years associated with them). There is no logical basis for this asymmetric method of comparison. Either the comparisons should involve all possible combinations of individuals, or else they should be between groups of individuals. There is no logical basis for the comparison on which Dr. Rasmussen bases his test of statistical significance.

31. A third fallacy behind Dr. Rasmussen's salary analysis is that it makes little allowance for the qualifications or experience the wrestlers may have had prior to 1996, or with employers since 1996. Dr. Rasmussen tacitly acknowledges that this consideration is important, because he does exclude from his analysis four people whose pay in at least one year exceeded $600,000, but whose careers are unusual. Two of these people, Karl Malone and Dennis Rodman, both African American basketball stars, signed on with WCW. Malone earned more than $600,000 in his first year (1998) and Rodman earned more than $600,000 in his second year (1999). But for their exclusion on the basis of their prior fame, they would have been accorded 0 years and 1 year, respectively, in Dr. Rasmussen's Table 5. Two other people, Terry Bollea ("Hulk Hogan") and Randy Poffo earned over $600,000 in 1996, and though they

-12-

appear in Dr. Rasmussen's Table 5, they are not counted in his sign test, possibly in recognition of their pre-1996 accomplishments. But some of the other wrestlers named in Table 5 may also have prior experience serving to distinguish them from others on the list. For example, 11 people[10] listed on Table 5 each received pay from WCW in 1996, suggesting that their careers with WCW may have predated 1996, and therefore that some or all of their numbers of years to attain the pay rate of $600,000 shown in Table 5 may be understated.[11] As a result, Dr. Rasmussen's comparisons of the numbers of years wrestlers took to be paid at least $600,000 in a year shown in that table are not a reliable indication of differences in treatment based on race.

32. A proper analysis of the data in Dr. Rasmussen's Table 5 reveals that there is no statistically significant difference in the pattern of years associated with African Americans from that associated with the other wrestlers on the list. One such analysis notes that two out of twelve, or 16.7%, of the non-African American wrestlers are associated with three years, and asks how likely it is that the only two African-American wrestlers, consistent with such odds, would both be assigned three years. The answer to that question is one chance in 36, which equates to an imbalance of 1.91 standard deviations. This being less than two standard deviations, it raises no suggestion that race played a role in its creation.

33. Another such analysis, based on ranking the wrestlers in accord with their numbers of associated years, produces a racial imbalance of 1.51 standard deviations.[12] Again this difference, being less than two standard deviations, is of such small magnitude that it is within the range conventionally attributed to chance, and does not raise the inference that African American wrestlers on the list have, as a group, been treated any differently than the non-African Americans.

---

[10] Steven Borden, Page Falkinburg, Richard Fliehr, Bill Goldberg, Scott Hall, Booker Huffman, Lash Huffman, Kevin Nash, Lawrence Pfohl, Scott Rechsteiner and Roderick Toombs.

[11] Page Falkenburg's number of years is in fact understated. Falkenburg is shown in Table 5 as having waited one year to get to $600,000, but in fact he was paid in 1996 and 1998 (though not 1997), and then he surpassed the $600,000 level in 1999. This would seem to qualify him for at least a "2" in Table 5's Time-to-$600,000 column.

[12] This type of analysis is called a rank sum test. It is a well-known and widely accepted form of analysis, and it is applicable to the present circumstances.

34. As with his misapplications of the binomial probability model noted previously, Dr. Rasmussen has failed with his sign test to match a fact situation properly to its statistical abstraction. Such technical failures cause his probability and statistical significance calculations to be unreliable, and improperly grounded in the methods and procedures of science. These technical failures are quite distinct from issues related to the completeness and correctness of his data and the relevance to this litigation of the issues he investigates.

**Conclusion**

35. Dr. Rasmussen's analyses are far removed from the types that permit a convincing indication of disparate treatment in hiring and pay. Instead of comparing new hires to applicants, he compares the entire group of WCW wrestlers to trainees at the Power Plant wrestling school. Instead of comparing the rates of pay or pay advancement for wrestlers similarly situated at some point in time, he analyzes the "salary years" and a dubious measure of time-to-salary of a so-called "salary elite." Thus, his comparisons have little or no connection to the issues of interest in these cases.

36. Correcting Dr. Rasmussen's several statistical modeling errors, and taking account of the uncertainty in his labor force estimates, one finds that his studies, properly interpreted, provide no statistical indication that African Americans were treated any differently by WCW than were other similarly situated applicants and contract wrestlers.

David W. Peterson
November 19, 2002

-14-

**Sources**

Declaration of Bobby Walker, dated 11/07/2002

Second Amended Complaint in the matter of Bobby Walker v. World Championship Wrestling,
Inc, and Turner Sports, Inc., dated April 27, 2001

Plaintiffs' Rule 26(a)(2) Disclosures of Expert Testimony of J. Steve Hicks, dated 06/26/2002

Plaintiffs' Rule 26(a)(2) Disclosures of Expert Testimony of Statistician, dated 08/02/2002

Plaintiffs' Second Amended Supplemental Response to Initial Disclosures Providing Expert
Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(2), dated 11/06/2002

Excel spreadsheet labeled Wrestler Earnings.xls

**Retention Terms**

David W. Peterson is retained through Peopleclick, Inc. which bills his time on this project at the
hourly rate of $390.

**Publications and Qualifications**

Dr. Peterson's resume, listing his publications and professional affiliations is attached.

**Previous Testimony**

A list of cases in which Dr. Peterson has testified at trial or by deposition since January 1, 1996 is
attached.

David W. Peterson

DAVID WEST PETERSON

1942 Rock Rest Road                                      Home: 919-542-6937
Pittsboro, North Carolina 27312                          Office: same

Personal:  Born 1940, U.S.
           Married, two children

Higher Education:

| | |
|---|---|
| B.S., University of Wisconsin at Madison, 1962 | ) |
| M.S., Stanford University, 1963 | ) |
| Ph.D., Stanford University, 1965 | )Electrical Engineering |

Employment History:

| | |
|---|---|
| 1960 | Engineering Trainee, General Electric Company |
| 1961-62 | Research Assistant, Computer Laboratory, Department of Electrical Engineering, University of Wisconsin |
| 1962-63 | Member, Technical Staff, Hughes Aircraft Company |
| 1963-65 | Research Assistant, Systems Laboratory, Stanford University |
| 1965-67 | Mathematician and Hybrid Simulation Project Officer, U.S. Army Electronics Command, Fort Monmouth, NJ |
| 1967-70 | Assistant Professor of Quantitative Methods, Northwestern University Graduate School of Management |
| 1970-73 | Associate Professor of Managerial Economics and Decision Sciences, Northwestern University Graduate School of Management |
| 1971-72 | Research Fellow, International Institute of Management, Berlin |
| 1973 | Visiting Lecturer, Systems Engineering, University of Illinois at Chicago Circle (spring quarter) |
| 1973-84 | Professor, Graduate School of Business Administration, Duke University, Durham, NC |
| 1979-2000 | President, PRI Associates, Durham, NC |
| 1982-86 | Senior Lecturer, Duke Law School |
| 1984-89 | Adjunct Professor, Graduate School of Business Administration, Duke University, Durham, NC |
| 1989-94 | Adjunct Professor, Institute for Statistics and Decision Sciences, Duke University, Durham, NC |
| 2000-02 | Senior Vice President, Peopleclick, Inc., Raleigh, NC |

A - 1

David W. Peterson

Various consulting activities undertaken for the U.S. Public Health Service, U.S. Army Electronics Command, and numerous private corporations, law firms and governmental agencies.

Languages:

> English (native)
> German (working knowledge)
> Some French, Russian and Chinese

Professional Memberships:

> Institute for Electrical and Electronic Engineers
> Econometric Society
> The Institute of Management Sciences
> The American Statistical Association

Professional Publications:

Numerous technical articles published in internationally circulated journals, treating topics in the theory and application of mathematical modeling in areas such as radio propagation, control of economic systems, optimization of static and dynamic systems, statistical decision making, the measurement of employment opportunity equality, and the detection of computer code theft.

Professional Speaking Engagements:

Technical papers read at meetings of the IEEE Man, Systems and Cybernetics Group, the Econometric Society, The Institute for Management Sciences and the American Statistical Association. Many semi-technical engagements in the U.S., Europe and the Middle East, generally pertaining to mathematical modeling applications in management. Speaker at numerous seminars for lawyers dealing with statistical applications in litigation.

Long Term Professional Interest:

To be involved in the analysis of situations of a managerial, economic or engineering nature, requiring a carefully chosen blend of mathematics and computation. This involvement may be in the form of performing the analysis, teaching others to perform it, or supervising others as they perform it. A combination of the three would be ideal.

David W. Peterson

Amplifying Remarks:

While at Stanford University I was involved in a project whose chief aim was to analyze radar return data to discriminate among different types of vehicles entering the atmosphere. Problems of primary concern in this project were data processing speed and discrimination accuracy.

While at Fort Monmouth I was involved in two major types of activities. The first was the construction and analysis of models describing very-low-frequency electromagnetic propagation in the earth-atmosphere-ionosphere system and in the lithosphere. The first-named involved the construction of a model and the estimation of its parameters using data gathered as part of the project. The second-named was primarily a theoretical study. Both resulted in professional publications.

The second major project with which I was associated was the simulation of various helicopter fire control systems on a large scale hybrid computer. In this project I was responsible for the construction of a model of a fire control computer, for the stochastic subroutines associated with the simulation, and for various subroutines involving the generation of certain artificial images for the benefit of the pilot. The system simulated was comprehensive in that it included the pilot and a gunner (both of them live) and a cockpit with a visual display consisting of a television-scanned terrain belt on which were superimposed artificially-generated data relating target  size and location to the trajectories of tracer rounds. The challenge in this task was to simulate the aircraft flight dynamics, the tracer round trajectories and the feel of the aircraft on the pilot and co-pilot controls, to within acceptable tolerances, subject to limitations on computer memory and computational speed.

At Northwestern I taught courses in mathematical programming, elementary probability and statistics, computer programming and applications, and optimal control to graduate students in management, attracting some students from economics, computer science and industrial engineering.

My research interests have been in establishing a logical-mathematical foundation for information theory, and the construction and analysis of dynamic econometric models. A year spent at the International Institute of Management in Berlin enabled me to bring to publishable form the results of several investigations in these areas, as well as to make personal and professional acquaintances in several European and Middle Eastern communities.

While at Duke my activities in the early years were directed toward improving the quality and volume of research of junior faculty, to developing an expanded Ph.D. program, to revising the MBA curriculum, and to exploring and developing bases on which GSBA faculty and students can interact with faculty and administrators in various departments outside the GSBA. I developed a special interest in the application of statistical methods to the measurement of the equality with which an employer extends employment opportunities to employees of differing ages, sex or ethnicity. These activities led to several publications, speaking engagements and consulting assignments, and to the formation of PRI Associates.

A - 3

David W. Peterson

Other work experience includes:

a.    the formulation of a plan for a national health data information center, and for its process of creation

b.    the design of a computer-based inventory management system for a $50M per year mail-order firm

c.    the provision of statistical advice to researchers studying the effects on costs and services of a merger of nine hospitals in Arizona

d.    the provision of criticism, advice and encouragement to researchers establishing a methodology for evaluating the effects of different types of care extended to elderly Americans

e.    consultation with legal teams on the structuring of statistical data presented at judicial proceedings involving employment discrimination

f.    formation of PRI Associates, Inc., providing statistical consultation services on matters pertaining to the use of statistical methods in litigation, and on matters related to software development

David W. Peterson

Bibliography:

1.  Ilt--Inverse LaPlace Transform, IBM 1620 Digital Computer Program, IBM Program Information Department Library File Number 6.0.164, September, 1964.

2.  Discriminant Functions--Properties, Classes, and Computational Techniques, Ph.D. thesis, Rept. SU-SEL-021, Technical Report 6761-2, Stanford Electronics Laboratories, Stanford, California, April 1965.

3.  A Theorem on Decision Boundaries, *Proceedings of the 12th Annual Conference of Army Mathematicians*, Dartmouth College, Hanover, New Hampshire, June 22-23, 1966 with K. A. Belser.

4.  A Method of Finding Linear Discriminant Functions for a Class of Performance Criteria, *IEEE Transactions on Information Theory*, IT-12, No. 3, July, 1966, pp. 380-387, with R. L. Mattson.

5.  A Theorem on Single Sample Confidence Intervals, 13th Annual Conference of Army Mathematicians, Fort Monmouth, New Jersey, June 7-8, 1967. Also, *Proceedings of the IEEE*, Vol. 55, No. 9, September 1967, pp. 1637-1638, (Correspondence).

6.  The Mathematics of Information--A Critique, paper read at the U.S. Army Electronics Command Advanced Planning Briefing and Technical Symposium, Fort Monmouth, New Jersey, March 7, 1968.

7.  A Model for Electromagnetic Propagation in the Lithosphere, *Proceedings of the IEEE*, Vol. 56, No. 5, May 1968, pp. 799-804, with F. H. Schwering and S. B. Levin.

8.  A Proposed Method for Predicting the Phase Behavior of a VLF Radio Signal, *Journal of Atmospheric and Terrestrial Physics*, Vol. 31, 1969, pp. 225-232.

9.  Using the Maximum Principle and a Hybrid Computer for Production Planning, with Robert R. Gann, *Proceedings of the American Institute for Decision Sciences Meeting*, New Orleans, Louisiana, October 1969.

10. Some Convergence Properties of a Nearest Neighbor Decision Rule, Record of the IEEE Systems Science and Cybernetics Conference, October, 1968, San Francisco, also *IEEE Transactions on Information Theory*, Vol. IT-16, No. 1, January 1970, pp. 26-31.

11. A Stabilizing Transformation for Numerical Solution of Maximum Principle Problems, with R. Gann, *IEEE Transactions on Automatic Control* (correspondence), Vol. 15, No. 6, December 1970, pp. 686-687.

David W. Peterson

12. A Sufficient Maximum Principle, *IEEE Transactions on Automatic Control* (correspondence), February 1971, Vol. 16, No. 1, pp. 85-86.

13. Optimal Control and Monetary Policy, with E. M. Lerner, *International Economic Review*, Vol. 12, No. 2, June 1971.

14. The Response of Prices and Income to Monetary Policy: An Analysis Based Upon a Differential Phillips Curve, with E. M. Lerner and E. J. Lusk, *Journal of Political Economy*, Vol. 19, No. 4, July/August 1971, pp. 857-866.

15. Equitability in Multi-Agent Dynamic Systems: The Case of Two Agents and Four States, presented at the European Econometric Society Meeting, Barcelona, September 1971, published in revised form in the *Nigerian Journal of Quantitative Economics*, Vol. 1, No. 1, March 1975, pp. 33-58.

16. Equitability in Multi-Agent Dynamic Systems: The Case of m Agents and nm States, *Proceedings of the Joint Conference on Major Systems*, Sponsored by IEEE Systems, Man and Cybernetics Group and by ORSA, Anaheim, California, October 1971.

17. Comments on "Economics of Information Systems," by Jacob Marschak, in *Frontiers of Quantitative Economics*, M. Intriligator, ed., North-Holland Publishing Company, Amsterdam, 1971, pp. 107-108.

18. The Economic Significance of Auxiliary Functions in Optimal Control, presented at the Econometric Society North American Meeting, August 1971, *International Economic Review*, Vol. 14, No. 1, February 1973, pp. 1-19.

19. A Review of Constraint Qualifications in Finite Dimensional Spaces, *SIAM Review*, Vol. 15, No. 3, July 1973, pp. 639-654.

20. Some Relationships Between Hierarchical Systems Theory and Certain Optimization Problems, with Y. M. I. Dirickx and L. P. Jennergren, presented at the IEEE Systems, Man and Cybernetics Group Conference, Washington, D. C., October 1972; *IEEE Transactions on Systems, Man and Cybernetics*, Fall 1973.

21. On Sensitivity in Optimal Control Problems, *Journal of Optimization Theory and Applications*, Vol. 13, No. 1, January 1974, pp. 56-73.

22. Toward a Mathematical Definition of Information, *Proceedings of the Sixth Annual Southeastern Symposium on System Theory*, February 1974.

23. On Dynamic Behavior of the Regulated Firm, with James Vander Weide, presented at the Econometric Society Winter Meetings, 1974, revised March 1975.

A - 6

David W. Peterson

24. Transferring Ideas from Engineering to the Social Sciences, *Proceedings of the IEEE*, Vol. 63, No. 3, pp. 354-359, March 1975.

25. Trader-Commodity Parity Theorems, with D. Graham, P. Jennergren, and R. Weintraub, *Journal of Economic Theory*, Vol. 12, No. 3, June 1976.

26. A Note on the Optimal Investment Policy of the Regulated Firm, with J. H. Vander Weide, *Atlantic Economic Journal*, Vol. IV, No. 3, Fall 1976, pp. 51-55.

27. A Strategy which Maximizes the Geometric Mean Return on Portfolio Investments, with S. F. Maier and J. H. Vander Weide, *Management Science*, Vol. 23, No. 10, June 1977, pp. 1117-1123.

28. A Monte Carlo Investigation of Characteristics of Optimal Geometric Mean Portfolios, with Steven F. Maier and James H. Vander Weide, invited paper, presented at a joint session of the Econometric Society and the American Finance Association Winter Meeting, 1974, revised and published in the *Journal of Financial and Quantitative Analysis*, June 1977, pp. 215-233.

29. Quadraticity and Neutrality in Discrete Time Stochastic Linear Quadratic Control, with Carole Aldrich, *Automatica*, Vol. 13, 1977, pp. 307-312.

30. The Coordination of Short-Run Decision Making with Long-Range Planning, with D. Loughridge and W. Damon, *Omega*, Vol. 4, No. 6, 1977, pp. 1-12.

31. On the Estimation of the Racial and Sexual Composition of the Labor Force Available to an Employer, in *Perspectives on Availability*, Equal Employment Advisory Council, August 1978.

32. A Review of Direct Sufficiency Conditions in Optimal Control Theory, with J. Zalkind, *International Journal of Control*, Vol. 28, No. 4, 1978, pp. 589-610.

33. An Analytic Framework for Evaluating Rolling Schedules, with K. Baker, *Management Science*, Vol. 25, No. 4, April 1979, pp. 341-351.

34. *Use of Statistics in Equal Employment Opportunity Litigation*, with Walter B. Connolly, Jr., New York Law Journal Seminars Press, February 1980 (1982, 1983, 1985, 1987, 1988, 1989, 1991, 1992, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001).

35. Pitfalls in the Use of Regression Analysis for the Measurement of Equal Employment Opportunity, *Journal on Policy Analysis and Information Systems*, Vol. 5, No. 1, March 1981, pp. 43-65.

36. An Empirical Bayes Estimate of Market Risk, with S. F. Maier and J. H. Vander Weide, *Management Science*, Vol. 28, No. 7, July 1982, pp. 728-737.

David W. Peterson

37. Measurement Error, Regression and Equal Employment Opportunity, in *Statistical Evidence of Discrimination*, D. H. Kaye and M. Aickin, eds., Marcel Dekker, New York, 1986.

38. Measuring Pass-Fail Employment Test Impact Disparities, presented at the joint National Meeting of ORSA/TIMS, October 1982.

39. A Regression Specification Test Based on Observation Exchanges, presented at the American Statistical Association meetings, August 1984, Philadelphia, PA. Revised June 1985.

40. *Law and Contemporary Problems*, Vol. 46, Autumn 1983, No. 4, Special Editor for the Symposium on Statistical Inference in Litigation.

41. Data Acquisition and Analysis, in *Statistical Evidence in Litigation*, David W. Barnes and John Conley, Little, Brown, Boston 1986.

42. Trial by Regression:  Detecting and Measuring Disparate Treatment in Employment Discrimination Litigation, presented at the American Statistical Association meetings, August 1986, Chicago, IL.

43. The Role of Experts in Software Infringement Cases, with John M. Conley, *Georgia Law Review*, Vol. 22, No. 2, Winter 1988, pp. 425-468.  Reprinted in *Computer Law & Practice*, Vol. 5, No. 3, pp. 99-110 (Part 1) and Vol. 5, No. 4, pp. 147-153 (Part 2).

44. Court-Imposed Methodological Constraints:  An Employment Discrimination Example, with John M. Conley, presented at the American Statistical Association meetings, August 6-9, 1990.

45. The Employment Discrimination Case of Bayes v. Fisher, presented at the Second International Conference on Forensic Statistics, Arizona State University, Tempe, AZ, May 19-21, 1993.

46. When Ethical Systems Collide:  The Social Scientist and the Adversary Process, with John M. Conley, in Kniffka, Hannes, *Recent Developments in Forensic Linguistics*, Peter Lang, Frankfurt am Main, 1996, pp. 345-358.

47. Review of Daniel L. Rubinfeld's Reference Guide on Multiple Regression in the Federal Judicial Center's 1994 Reference Manual on Scientific Evidence, *Jurimetrics*, Vol. 36, No. 2, Winter 1996, pp. 213-216.

48. Science of Gatekeeping:  The Federal Judicial Center's New Reference Manual on Scientific Evidence, with John M. Conley, *North Carolina Law Review*, Vol. 74, No. 4, April 1996, pp. 1183-1223.

David W. Peterson

49. Pay Discrimination Models, *Journal of Forensic Economics*, Vol. 12, No. 2, Spring/Summer 1999, pp. 111-124.

50. Of Cherries, Fudge and Onions: Science and its Courtroom Perversions, with John M. Conley, *Law and Contemporary Problems*, Vol. 64, No. 4, Autumn 2001, pp. 213-240.

51. In Quest of the Perfect P-Value, *Journal of Forensic Economics*, forthcoming.

David W. Peterson

Newsletter Articles:

1. Measurement of Age Discrimination, *Personnel Research Report*, Vol. 1, No. 1, July 1981.

2. Measurement Error, Regression, and Equal Employment Opportunity, *Personnel Research Report*, Vol. 1, No. 2, October 1981.

3. Notes on Statistical Proof: Rebuttal and Cumulative Impact, *Personnel Research Report*, Vol. 1, No. 3, January 1982.

4. Age Profiles and Workforce Reductions: Some Basic Relationships, *Personnel Research Report*, Vol. 2, No. 1, July 1982.

5. Statistical Models and Employer Discretion, *Personnel Research Report*, Vol. 2, No. 2, October 1982.

6. Binomial v. Hypergeometric Employee Selection Models, *Personnel Research Report*, Vol. 2, No. 4, April 1983.

7. Preponderance of Evidence, P-values and Standard Deviations, *Personnel Research Report*, Vol. 3, No. 1, October 1983.

8. Age Patterns in Employee Flow, *Personnel Research Report*, Vol. 3, No. 2, April 1984.

9. Testing the Plausibility of A Regression, *Personnel Research Report*, Vol. 3, No. 3, July 1984.

10. Workforce Reductions: A Time for Preventive Statistics, *PRI Report*, Vol. 4, No. 3, October 1985.

11. Data Acquisition for Litigation (Part 1 & II), *PRI Report*, Vol. 5, No. 1, April 1986, Vol. 5, No. 3, March 1987.

12. Underutilization: The Small Group and Large Group Problems, and a Proposed Solution to Both, *PRI Report*, Vol. 5, No. 2, July 1986.

13. Calculating Mitigated Lost Earnings, *PRI Report*, Vol. 5, No. 4, June 1987.

14. Using Computers to Prepare Evidence, *PRI Report*, Vol. 6, No. 1, October 1987.

15. Samples, Populations and the Whole Universe, *PRI Report*, Vol. 6, No. 2, July 1988.

16. Lost Future Income: Calculating Expected Present Values, *PRI Report*, Vol. 6, No. 3, October 1988.

David W. Peterson

17. Detecting Discrimination in Peremptory Challenges, *PRI Report*, Vol. 6, No. 4, December 1990.

18. One Tail or Two? Or Does it Really Matter?, *PRI Report*, Vol. 7, No. 1, June 1991.

19. The Worst of Ten is Pretty Bad, *PRI Report*, Vol. 8, No. 1, July 1997.

20. Standard Deviation Calculations: A Refinement for Small Numbers, *PRI Report*, Vol. 8, No. 3, May 1998.

21. What Does a Regression Analysis Really Show?, *PRI Report*, Vol. 8, No. 4, November 1998.

22. Compensation Analysis à la OFCCP, *PRI Report*, Vol. 9, No. 2, March 2000.

23. Compensation Analysis: Accounting for Employer Latitude in Setting Pay, *The Report*, Vol. 1 No. 1, February 2001.

24. A Regression Example for Those Who Still Believe in it, *The Report*, Vol. 1 No. 3, August 2001.

25. Normal Equivalent Standard deviations, *The Report*, Vol. 1 No. 4, March 2002.

## Cases in which David W. Peterson has Testified at Trial or by Deposition

### Cases Involving Testimony Since January 1, 1996

| Case Name | Depo or Trial | Date | Venue |
|---|---|---|---|
| Albers v. Provident Mutual Life Insurance Co., et al. | Deposition | 3/13/02 | Telephone |
| Allen, et al. v. Entergy & AP&L | Deposition | 1/30/97 | Little Rock, AR |
| American Cyanamid v. Impact Profiles v. Phoenix Marketing Group | Deposition Trial | 7/25/95 4/30-5/1/98 | New Jersey |
| Bayless v. Hallmark Marketing, Inc. | Deposition | 11/1/99 | Durham, NC |
| Bleimehl v. Eastman Kodak Company 4-93-CV-30802 | Deposition Trial | 5/4/96 5/20/96 | Telephone USDC SD IA Des Moines, IA |
| Bryant et al. v. Food Lion 2-90-0505-1 | Deposition Trial | 3/2/93 5/29/97 | Columbia, SC USDC D SC Charleston SC |
| Burns, et al., v. Control Data Corporation | Deposition | 5/23/96 | Washington DC |
| CMAC v. Robert F. deCastro, Inc. et al. 97-0514 | Deposition Trial | 8/17/98, 9/1/98 11/10/98, 11/12/98 | Metairie, LA USDC ED LA New Orleans |
| Colunga v. Hercules et al. 89-C-954B | Trial | 3/21/97 | USDC D UT Salt Lake City |
| Cromartie et al. v. Hunt et al. CV-104-H2 | Deposition Trial | 9/20/99 12/1/99 | Raleigh, NC USDC Raleigh |
| Daniel v. Entergy, et al. | Deposition | 9/5/00 | |
| Dyer et al. v. Publix Super Markets, Inc. | Deposition | 4/15, 19, 20/98; 5/5/98 | |
| Evers et al. v. University of Cincinnati, C-1-95-259 | Deposition Trial | 5/15/96 6/7/96 | Cincinnati, OH. USDC SD OH Judge Weber |
| Hamblin, et al. v. Alliant Techsystems | Deposition | 9/16-17/98 | |
| Holly Mathers et al. v. Northshore Mining Co. | Deposition | 6/24/02 | Raleigh, NC |

B - 1

| | | | |
|---|---|---|---|
| Hoops, *et al. v.* Elk Run Coal Company | Deposition | 2/1, 3, 7/00 | Charleston, WV |
| Kovacevich *v.* Kent State University | Deposition | 5/31/01 | Raleigh, NC |
| Leal *v.* Baptist Health System | Deposition | 9/15/98 | San Antonio |
| McManus *v.* Washington Gas Light Co. 90-3169 (RCL) | Trial | 8/14/96 | USDC DC Judge Lambert |
| Miller *v.* Aristech, 94-1921 | Trial | 1/13/98 | USDC WD PA |
| Nolin *et al. v.* Orange Co. | Deposition | 1/6/97 | Durham, NC |
| Replacements, Ltd. *v.* SKC, Inc. | Deposition | 8/10/99 | Greensboro NC |
| Robert McLaughlin *v.* Rhone-Poulenc Ag Company, Inc. *et al.* | Deposition | 6/8/00 | Durham, NC |
| Shapira *v.* Lockheed Martin Energy Systems, Inc. | Deposition | 9/19/97 | Durham, NC |
| United States *ex rel.* Brett Roby *v.* The Boeing Company | Deposition | 2/8/00 | Washington DC |
| Wales *et al. v.* Jack M. Berry, Inc. | Trial | 5/22/98 | Tampa, FL |
| Wilfong, *et al. v.* Rent A Center | Deposition | 10/31/01 | St. Louis, MO |

B - 2

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Walker v. World Championship Wrestling, Inc., Turner Sports,
   Inc. and Turner Broadcasting System, Inc., Civ. File No.
   1:00-CV-0367-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports, Inc.
   and Turner Broadcasting System, Inc., Civ. File No. 1:00-
   CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner Sports,
   Inc. and Turner Broadcasting System, Inc., Civ. File No.
   1:00-CV-0369-CC
Easterling v. World Championship Wrestling, Inc. and Turner
   Sports, Inc. and Turner Broadcasting System, Inc., Civ.
   File No. 1:00-CV-1715-CC
Davis v. World Championship Wrestling, Inc. and Turner Sports,
   Inc. and Turner Broadcasting System, Inc., Civ. File No.
   1:00-CV-1716-CC
Worthen v. World Championship Wrestling, Inc. and Turner Sports,
   Inc. and Turner Broadcasting System, Inc., Civ. File No.
   1:00-CV-1717-CC
Speight v. World Championship Wrestling, Inc. and Turner Sports,
   Inc. and Turner Broadcasting System, Inc., Civ. File No.
   1:00-CV-1718-CC
Saengsiphan v. World Championship Wrestling, Inc. and Turner
   Sports, Inc. and Turner Broadcasting System, Inc., Civ.
   File No. 1:00-CV-1719-CC
Reeves v. World Championship Wrestling, Inc. and Turner Sports,
   Inc. and Turner Broadcasting System, Inc., Civ. File No.
   1:00-CV-1720-CC
Patterson v. World Championship Wrestling, Inc., Turner Sports,
   Inc., Turner Entertainment Group, Inc. and Turner
   Broadcasting System, Inc., Civ. File No. 1:01-CV-1152-CC

CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of

*DEFENDANTS' NOTICE OF FILING EXPERT WITNESS REPORT* upon the

interested parties by hand-delivery to:

Cary Ichter
Kelly Jean Beard
Charles J. Gernazian
Michelle M. Rothenberg-Williams
MEADOWS, ICHTER AND BOWERS, P.C.
Eight Piedmont Center, Suite 300
3525 Piedmont Road
Atlanta, GA  30305


This 20th day of November, 2002.

_____
Evan H. Pontz
Georgia Bar No. 583577


TROUTMAN SANDERS LLP
Bank of America Plaza
600 Peachtree Street, N.E.
Suite 5200
Atlanta, GA  30308-2216
(404) 885-3000 (voice)
(404) 885-3995 (facsimile)